## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

|  |  |
|---|---|
| SERGIO NAVARRO, THERESA GAMAGE, DAYLE BULLA, and JANE KINSELLA, on their own behalf, on behalf of all others similarly situated, and on behalf of the Wells Fargo & Company Health Plan and its component plans, | |
| Plaintiffs, | Civil Action No. 24-cv-3043 |
| v. | |
| WELLS FARGO & COMPANY, MICHAEL BRANCA, MARK HICKMAN, DREW WINELAND, DAVID GALLOREESE, BEI LING, and DOES 1-20 | |
| Defendants. | |

## CLASS ACTION COMPLAINT

Plaintiffs Sergio Navarro, Theresa Gamage, Dayle Bulla, and Jane Kinsella, individually, on behalf of all others similarly situated, and on behalf of the Wells Fargo & Company Health Plan (the "Plan"), bring this action under 29 U.S.C. § 1132 against Defendants Wells Fargo & Company, Michael Branca, Mark Hickman, Drew Wineland, David Galloreese, Bei Ling, and Does 1-20, for breaches of fiduciary duties and engaging in prohibited transactions under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001-1461, and state and allege as follows:

1.      Congress enacted ERISA in the wake of several high-profile scandals involving employers that mismanaged their employee benefits programs.     This

- 1 -

mismanagement had inflicted millions of dollars of harm on employees and their dependents.  ERISA was designed to put an end to this mismanagement and to protect the interests of employee benefit plan participants.  It does so by "establishing standards of conduct, responsibility, and obligation for fiduciaries of employee benefit plans," and by providing plan participants and beneficiaries with "appropriate remedies, sanctions, and ready access to the Federal courts" when plan fiduciaries mismanage ERISA plans.  29 U.S.C. § 1001(b).  Courts have referred to ERISA's fiduciary duties as "the highest known to the law."

2.     ERISA subjects anyone with discretionary authority over an employee-benefits plan to fiduciary duties derived from the law of trusts.  Relevant here, ERISA's "duty of prudence" requires fiduciaries to act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B).  Among other things, ERISA's duty of prudence requires plan fiduciaries to make a diligent effort to compare alternative service providers in the marketplace, negotiate prudently on behalf of the plan, and continuously monitor plan expenses to ensure that they remain reasonable and appropriate under the circumstances. In addition, ERISA's "duty of loyalty" requires fiduciaries to discharge their duties for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administering the plan.

3.     This case involves mismanagement of prescription-drug benefits.  Over the past several years, Defendants breached their fiduciary duties and mismanaged Wells

Fargo's prescription-drug benefits program, costing their ERISA plan and their employees millions of dollars in the form of higher payments for prescription drugs, higher premiums, higher out-of-pocket costs, and lower wages or limited wage growth. Defendants' mismanagement is evident from, among other things, the prices it agreed to pay one of its vendors—its Pharmacy Benefits Manager ("PBM")—for many generic drugs that are widely available at drastically lower prices. For example, someone with a 90-unit prescription for the generic drug fingolimod (the generic form of Gilenya, used to treat multiple sclerosis) could fill that prescription, *without even using their insurance*, at Wegmans for $648, ShopRite for $677.68, Rite Aid for $891.63, Walmart for $895.63, or from Cost Plus Drugs online pharmacy for $875.09. Defendants, however, agreed to make the Plan and its participants/beneficiaries pay ***$9,994.37*** for each 90-unit fingolimod prescription. The burden for that overpayment falls on both the Plan and its participants/beneficiaries. The Plan itself pays most of the agreed amount from Plan assets, while Plan participants/beneficiaries pay more in the form of increased premiums and increased out-of-pocket costs. No prudent fiduciary would agree to make its plan and participants/beneficiaries pay a price that is *fifteen times* higher than the price available to anyone who just walks into a pharmacy and pays without using their insurance.





4.     The roughly $9,000 (per-prescription) difference between what pharmacies pay to acquire fingolimod and what Defendants agreed to make the Plan and

participants/beneficiaries pay for the exact same drug goes largely into the pockets of the Plan's PBM (Express Scripts), at the expense of the Plan and its participants/beneficiaries.

5.      Discrepancies like this exist for dozens of drugs under the Plan.  For example, as explained in greater detail below, Defendants designated approximately 300 generic drugs as "preferred" drugs that participants/beneficiaries are encouraged to use.  Across all such "preferred" drugs for which there is publicly available data on average acquisition costs, Defendants agreed to make the Plan and its beneficiaries pay, on average, a markup of *114.97%* above what it costs pharmacies to acquire those same drugs.  In other words, for drugs that Defendants themselves designate as "preferred" choices for Plan participants/beneficiaries,  Defendants  agreed  to  make  the  Plan  and  its participants/beneficiaries pay, on average, *more than twice* as much as Express Scripts (or the pharmacy owned by Express Scripts, called Accredo) paid for those very same drugs.

6.      For another example, as explained in greater detail below, certain generic and branded drugs are designated as "specialty" drugs based on the conditions they treat or other factors.  An analysis of Defendants' prices for the generic drugs designated as specialty on a publicly available formulary managed by Express Scripts reveals a pattern of unreasonable markups.  Across all generic-specialty drugs on the formulary for which there is publicly available data on average acquisition costs, Defendants agreed to make the Plan and its beneficiaries pay, on average, a markup of *383%* above what it costs pharmacies to acquire those drugs.  In other words, Defendants agreed to make the Plan and its beneficiaries pay, on average, roughly *5 times* as much as Express Scripts or Accredo paid for those very same drugs.

7.     Defendants also agreed to terms under which Plan participants/beneficiaries are required to obtain some of their prescriptions from Accredo, the mail-order pharmacy that Express Scripts owns, even though that pharmacy's prices are routinely higher than the prices at other pharmacies.   For example, Defendants agreed to require a Plan participant/beneficiary seeking to obtain one tube of the generic drug bexarotene (used to treat a form of lymphoma) to use Accredo instead of going to a retail pharmacy, even though this would result in the Plan paying thousands of dollars more due to the high prices at Accredo.  Specifically, bexarotene gel is available for a cash price (*i.e.*, without using insurance) of $3,750 at Rite Aid, $4,129 at Wegmans, $7,256 at Walgreens, and $10,310.07 at Cost Plus Drugs, but costs ***$69,806.75*** from Accredo.  In short, Defendants are steering Plan participants/beneficiaries toward an option that, for many drugs, wastes thousands of dollars in Plan assets while enriching Express Scripts by that same amount.  This fiduciary mismanagement has resulted in higher costs for the plan, higher premiums for participants/beneficiaries including Plaintiffs, and higher out-of-pocket costs for those required to use Accredo to fill their prescriptions.

8.     Defendants also agreed to pay excessive administrative fees to Express Scripts.  Fiduciaries conducting negotiations on behalf of plans as big as Wells Fargo's have substantial bargaining power and, when acting prudently, can obtain low rates compared to smaller plans with less bargaining power.  Defendants, however, squandered that bargaining power, agreeing not only to make the Plan and its participants pay Express Scripts unreasonably high prices for prescription drugs, but also to pay excessive administrative fees to Express Scripts.  According to its most recent Form 5500 filing,

Defendants paid over $25 million in administrative fees to Express Scripts in 2022, or $135.81 per participant.  That amount greatly exceeds the per-participant fees paid to Express Scripts by plans comparable in size and smaller than Wells Fargo's plan.  These excessive fees have resulted in higher costs for the plan and higher premiums for participants/beneficiaries, including Plaintiffs.

9.      Defendants failed to satisfy their fiduciary obligations at multiple steps in the process of administering prescription-drug benefits.   Defendants failed to exercise prudence and failed to act in the interest of participants and beneficiaries in selecting a PBM, in agreeing to make Wells Fargo's ERISA plan and its participants/beneficiaries pay unreasonable prices for prescription drugs based on unreasonable methodologies, in agreeing to pay excessive fees to Express Scripts, in agreeing to contract terms with Express Scripts that needlessly allows Express Scripts to enrich itself at the expense of the Plan and its participants/beneficiaries, in failing to monitor Express Scripts and the prices charged for prescription drugs, in failing to address conflicts of interest, in failing to actively manage and take reasonable measures oversee key aspects of the company's prescription-drug program, and failing to take available steps to rein in Express Scripts' profiteering, protect plan assets, and avoid unnecessary costs to participants and beneficiaries and protect their interests.

10.      The price discrepancies noted herein are illustrative of a pervasive and systematic problem of unreasonable prescription drug charges, despite well-known alternatives available to Defendants. Among other things, Defendants should have: used their bargaining power to obtain better rates from Express Scripts or another traditional

PBM; taken steps to steer participants/beneficiaries toward the most cost-effective option or away from Accredo; moved all or parts of their prescription-drug plan to a PBM that bases its prices on actual pharmacy acquisition costs rather than inflated and manipulable benchmarks; moved all or parts of their prescription-drug plan to a "pass-through" PBM that does not engage in spread pricing; and/or taken other steps detailed below. Yet Defendants have instead chosen to force the Plan and its participants/beneficiaries to acquire drugs via some of the most expensive methods conceivable.

11.    ERISA required Defendants to make a diligent and thorough comparison of alternative service providers in the marketplace, to negotiate prudently on behalf of the plan, and to continuously monitor plan expenses and ensure that they remain reasonable under the circumstances. Defendants did not do those things, and certainly not to the extent ERISA requires. Defendants breached their fiduciary duties by failing to engage in a prudent and reasoned decision-making process. If Defendants had engaged in a prudent and reasoned decision-making process, they would have known of, and adopted, any of numerous options that would have drastically lowered the cost of prescription drugs, and would have resulted in other cost savings for the Plan and its participants and beneficiaries. Implementing those available options would have saved the Plan and its participants/beneficiaries millions of dollars over the proposed class period.

12.    Defendants also violated ERISA's strict prohibitions on transactions with parties-in-interest. To ensure that plan assets are not wasted through irresponsible contracting practices, Congress prohibited all exchanges of property between an ERISA plan and a third-party service provider, all furnishing of services between an ERISA plan

and a third-party service provider, and all transfers of assets between an ERISA plan and a third-party service provider unless plan fiduciaries demonstrate that such transactions fall within specifically enumerated exemptions to the prohibited-transaction provision. Because the compensation Defendants agreed to pay Express Scripts was not "reasonable," and because no other exemption applies, Defendants also violated ERISA's prohibited-transaction provision, costing the Plan and its participants/beneficiaries millions of dollars over the proposed class period.

13.     To remedy these fiduciary breaches and prohibited transactions, Plaintiffs, individually and on behalf of the Plan and all others similarly situated, bring this action to enjoin Defendants from breaching their fiduciary duties and violating ERISA's prohibited transaction rules, to make good to the Plan and its participants and beneficiaries all losses resulting from each fiduciary breach and prohibited transaction, and for other equitable relief specified below.

## I.      PARTIES AND OTHER RELEVANT ENTITIES

14.     Plaintiff Sergio Navarro was a "participant" in the ERISA plan at issue here within the meaning of ERISA § 3(7), 29 U.S.C. § 1002(7).  Navarro began employment with Wells Fargo in May 2023 and ended his employment in November 2023.

15.     Plaintiff Jane Kinsella was a "participant" in the ERISA plan at issue here within the meaning of ERISA § 3(7), 29 U.S.C. § 1002(7).  Kinsella began employment with Wells Fargo in 1980 and ended her employment in or around January 2021.

16.     Plaintiff Dayle Bulla was a "participant" in the ERISA plan at issue here within the meaning of ERISA § 3(7), 29 U.S.C. § 1002(7).  Bulla began employment with Wells Fargo in 1994 and ended her employment in or around March 2020.

17.     Plaintiff Theresa Gamage was a "participant" in the ERISA plan at issue here within the meaning of ERISA § 3(7), 29 U.S.C. § 1002(7).  Gamage began employment with Wells Fargo in 2015 and ended her employment in or around July 2020.

18.     Plaintiffs bring this lawsuit on behalf of themselves, on behalf of all others similarly situated, and on behalf of the Wells Fargo & Company Health Plan, to remedy Defendants' mismanagement of the ERISA plan at issue here and to obtain appropriate relief under ERISA.

19.     Defendant Wells Fargo & Company is a multinational financial services company. Wells Fargo earned approximately $83 billion in revenue in the 2023 fiscal year, placing it 47th on the 2023 Fortune 500.  It employs over 200,000 people and provides many of its U.S. employees with healthcare benefits, including prescription-drug benefits. It also provides healthcare benefits, including prescription-drug benefits, to certain of its retirees.

20.     Wells Fargo sponsors the Wells Fargo & Company Health Plan (the Plan").  The Plan is an employee welfare benefit plan as defined at 29 U.S.C. § 1002(2)(A). The purpose of the Plan is to provide medical benefits to current and certain former employees of Wells Fargo, as well as to their family members.  The Plan's prescription-drug benefits are administered by a third-party service provider called Express Scripts.  The Plan pays Express Scripts about $25 million annually in administrative fees, plus many

millions more in fees that Express Scripts collects from the Plan and its beneficiaries/participants through its spread pricing and retention of rebates, as described below.

21.     All or most of the Plan's expenses are paid from the Wells Fargo & Company Employee Benefit Trust ("the Trust"), which is an employer-sponsored trust established under I.R.C. 501(c)(9) for the payment of medical benefits under the Plan.  The Trust's IRS Form 990 submission states: "The trust was established to provide employee benefits to eligible employees on Wells Fargo [*sic*] including medical, dental, and vision benefits." The Trust is funded by a combination of employer and employee contributions, along with investment income.  In the most recent year of reporting, the Plan's participants made approximately $650.94 million in contributions to the Trust.  The funds held by the Trust are assets of the Plan and must be used for the exclusive benefit of the Plan's participants and their beneficiaries.  No portion of the Trust may revert to Wells Fargo or be used for or diverted to any purpose other than for the exclusive benefit of participants in the Plan and its beneficiaries.

22.     The Wells Fargo & Company Health Plan Administrators are fiduciaries of the Plan with general authority for the management and administration of the Plan. The Plan Administrators currently include Wells Fargo's Head of Human Resources (or the functional equivalent title of the most senior position in Human Resources), the Head of Total Rewards (or the functional equivalent title of the most senior position in Human Resources over compensation and benefit plans or programs other than the Head of Human Resources), and the Head of Benefits (or the functional equivalent title of the most senior

- 11 -

position in Human Resources over benefit plans and programs other than the Head of Human Resources and the Head of Total Rewards).  The Plan Administrators are high-level Wells Fargo employees appointed to the Plan Administrator position by Wells Fargo.

23.     Defendant Wells Fargo is the sponsor of the Plan and a fiduciary of the Plan. Wells Fargo is responsible for appointing and removing Plan Administrators, and on information and belief, retains decision-making authority with respect to the Plan.  Wells Fargo also has a fiduciary duty to monitor its appointed fiduciaries, and it failed to adopt or follow sufficient procedures to review and evaluate the performance of the Plan Administrators and to remove fiduciaries whose performance was inadequate and/or failed to satisfy ERISA's fiduciary duties and statutory requirements.  Wells Fargo is also liable for the fiduciary breaches and other ERISA violations of Plan Administrators as an appointing and monitoring fiduciary, and as a co-fiduciary under 29 U.S.C. § 1105.  In addition, Wells Fargo is liable for the fiduciary breaches and other ERISA violations of the Plan Administrators because the Plan Administrators were acting within the course and scope of their employment when they committed the fiduciary breaches and violations at issue and because Wells Fargo did not make reasonable efforts under the circumstances to remedy the breaches and violations.

24.     Defendant David Galloreese is a former Senior Executive Vice President and Head of Human Resources at Wells Fargo.  During his time at Wells Fargo, he was a Plan Administrator and fiduciary of the Plan.

25.     Defendant Michael Branca is a former Executive Vice President and Head of Total Rewards at Wells Fargo. During his time at Wells Fargo, he was a Plan

Administrator and fiduciary of the Plan.  He signed the Plan's 2018 and 2019 Form 5500s as the Plan Administrator.

26.     Defendant Mark Hickman is a former Head of Benefits & Enterprise Recognition at Wells Fargo.  During his time at Wells Fargo, he was a Plan Administrator and fiduciary of the Plan.  He signed the Plan's 2020 and 2021 Form 5500s as the Plan Administrator.

27.     Defendant Drew Wineland is a Senior Vice President and Head of Human Capital Initiatives at Wells Fargo.  He is a Plan Administrator and fiduciary of the Plan. He signed the Plan's 2022 Form 5500 as the Plan Administrator.

28.     Defendant Bei Ling is a Senior Executive Vice President and Head of Human Resources at Wells Fargo. She is a Plan Administrator and fiduciary of the Plan.

29.     Does 1 through 20 are other individuals designated as Plan Administrators of the Plan, all of whom are fiduciaries of the Plan.

## II.     JURISDICTION AND VENUE

30.     This Court has exclusive subject-matter jurisdiction under 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1331 because it is an action under 29 U.S.C. § 1132.  Plaintiffs have been injured by the unlawful conduct alleged herein and have standing to bring this action.

31.     Venue is proper in this district under 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391(b) because it is the district in which the Plan is administered, where at least one alleged unlawful act took place, and where Defendants reside or may be found.

32.     This Court has personal jurisdiction over Defendants because they administered the Plan from this State and took some or all of the actions described herein in this State through their management of the Plan, which was administered from this State. Plan documents state: "The plan administrator's address is: Plan Administrator, Wells Fargo & Company, MAC N9310-110, 550 S. 4th St., Minneapolis, MN 55415."

## III.    FACTUAL AND LEGAL BACKGROUND

### A.    Prescription-Drug Plan and Fiduciary Duties Under ERISA

33.     Employers are the principal source of health benefits for working-age Americans in the United States.   To provide those benefits, many employers sponsor employee benefit plans.  The vast majority of employee health plans include coverage for prescription drugs.  Broadly speaking, the prescription-drug portion of an employee health plan covers a portion of the costs of an employee's prescription drugs.  The employee is responsible for a portion of a monthly or bi-weekly insurance premium (and in some cases, the full premium amount) and for the full cost of purchased prescriptions until they meet any applicable deductible. Once the employee meets the deductible, the plan begins to cover a portion of the cost, and the employee continues to pay either a co-pay (often a set cost) or co-insurance (often a percentage of the contracted amount) for each prescription. The employee's premium payments are based on the plan's projected costs for the next year, which are heavily influenced by the plan's actual costs in past years.  The employee's deductible, co-pay, and co-insurance amounts are set according to the plan documents. Costs are based on the plan's contractual arrangements with third-party service providers, typically a combination of insurers and PBMs, who work as intermediaries between the

plan and the healthcare delivery system by negotiating on behalf of the plan with doctors, hospitals, pharmacies, and pharmaceutical companies.

34.     Prescription-drug plans (or the broader health care plans of which they are often a part), like other employee welfare benefit plans established by private-sector employers, are governed by ERISA.  Congress enacted ERISA to address concerns that employee benefit plans were being mismanaged.  ERISA protects the interests of employee benefit plan participants and their beneficiaries by establishing standards of conduct, responsibilities, and obligations for fiduciaries of employee benefit plans.  In ERISA terms, an employer who offers a welfare plan to its employees (and, typically, its employees' family members) is called a "plan sponsor."

35.     Anyone who exercises any discretionary authority or discretionary control over the management of an employee-benefit plan, and anyone who exercises any authority or control respecting management or disposition of the assets of an employee-benefit plan, is a fiduciary of the plan.

36.     ERISA imposes strict fiduciary duties of loyalty and prudence on the fiduciaries of employee-benefit plans, including healthcare plans and prescription-drug plans.  The duty of loyalty requires fiduciaries to act "solely in the interest of the participants and beneficiaries … for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan." 29 U.S.C. § 1104(a)(1)(A).  The duty of prudence requires fiduciaries to exercise the "care, skill, prudence, and diligence" that would be expected in managing a plan of similar scope. 29 U.S.C. § 1104(a)(1)(B).  A fiduciary's process must bear the marks of

loyalty, skill, and diligence expected of an expert in the field. Courts have described these fiduciary duties as "the highest known to the law."

37.     Specifically, 29 U.S.C. § 1104(a) states, in relevant part, that:

> (1) [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—
>
> > (A) for the exclusive purpose of:
> >
> > > (i) providing benefits to participants and their beneficiaries; and
> > > (ii) defraying reasonable expenses of administering the plan;
> >
> > (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

38.     Under ERISA, fiduciaries must act prudently and for the exclusive benefit of participants and beneficiaries in the plan when they select service providers for the plan. Fiduciaries must conduct an independent investigation and consider alternatives when initially selecting service providers and must continue to monitor and critically review the performance and cost of such service providers after they are appointed. The common law of trusts, which informs ERISA's fiduciary duties, emphasizes the duty to avoid unwarranted costs. The Restatement (Third) of Trusts explains, "[i]mplicit in a trustee's fiduciary duties is a duty to be cost-conscious."

39.     Fiduciaries must also ensure that their agreements with service providers and the amounts they pay to those service providers are reasonable. Fiduciaries must

continuously monitor plan expenses to ensure that they remain reasonable and appropriate under the circumstances.  Fiduciaries of large plans like the Wells Fargo Plan also cannot ignore the power their plans wield to obtain favorable rates.  Put simply, wasting beneficiaries' money is imprudent.

40.     Fiduciaries cannot discharge their fiduciary duties simply by relying on the advice of third-party service providers, consultants, or experts.  As the Restatement explains, "[a]fter obtaining advice or consultation, the trustee can properly take the information or suggestions into account but then … must exercise independent, prudent, and impartial fiduciary judgment on the matters involved."  Fiduciaries also cannot discharge their fiduciary duties simply by relying on the advice of third-party service providers, consultants, or experts who have conflicts of interest that may prevent them from providing advice solely for the benefit of the plan.

41.     ERISA's fiduciary duties are supplemented by an extensive list of transactions that are strictly prohibited and considered *per se* violations of ERISA because they entail a high potential for abuse.  To ensure that plan assets are not wasted through irresponsible contracting practices, Congress presumptively prohibited *all* exchanges of property between an ERISA plan and a third-party service provider, *all* furnishing of services between an ERISA plan and a third-party service provider, and *all* transfers of assets from an ERISA plan and a third-party service provider (referred to as a "party in interest").

- 17 -

42.     Specifically, 29 U.S.C. § 1106(a)(1) states, in relevant part, that:

[A] fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect –

(A) sale or exchange, or leasing, of any property between the  plan and a party in interest; [or]
* * *
(C) furnishing of goods, services, or facilities between the plan and a party in interest;
(D) transfer to, or use by or for the benefit of a party in interest, of any assets of the plan.

43.     These presumptively prohibited transactions become permissible only if the plan fiduciary can demonstrate the applicability of one of the exemptions in 29 U.S.C. § 1108, which constitute affirmative defenses to a claim that a plan fiduciary has engaged in a prohibited transaction.  Generally speaking, a contract between a plan and a third-party service provider will not be exempt from the list of prohibited transactions unless the plan fiduciary can demonstrate that the compensation the plan agreed to pay the third-party service provider is "reasonable" and that the plan fiduciary obtained extensive disclosures from the third-party service provider before entering into the contract, to protect against conflicts of interest.

44.     A plan fiduciary who breaches his or her fiduciary duties or engages in a prohibited transaction is personally liable for the relief specified in 29 U.S.C. § 1109(a), which provides:

Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits

- 18 -

of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

45.     In addition to the remedies expressly identified, a plan participant or beneficiary may also obtain injunctive relief, surcharge, and other remedies, as appropriate, from a plan fiduciary who breaches his or her fiduciary duties, as well as attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g).

**B.      Management and Administration of Prescription-Drug Plans**

46.     When a person with prescription-drug insurance goes to her pharmacy to buy a prescription drug, that person makes a claim on her prescription-drug plan. If the person has yet to meet an applicable deductible, she is responsible for the full cost of the drug at plan rates.  Once she has met her annual deductible or no deductible applies, the plan often covers some or all of the drug's cost.

47.     Prescription-drug transactions work as follows:  The pharmacist sends a query to the insured's prescription-drug plan, which more or less instantaneously (*i.e.* while the insured is at the pharmacy counter) determines whether the drug is covered under the insured's plan. The plan communicates to the pharmacy whether the claim was approved or denied and the cost of the prescription when using the plan. If the claim is approved, the pharmacy is informed of the cost of the prescription including any co-pay or co-insurance amount required from the insured.  The pharmacy then collects the co-pay or co-insurance based on the information provided and dispenses the drug.  In a later transaction, the

prescription-drug plan pays the remainder of the drug's cost to the pharmacy, at a rate negotiated between the plan and the pharmacy.

48.     To provide prescriptions for plan members, a prescription-drug plan's fiduciaries (either directly or through a designated representative) generally must negotiate rates with a network of pharmacies at which its participants and beneficiaries may obtain prescription drugs; maintain a list of prescription drugs (called a formulary) that will be covered by the plan; maintain a framework to determine how the cost of those drugs will be shared between the plan and its participants/beneficiaries; process prescription-drug claims when participants/beneficiaries are at the pharmacy counter; and reimburse pharmacies for the plan's portion of the negotiated rates.

49.     The list of prescription drugs that are covered by a prescription-drug plan is called a "formulary."  The formulary is analogous to a commercial health plan's list of covered procedures: just as a commercial health plan will provide different levels of coverage (or no coverage) depending on the specific medical procedure at issue, a prescription-drug plan will provide different levels of coverage (or no coverage) depending on the specific prescription drug at issue.

50.     A generic drug is a pharmaceutical drug that contains the same chemical substance as a drug that was originally protected by chemical patents and sold under a brand name.  As the Food and Drug Administration explains, "generic medicines work in the same way and provide the same clinical benefit and risks as their brand-name counterparts.  A generic medicine is required to be the same as a brand-name medicine in dosage, safety, effectiveness, strength, stability, and quality, as well as in the way it is

taken. Generic medicines also have the same risks and benefits as their brand-name counterparts." Generics tend to be significantly lower-priced because they are produced by multiple competing manufacturers.

51.     Formularies are powerful tools for plan fiduciaries to control the plan's prescription-drug costs.  For example, when a lower-priced generic version of a drug becomes available, a prudent fiduciary will add the generic to its formulary and either remove the brand-name drug or disincentivize its use.  This will result in beneficiaries receiving the lower-priced generic instead of the expensive (but chemically identical) brand-name drug, which in turn will lower costs for the plan.

### C.     Pharmacy Benefit Managers

#### 1.     General Background on PBMs

52.     Many plan fiduciaries contract with third parties to help manage and administer the prescription-drug portion of their health plans.  These third parties are called "pharmacy benefit managers" or, for short, "PBMs."  PBMs offer various services to prescription-drug plans, including negotiating with pharmacies to establish pharmacy networks where plan participants and beneficiaries can obtain prescription drugs; helping manage plans' formularies; processing claims in real-time; and contracting with drug manufacturers to secure price reductions or other financial considerations.

53.     As a general matter, the PBM handles the day-to-day management of its clients' prescription drug programs and serves as the middleman between the benefits plan and network pharmacies.  Accordingly, when a plan participant or beneficiary obtains a prescription drug from a pharmacy, the PBM pays the pharmacy for the cost of the drug

(less the participant/beneficiary's out-of-pocket responsibility) and then, in a later transaction, collects payment from the plan. As noted in more detail below, however, the PBM may attempt to collect more money from the plan than it paid to the pharmacy, pocketing the difference.

54. PBMs are service providers to prescription-drug plans. They are profit-driven entities that seek to profit from their intermediary role in the prescription-drug ecosystem. The largest PBMs are owned by publicly-traded companies and accordingly owe fiduciary duties to their shareholders to maximize their own profits. As discussed in more detail below, many PBMs are also part of vertically integrated companies that create obvious conflicts of interest and incentivize them to take actions that are not in the best interest of their plan clients.

55. There are two dominant pricing models for PBMs. As described below, "traditional" PBMs typically make their money through a combination of spread pricing, rebates, and owning their own pharmacies, as described below. In contrast, "pass-through" PBMs typically make their money only through administrative fees. They do not engage in spread pricing, they pass through the full amount of any negotiated rebates to their client plans, and they do not own pharmacies.

## 2.    Traditional PBM Model

56. In the traditional PBM model, the prices that a prescription-drug plan pays for prescription drugs are determined in negotiations between plan fiduciaries and the PBM. Those prices can be determined in any number of ways, limited by only the parties' willingness to transact.

57.     One way that some plan fiduciaries and PBMs structure their agreements is to set prices for groups of drugs by reference to a specific benchmark price, rather than negotiating a separate price for each drug.

58.     One benchmark is called the National Average Drug Acquisition Cost ("NADAC").  The federal government's Centers for Medicare and Medicaid Services ("CMS") uses survey data to determine pharmacies' average "acquisition cost" for many prescription drugs.  The "acquisition cost" is the amount that the average pharmacy pays to acquire prescription drugs from wholesalers.  A prescription drug's NADAC is a widely-accepted and frequently-updated benchmark that describes the average price that pharmacies pay to acquire that drug.

59.     Another benchmark is called the "Average Wholesale Price" or "AWP."  In theory, the AWP is another benchmark that describes the average price that pharmacies pay to acquire that drug from wholesalers.  In reality, however, as is widely understood by prudent plan fiduciaries, AWP is not a true representation of actual market prices for either generic or brand drug products, is highly manipulable by manufacturers and wholesalers, and often bears little to no relation to a pharmacy's actual acquisition costs.  (A common joke among insiders in the industry is that AWP stands for "Ain't What's Paid.")  The difference between the AWP and a pharmacy's actual acquisition costs can be substantial, and sometimes arbitrarily so.  Researchers have found several examples in which the AWP for a drug was 50, 70, or even 100 times higher than the drug's actual cost to pharmacies.

60.     Plan fiduciaries that decide to use a traditional PBM may negotiate a bundled price, relative to a benchmark, for all generic drugs; a bundled price, relative to a

benchmark, for all brand-name drugs; and a bundled price, relative to a benchmark, for all "specialty" drugs. For example, a plan may agree to pay its PBM "AWP minus 85%" for generic drugs, "AWP minus 20%" for brand drugs, and "AWP minus 15%" for "specialty" drugs. These prices might vary further based on whether the prescription is for a 30-day supply or a 90-day supply or based on other factors, including whether the prescription is filled at the PBM's own pharmacy. These prices are negotiable between the traditional PBM and the plan fiduciaries.

61.     Critically, however, the prices the plan agrees to pay its traditional PBM for a prescription need not bear any relation to the price the PBM will pay the pharmacy for the same prescription. Any difference between those two amounts is known as the "spread."

62.     The "spread" can be a major revenue stream for traditional PBMs. "Spread pricing" is when a PBM negotiates a price with pharmacies that is lower than the price it charges the prescription-drug plan, and then pockets the difference. For example, a PBM may negotiate with a pharmacy for a price of $17 for each prescription of a certain drug, but then may try to separately negotiate with the plan fiduciaries for a price of $20 for that same drug. The $3 "spread" between these two negotiated rates represents profit for the PBM, at the expense of the plan and its participants and beneficiaries. As an example of how this works in practice, a participant or beneficiary filling this prescription might pay a $5 co-insurance amount to the pharmacy. The PBM would then pay the pharmacy $12 more, satisfying the PBM's agreement to pay the pharmacy $17 for the prescription. The PBM would then bill the plan the remaining $15 (the $20 negotiated price minus the $5

patient co-insurance).  The result for the PBM in the arrangement is that it received $15 from the plan but paid only $12 to the pharmacy, netting a $3 spread.



63.   For generic drugs, there is often an especially pronounced disconnect between an AWP-based price paid by a plan and its participants/beneficiaries to the PBM and the price then paid by the PBM to a pharmacy.  This is because the prices that PBMs pay to pharmacies for generic drugs are generally not based on AWP.  Instead, PBMs pay pharmacies for generic drugs based on prices listed on the PBM's proprietary "Maximum Allowable Cost" or "MAC" list.  A "MAC" list is a PBM-generated list that includes the maximum amount the PBM will pay a pharmacy for generic drugs.  PBMs have essentially free reign to determine their own pricing methodologies for their MAC lists, so long as the prices are not so low that pharmacies will refuse to do business or refuse to stock a drug.  One recent study observed that "proprietary PBM prices (i.e., maximum allowable cost, or MAC) were … highly variable and disconnected from the manufacturer or pharmacy established price for the medication."  PBMs may also have different MAC lists

corresponding to different pharmacies (*e.g.*, the MAC prices may be far higher at the pharmacies they own) and different payers.

64.     Traditional PBMs engaging in spread pricing try to exploit the disconnect between the prices they receive from plans and the prices they pay to pharmacies, pocketing the difference between the two prices.   Because of this dynamic (and also for other reasons), it is imperative that the plan fiduciaries actively monitor PBMs and their pricing, and minimize any excess costs or spread.  Prudent fiduciaries minimize or eliminate spread.

65.     Traditional PBMs benefit the most when plan participants and beneficiaries are prescribed drugs with the highest cost to the plan relative to the actual drug acquisition cost, as this maximizes the "spread" retained by the PBM.  PBMs in such an arrangement are financially motivated not to make formulary decisions based on which drugs have the lowest cost to the plan and its participants and beneficiaries, but rather based on which drugs allow them to pocket the largest spread.   Prudent fiduciaries therefore closely supervise their formularies and carefully negotiate their payment structures to ensure that PBMs are not acting based on considerations that run contrary to the interests of the plan and its participants and beneficiaries.

66.     Because of the pronounced disconnect between AWP and acquisition cost for generic drugs, many prudent fiduciaries negotiate generic pricing based on NADAC instead of with reference to AWP.   These fiduciaries negotiate either a fixed, pre-determined price for each drug derived from each drug's NADAC, or a broadly applicable formula based on NADAC.  Basing prices on NADAC rather than AWP reduces overall spending on generic drugs, limits spread pricing, and eliminates the variability in pricing

inherent in AWP-based pricing models.  Instead of agreeing to pay prices based on a "discount" from a made-up benchmark (AWP) that does not correspond to the actual cost of prescription drugs, prudent fiduciaries agree to pay reasonable prices based on the actual acquisition cost of the drugs that Plan participants/beneficiaries purchase.

67.     There is an additional component in pricing for brand-name drugs. Manufacturers of brand-name drugs often agree to provide plans with large discounts off the "list price" for a brand-name drug in exchange for the plans' promise to include that drug on their formularies.  These discounts are termed "rebates" and are generally paid by manufacturers on a quarterly basis for all drugs purchased during the previous quarter. Traditional PBMs collect those rebates for their plan clients, but often pocket some of the rebate for themselves instead of passing the full amount through to their plan clients.  Plans and traditional PBMs negotiate over how much of any such rebate or price concession will be retained by the PBM and how much will be passed through to the plan.  Traditional PBMs may attempt to denominate rebates by other names to obscure their nature and reduce the amounts they are contractually obligated to pass on to their client plans. Traditional PBMs may also try hide rebates by purchasing medications from a wholly owned group purchasing organization ("GPO") that itself pockets some of the rebates.  Any amount the PBM retains is revenue for the PBM.

68.     Prudent fiduciaries negotiate with their PBMs to minimize or eliminate any portion of rebates or other financial concessions from manufacturers that the PBM or its GPO retains instead of passing through to the plan.  Prudent fiduciaries likewise ensure that their PBM contract is written with sufficient precision that the PBM cannot hide or

obscure these rebates to avoid passing them through to the plan.  While such rebates are not per se unlawful, prudent fiduciaries have a responsibility to ensure that the PBM and its affiliated entities are not receiving unreasonable compensation via such revenue sharing arrangements at the expense of the plan and its participants and beneficiaries.

69.     Some traditional PBMs also earn revenue through ownership of pharmacies. Express Scripts, for example, is vertically integrated with the mail-order pharmacy Accredo.  When PBMs own pharmacies, they may attempt to steer beneficiaries of their clients' prescription-drug plans to those pharmacies, including by refusing to cover prescriptions obtained at competitors' pharmacies.  In addition, traditional PBMs may "agree" to excessively high reimbursement rates with the pharmacies they own (*i.e.*, reimbursement rates that greatly exceed the pharmacy's actual acquisition costs)—rates that the PBM would never agree to pay in a truly market-based transaction.  Through this arrangement, PBMs can misleadingly represent to plans that they are not engaging in spread pricing (*i.e.*, they can promise that they are charging the plan the same amount they are paying the pharmacy), even though that is technically true only because the PBM "agreed" to pay its own pharmacy excessive amounts.  In reality, the mechanism is the same as spread pricing—*i.e.*, the traditional PBM charges the plan far more than the drug actually costs, and then the PBM or its affiliated pharmacy pockets the difference.

70.     There are several traditional PBMs in the marketplace that are capable of providing a high level of service and that will vigorously compete to win a PBM contract from a Fortune 50 company like Wells Fargo.  To ensure that they are continuing to manage the plan's costs and incur only reasonable expenses, prudent fiduciaries conduct open

Request for Proposal ("RFP") processes to obtain competitive bids for PBM services at regular intervals and ensure that the rates and terms to which they agree continue to reflect the best rates and terms available in light of the plan's size, bargaining power, and other characteristics. At a minimum, it is necessary to regularly survey the market to ensure that the plan and its participants and beneficiaries are not paying excessive costs.

### 3. The "Pass-Through" PBM Model

71.     One alternative to the traditional PBM model is the "pass through" model. The payment structure for the pass-through model is more transparent and straightforward, and it provides plan sponsors with a reasonable alternative to traditional PBMs that offers many advantages including reduced costs. In the pass-through PBM model, the amount that the PBM bills the plan is equal to the amount the PBM pays the pharmacy. In this model, the PBM does not engage in spread pricing and commits to passing through all discounts and rebates to the plan. The pass-through PBM earns revenue based only on a flat administrative fee it charges to the plan, usually assessed on a per-member, per-month basis (similar to a per-head fee for recordkeeping services to a retirement plan). Pass-through PBMs still negotiate for rebates and discounts from manufacturers, and they pass those rebates and discounts through to their clients instead of keeping them for themselves. This keeps incentives aligned. The amounts of rebates and discounts that many pass-through PBMs pass through to their clients are comparable, and often higher than, the amounts of rebates and discounts that traditional PBMs pass through to their clients.

72.     Because pass-through PBMs do not benefit from rebates or spread pricing, they have no incentive to favor drugs on any factor other than what is in the best interest

of the plan and its participants and beneficiaries. Whereas a PBM using the traditional model is inherently incentivized to select drugs with higher rebates and/or that allow for higher spreads—even if those drugs have higher net costs for the plan—pass-through PBMs have no such incentives or conflicts of interest.

73. Using a pass-through PBM does not negatively affect the patient experience compared to a traditional PBM, and in many cases improves the experience. Most pass-through PBMs have network agreements with many or all major pharmacies, allowing plan beneficiaries to obtain their prescriptions from a wide range of pharmacies, including most or all of the pharmacies that are in-network for traditional PBMs. For example, the pass-through PBM Navitus has network agreements with CVS, Walgreens, Walmart, Rite Aid, Giant, Stop & Shop, Wegman's, Publix, Kroger, Costco, and many others. Similarly, the pass-through PBM Capital Rx "maintains a national network of more than 65,000 pharmacies, including all national chains and most independent pharmacies." Pass-through PBMs also partner with mail-order pharmacies, including for specialty drugs, that can provide plan participants and beneficiaries with the same (or greater) level of convenience as a traditional PBM's mail-order pharmacy.

74. Pass-through PBMs are able to obtain the same drugs from manufacturers as traditional PBMs. Any plan that wants to include or exclude any specific prescription drug on its formulary can do so with either a pass-through PBM or a traditional PBM. Pass-through PBMs also offer the same types of services—and, if anything, more personalized services—than traditional PBMs.

- 30 -

75.     There are numerous pass-through PBMs in the marketplace that are capable of providing a high level of service and will vigorously compete to win a PBM contract from a Fortune 50 company like Wells Fargo.  To ensure that they are continuing to manage the plan's costs and incur only reasonable expenses, prudent fiduciaries conduct open RFP processes to obtain competitive bids for PBM services at regular intervals from both traditional PBMs and pass-through PBMs, and also ensure that the rates and terms to which they agree continue to reflect the best rates and terms available in light of the plan's size, bargaining power, and other characteristics.  At a minimum, it is necessary to regularly survey the market, including pass-through PBMs, to ensure that the plan and its participants and beneficiaries are not paying excessive costs.

76.     Prudent fiduciaries choose carefully among PBMs, analyzing multiple PBMs' offerings to decide which PBM and which payment model will be most beneficial and most cost-effective for the plan.  Prudent fiduciaries also negotiate favorable terms with PBMs and continually supervise their PBM's actions to ensure that the plan is minimizing costs and maximizing outcomes for beneficiaries.  Prudent fiduciaries retain sufficient control over their plans' formularies to prevent the PBM from making formulary decisions that serve the PBM's interests but not the plan's interests.  Prudent fiduciaries also periodically attempt to renegotiate their PBM contracts, conduct marketplace surveys, and/or conduct an open RFP process to solicit proposals from other PBMs and ensure that they have the best possible deal for the plan and plan participants/beneficiaries.

### D.    Brokers and Consultants

77.    Many plan sponsors hire consultants and/or brokers to assist them with soliciting bids from, selecting, and negotiating with a PBM.  A plan sponsor's broker may serve as the broker for a range of the plan sponsor's vendor agreements but recommend that the plan sponsor hire a consultant (usually one affiliated with the brokerage) to assist specifically with the PBM selection process.  For simplicity, consultants and brokers together are referred to here as "employee benefit consultants" ("EBCs").  EBCs are service providers to prescription-drug plans.  They are profit-driven entities that seek to profit from their intermediary role in the prescription-drug ecosystem.

78.    Some EBCs, while purporting to act in the interest of their client ERISA plans, are in fact being paid by PBMs in ways that incentivize them to act against the plan's interests.  For example, PBMs may promise to pay an EBC a commission on every prescription if the EBC recommends the PBM to its client plans.  As one media outlet reported, "[c]onsulting firms can collect at least $1 per prescription from the largest PBMs, according to more than a dozen independent drug benefits, consultants, and attorneys involved with employers' PBM contracts.  That can go as high as $5 per prescription in extreme cases, three of those people said. Consulting firms and brokerages may receive a certain dollar amount for each covered employee and member. Or they may share in the rebates that the PBMs pluck from pharmaceutical manufacturers — money that otherwise could be used by employers to lower premiums for their workers."

79.    According to one report, an EBC managing an RFP process refused to allow a PBM to even enter a bid for a plan's contract unless the PBM agreed to pay the EBC

$6.50 per prescription.  In an apparent attempt to hide the payment, the EBC asked the PBM to mail the payments quarterly to a PO box in another state.

80.     Industry experts have warned that many EBCs or brokers "not only give bad advice to the employer that's in the broker's self-interest, but the broker also allows the big PBM to write crazy terms into a contract."

81.     Some EBCs, while purporting to manage an open RFP process for their client prescription-drug plans, will refuse to solicit bids from PBMs that decline to offer the EBC kickbacks or other forms of indirect compensation.

82.     Prudent fiduciaries ensure that any EBC they hire to help them select and negotiate with a PBM does not have conflicts of interest that would prevent it from offering objective advice to the plan and operating a truly open RFP process.  Prudent fiduciaries would not hire an EBC who was receiving kickbacks or other forms of compensation from the PBM it was assisting in selecting or negotiating with, or who would refuse to solicit bids or accept offers from PBMs who were not paying kickbacks or providing other forms of compensation.  As one media outlet put it, "[e]mployers … may be neglecting their legal duty by not asking their consultants and brokers to disclose all the sources of their revenue."

83.     Prudent fiduciaries exercise—and are required to exercise—independent, prudent, and impartial fiduciary judgment even on matters for which they receive advice from EBCs.

84.     Section 202 of the 2021 Consolidated Appropriations Act prohibits covered plans from entering into a contract, renewal, or extension of services for the plan with "covered service providers," which includes EBCs, without first requiring the covered

service provider to disclose, in writing, any and all direct and indirect compensation in excess of $1,000 it receives for providing services to the plan. A covered plan's failure to obtain the required disclosures from a covered service provider under Section 202 makes its contract with that service provider a prohibited transaction under ERISA. Prudent fiduciaries obtain the required disclosures from their EBCs and ensure that the disclosures are sufficiently clear and unambiguous, and that no conflict of interest exists, before entering into, renewing, or extending their contract.

### E.     Specialty Drugs

85.     Some drugs, whether brand or generic, are classified as "specialty" drugs. As originally envisioned, the "specialty" designation referred to expensive branded drugs used to treat complex or rare chronic conditions, required special handling or care, and historically were available only at hospitals, doctors' offices, or specialty pharmacy locations where the patient could receive specialized instruction from a medical professional.

86.     Today, however, the "specialty" designation is largely arbitrary. There is no universal standard or agreement regarding what qualifies as a "specialty" drug. Indeed, the three largest PBMs disagree about whether any particular drug is a "specialty" drug about 50% of the time:



87.     However defined, there is no question that specialty drugs are a major driver of prescription-drug spending.  According to numerous industry experts, specialty drugs account for more than half of all pharmacy spending, with total non-discounted spending in 2022 at approximately $324 billion (compared to $311 billion for non-specialty).  This makes the cost of specialty drugs a significant driver of premiums for all plan participants, including participants in the Wells Fargo Plan, regardless of whether they themselves are prescribed specialty drugs and pay out-of-pocket costs for those drugs.

88.     An arrangement in which a plan's members are incentivized or required to obtain specialty drugs only from the PBM's own pharmacy provides powerful incentives for PBMs to designate generic drugs as "specialty" drugs and/or to inflate the prices of specialty drugs.  The PBM's costs are limited to its pharmacy's actual acquisition cost of the drug from the wholesaler (which is typically even lower than the MAC price), and yet it can continue to charge the plan the high AWP-based price designated for "specialty" drugs.

89.    "Specialty" drugs can be a major driver of costs for a prescription-drug plan. While specialty drugs make up a relatively small percentage of overall prescriptions, they typically account for more than 50% of a prescription-drug plan's overall spending. Prudent fiduciaries will therefore be extra careful to negotiate favorable contract terms regarding specialty drugs to avoid paying excessive amounts for specialty drugs, closely manage their specialty drug expenditures, closely supervise their PBMs' treatment and designation of specialty drugs, and make changes to their prescription-drug plans as necessary to fulfill their fiduciary obligations.

90.    Some PBMs offer services focused specifically on specialty drugs.  In this kind of arrangement, a plan uses a traditional PBM for most of its prescription-drug needs, but carves out management of all specialty drugs to a specialty-focused PBM.  In the specialty PBM carve-out model, responsibility for the entire specialty benefit is carved out to a PBM with a focus on, and expertise in, management of specialty drugs. These specialty PBMs—who typically use the pass-through model—can incorporate all aspects of specialty drug management, including claims processing, specialty formulary, and specialty pharmacy network management.  Specialty carve-out PBMs do not need to own a specialty pharmacy and have no financial incentive to artificially promote greater or more expensive drug use—and, as a result, offer substantial savings to plans and their participants/beneficiaries.  Many large companies use the specialty carve-out model for their prescription-drug plans.  For example, DuPont carved out specialty drugs from its contract with CVS Caremark, and it contracted with the pass-through PBM Archimedes to manage its specialty-drug program.  Similarly, Signet Jewelers carved out specialty drugs

from its contract with the traditional PBM OptumRx and contracted with Archimedes to manage its specialty-drug program.

91.     Plan fiduciaries must be cognizant of PBMs' self-interest in maximizing their own profits, and not simply accede to PBMs' preferences without conducting an independent investigation or considering alternatives.  For example, instead of accepting a PBM's request that participants/beneficiaries be steered to fill their "specialty" drug prescriptions at the PBM's own pharmacy, fiduciaries must consider whether participants/beneficiaries (and the plan writ large) would be better off if they were permitted or encouraged to fill their prescriptions at a broader range of pharmacies.  Plan fiduciaries must also engage in a prudent decision-making process with respect to whether to carve out their specialty-drug program from their broader PBM contract.

## IV.   DEFENDANTS BREACHED THEIR FIDUCIARY DUTIES

### A.   Defendants Agreed to Unreasonable Prices and Terms for Prescription Drugs

92.     The fiduciaries of a prescription-drug plan have control over the plan's expenses, formulary, and choice of third-party service providers (including PBMs and EBCs).  Their control over the formulary includes which drugs will be covered by the plan and which tier of the formulary any covered drug will be placed.  The fiduciaries are also responsible for hiring third-party service providers, for negotiating the terms of their agreements with those third-party service providers (including drug prices), and for exercising continued oversight over the service providers and any aspect of the plan for which a third-party service provider is contractually responsible.

93.    These fiduciary responsibilities (and how they are carried out) have the potential to dramatically affect the amount of money the plan pays for prescription drugs. Accordingly, fiduciaries of prescription-drug plans must engage in a rigorous process to manage the plan's formulary, oversee any formulary management performed by a third-party vendor, and ensure that the plan pays no more than reasonable amounts for prescription drugs and in administrative fees.  This is particularly true for Fortune 50 companies like Wells Fargo with tens of thousands of employees and former employees in their plans, which have the bargaining power to obtain the most favorable terms from third-party vendors.

94.    Defendants imprudently managed the Plan's prescription-drug program and failed to act in the best interest of participants/beneficiaries and ensure that expenses were reasonable.

95.    Defendants' mismanagement has caused the Plan and its participants/beneficiaries to vastly overpay for prescription drugs and has cost the Plan and its participants/beneficiaries (including Plaintiffs) millions of dollars over the Class Period.

96.    When fiduciaries agree to overpay for prescription drugs, plan participants— and especially the sickest ones—bear much of the burden.

97.    First, plan participants may be responsible for the entire cost of covered items until they meet their deductible, and after the deductible is met, typically are responsible for a co-pay or co-insurance amount.  Accordingly, if plan fiduciaries agree to inflated prices for prescription drugs, the participants/beneficiaries receiving those drugs may be

required to pay some or all of those inflated prices out-of-pocket.  This is true for prescription-drug plans generally and Plaintiffs and the Plan specifically.

98.     Second, the amounts that a health plan spends on prescription drugs directly affect the premiums that all plan members must pay for the prescription-drug portion of their health plans.  Accordingly, if plan fiduciaries agree to inflated prices for prescription drugs, they pass those inflated prices on to all participants—including those who did not receive any prescription drugs—through increased premiums.  This is true for prescription-drug plans generally and Plaintiffs and the Plan specifically.

99.     Third, employers often pass higher healthcare costs on to their employees in the form of depressed wages.  In a recent report, the Congressional Budget Office noted that "[e]mployers' spending on health insurance represents a large part of their employees' nonwage compensation, so employers generally take actions to offset increases in health insurance spending in order to maintain their profits."  The CBO also cited a recent study finding that increased healthcare spending by employers was "associated with a rise in employees' out-of-pocket costs, an increase in the use of high-deductible health plans, and slower wage growth for employees."  UC Berkeley researchers summarized recent academic research on this topic: "Increases in health care costs are coming out of workers' pockets one way or another. . . . When health care costs rise, employers can respond in a variety of ways, such as by increasing worker premium contributions, increasing deductibles or copayment amounts, reducing employment, or increasing their own premium contributions while reducing or limiting wage growth accordingly."  This is true for employers generally and, on information and belief, Wells Fargo specifically.

100.    On one or more occasions, Defendants entered into and/or renewed a contract with Express Scripts, a traditional PBM.  Through that contract or those contracts, which governed throughout all or most of the class period, Express Scripts agreed to serve as the Plan's PBM and Defendants agreed (or caused the Plan to agree) to various terms regarding drug prices, formulary management, pharmacy networks, and administrative services.

101.    On information and belief, the process by which Defendants chose and/or retained Express Scripts as the Plan's PBM was not an open RFP process, was not otherwise diligent or consistent with the applicable fiduciary standard of care, and did not consider the full range of available options for PBM services.

102.    The standard contract that Express Scripts uses with its clients—and, on information and belief, its contract with Defendants—makes clear that the plan sponsor and the plan fiduciaries retain "all … discretionary authority and control with respect to the management of the Plan and plan assets."  In other words, Defendants acknowledged in their contract with Express Scripts that they, and not Express Scripts, have final say over management of the Plan and plan assets.

103.    On information and belief, Defendants used Aon as their broker, or EBC. According to public reporting, Aon receives indirect compensation from certain PBMs in connection with Aon's clients' use of those PBMs.  In its SEC filings, Aon acknowledges its receipt of indirect compensation from the companies to which it steers its clients—compensation it refers to as "market-derived income"—and warns investors that "this revenue may be subject to scrutiny by various regulators under conflict of interest, anti-trust, unfair competition, conduct and anti-bribery laws and regulations."  Accordingly,

Defendants allowed their selection of a PBM for the Plan to be guided or managed by a broker with a conflict of interest—*i.e.*, a financial interest in steering Defendants toward certain PBMs or including certain provisions in the PBM contract, in ways not necessarily correlated with the financial and other interests of the Plan and its participants/beneficiaries.

104.   The contract between Defendants and Express Scripts is not public. However, an analysis of the prices that Defendants agreed to make the Plan and its participants/beneficiaries pay for generic drugs reveals a staggering markup from acquisition costs for those drugs, a staggering markup from the prices that would be charged by a "pass-through" PBM, and a staggering markup from prices charged to comparable plans by other traditional PBMs.  These prices greatly exceed the prices that any prudent fiduciary would agree to pay and are not reasonable.

105.   Defendants imprudently agreed to a pricing model in which the prices the Plan and its participants/beneficiaries pay for generic drugs are based on a discount from AWP rather than on a fixed unit-price schedule or with reference to actual pharmacy acquisition costs (*e.g.* NADAC) for those drugs.  Defendants' acceptance of this AWP-based pricing model for generic drugs resulted in the Plan and its participants/beneficiaries paying millions of dollars more than they would have paid under a pricing model based on pharmacy acquisition costs.  Those overpayments resulted in Defendants paying Express Scripts a fee for its services far in excess of a reasonable fee for PBM services.

106.   As described in more detail below, Defendants agreed to make the Plan and its participants/beneficiaries pay unreasonable markups above what it costs for pharmacies

to acquire those same drugs. Most of these markups represent profit for Express Scripts and its affiliated entities, with no corresponding benefit for the Plan or its participants/beneficiaries. The markups to which Defendants agreed are substantially higher than what a pass-through PBM would charge and substantially higher than even traditional PBMs provide to their other clients. Indeed, Defendants squandered their bargaining power and, for many drugs, agreed to make the Plan and its participants/beneficiaries pay more than someone would pay if they just walked into a retail pharmacy and filled the same prescription *without* using insurance. Put another way, it would be more prudent for Defendants to tell employees *not* to use their insurance and instead to give them a company credit card that the Plan was responsible for paying. This despite Defendants having significant bargaining power as a Fortune 50 company with over 200,000 employees. Had Defendants prudently negotiated and continued to monitor the terms of their PBM contract with Express Scripts in light of market developments, or had Defendants conducted a prudent process to inquire as to different PBMs (through an RFP process, market surveys, or otherwise), the Plan and its participants/beneficiaries would have saved millions of dollars.

107. Generic drugs (including generic-specialty drugs) account for 30–50% of overall prescription-drug spending. That makes them a significant driver of out-of-pocket costs for plan participants/beneficiaries who are prescribed such drugs and a significant driver of premiums for all plan participants, including participants in the Plan, regardless of whether they themselves are prescribed such drugs.

108.   The Plan provides its beneficiaries/participants with a document titled the "2024 Express Scripts National Preferred Formulary for Wells Fargo."  The document includes what it describes as "a list of the most commonly prescribed drugs" and is "an abbreviated version of the drug list (formulary) that is at the core of your prescription plan." The formulary includes a list of approximately 300 generic drugs, across many drug classes, that are designated as "preferred alternatives" that participants/beneficiaries are encouraged to use.  For 260 of those drugs, NADAC information is publicly available, allowing a comparison between the prices Defendants agreed to make the Plan and its participants/beneficiaries pay for a 90-day prescription of each drug and the acquisition cost of the same drug, quantity, and dosage for the average pharmacy.

109.   This  comparison  reveals  staggering  markups  and  unreasonable overpayments.  In total, across the 260 drugs that Defendants themselves designated as "preferred alternatives," Defendants' negotiated prices reflect, on average, a markup of *114.97%* above pharmacy acquisition cost.  Put another way, the total acquisition cost for one 90-day prescription of each of the 260 drugs is $40,656.02, but Defendants agreed to prices that would result in one 90-day prescription of each of the 260 drugs costing the Plan and its beneficiaries/participants *more than twice as much*, or $87,397.29.  No prudent fiduciary would agree to pay their PBM an average 114.97% markup above pharmacy acquisition cost.

110.   These unreasonable markups are spread broadly across the 260 drugs. Defendants agreed to pay more than a 100% markup—*i.e.*, more than double acquisition cost—for over one-third of the drugs that Defendants themselves designated as "preferred

alternatives." Defendants agreed to pay more than a 50% markup for over half of the drugs that Defendants themselves designated as "preferred alternatives." In all, Defendants agreed to pay an unreasonable (more than 15%) markup for approximately three-quarters of the 260 drugs that Defendants themselves designated as "preferred alternatives."

111. These unreasonable percentage markups are spread broadly across low-priced and high-priced drugs. If the analysis is isolated to the most expensive drugs on the list—*i.e.*, the 121 drugs with a pharmacy acquisition cost above $50 for a 90-day prescription—Defendants' negotiated prices reflect, on average, a markup of ***91.1%*** above pharmacy acquisition cost. Put another way, the total acquisition cost for one 90-day prescription of each of the 121 most-expensive generic drugs is $37,937.26, but Defendants agreed to prices that would result in one 90-day prescription of each of these drugs costing the Plan and its beneficiaries/participants almost twice as much, or $72,513.58.

112. Defendants' overpayments are even more pronounced for the subset of generic drugs designated as "specialty." Generic-specialty drugs are an important subset of Defendants' formulary because Defendants agreed to terms under which plan participants/beneficiaries are required to obtain their prescriptions of specialty drugs from Accredo, Express Scripts' own mail-order pharmacy. This creates obvious conflicts of interest for the PBM, which directly benefits from Plan spending on specialty drugs and is incentivized to make the Plan and its beneficiaries/participants to pay as much as possible for these drugs. Prudent plan fiduciaries would take extra care to monitor this obvious conflict of interest and ensure that prices for specialty drugs remain reasonable. Defendants did not do that.

113.    CMS has published a recent NADAC for 38 of the 95 generic drugs that are covered by Wells Fargo and classified as specialty on a publicly available Express Scripts formulary.  Across those 38 drugs, Defendants' negotiated prices reflect, on average, a markup of ***383%*** above pharmacy acquisition cost.  Put another way, the total acquisition cost for one 90-day prescription of each of the 38 drugs is $26,528.25, but Defendants agreed to prices that would result in one 90-day prescription of each of the 38 drugs costing the Plan and its beneficiaries nearly *five times as much*, or $128,239.77.  No prudent fiduciary would agree to pay their PBM an average 383% markup above pharmacy acquisition cost, especially where the PBM itself owns the pharmacy.

114.    Abacavir-lamivudine is a generic HIV antiviral drug.  According to the NADAC database, the acquisition cost for pharmacies for abacavir-lamivudine is $2.01 per tablet, or $180.90 for a 90-unit prescription.  Defendants, however, agreed to make the Plan and its participants/beneficiaries pay Express Scripts ***$3,107.47*** for each 90-unit abacavir-lamivudine prescription.  This price reflects an ***1,617.78%*** markup**.**

115.    Abacavir-lamivudine is widely available at retail (non-specialty) pharmacies, including Rite Aid, Walmart, ShopRite, Wegmans, Costco, Walgreens, Duane Reade, CVS, Target, and others.  The cash price (*i.e.*, the price a person would pay if she did not use insurance) for an abacavir-lamivudine prescription at *every one* of these pharmacies is lower than the price Defendants agreed to make the Plan and its participants/beneficiaries pay.  While Defendants agreed to a price of ***$3,107.47*** for each 90-day abacavir-lamivudine prescription, the same prescription is available from Rite Aid for $123.82, Walmart for $127.32, ShopRite for $154.70, Wegmans for $175.47, or from Cost Plus Drugs online

pharmacy for $210.20.   No prudent fiduciary would agree to make its plan and participants/beneficiaries pay a price that is up to twenty-five times higher than the price at which the drug is widely available.



116.    Abiraterone acetate is a generic drug used to treat prostate cancer.  According to the NADAC database, the average acquisition cost for pharmacies for abiraterone acetate is $0.92 per 250mg tablet, or $82.80 for a 90-unit prescription.  Defendants, however, agreed to make the Plan and its participants/beneficiaries pay Express Scripts *$1,881.00* for each 90-unit abiraterone acetate prescription.  This price reflects a *2,171.74%* markup.

117.    Abiraterone acetate is widely available at retail (non-specialty) pharmacies, including Rite Aid, Walmart, ShopRite, Wegmans, Costco, Walgreens, Duane Reade, CVS, Target, and other pharmacies.  The cash price for an abiraterone acetate prescription at *every one* of these pharmacies is lower than the price Defendants agreed to make the Plan and its participants/beneficiaries pay to Express Scripts.  While Defendants agreed to a price of *$1,881.00* for each 90-unit abiraterone acetate prescription, the same prescription is available from Rite Aid for $105.87, Walmart for $111.19, ShopRite for $115.30, Wegmans for $115.30, or from Cost Plus Drugs online pharmacy for $90.50.  No prudent fiduciary would agree to make its plan and participants/beneficiaries pay a price that is up to almost sixty times higher than the price at which the drug is widely available.



118.    Imatinib is a generic oral therapy medication used to treat certain types of

leukemia and bone marrow disorders.  According to the NADAC database, the average

acquisition cost for pharmacies for imatinib is $1.88 per 400mg tablet, or $169.20 for a

standard 90-unit prescription.   Defendants, however, agreed to make the Plan and its participants/beneficiaries pay Express Scripts ***$8,199.00*** for each 90-unit imatinib prescription.  This price reflects a ***4,745.74%*** markup.

119.    Imatinib is widely available at retail (non-specialty) pharmacies, including Rite Aid, ShopRite, Wegmans, Acme, Costco, Walgreens, Duane Reade, CVS, Target, and other pharmacies.   The cash price for an imatinib prescription at *every one* of these pharmacies is lower than the price Defendants agreed to make the Plan and its participants/beneficiaries pay to Express Scripts.  While Defendants agreed to a price of ***$8,199.00*** for each 90-unit imatinib prescription, the same prescription is available from Rite Aid for $155.42, ShopRite for $249.83, Wegmans for $249.83, Acme for $261.08, or from Cost Plus Drugs online pharmacy for $94.10.  No prudent fiduciary would agree to make its plan and participants/beneficiaries pay a price that is one-hundred times higher or more than the price at which the drug is widely available.

Cash Price Using No Insurance



| Price Using Wells Fargo Plan |
|---|

**Imatinib Mesylate 400 Mg Tab**

Pharmacy: Delivery

Days supply: 30

Quantity: 90

| | |
|---|---|
| Total medication cost: | $ 8,199.00 |
| Plan pays*: | $ 4,899.00 |
| You pay: | $ 3,300.00 |
| | |
| Applied to your <u>deductible</u>: | $ 3,250.00 |
| Applied to your <u>out-of-pocket</u>: | $ 3,300.00 |
| | |
| Cost per day: | $ 110.00 |

Your plan pays about 60% of the cost for this medicine.

120. Fingolimod is a generic medication used to treat multiple sclerosis. According to the NADAC database, the average acquisition cost for pharmacies for fingolimod is $9.74 per 0.5mg capsule, or $876.60 for a 90-unit prescription. Defendants, however, agreed to make the Plan and its participants/beneficiaries pay Express Scripts **$9,994.37** for each 90-unit Fingolimod prescription. This price reflects an **1,040.13%** markup.

121. Fingolimod is widely available at retail (non-specialty) pharmacies, including Wegmans, ShopRite, Rite Aid, Walmart, Costco, Acme, Walgreens, Duane Reade, CVS, Target, and other pharmacies. The cash price for a fingolimod prescription at *every one* of these pharmacies is lower than the price Defendants agreed to make the Plan and its participants/beneficiaries pay to Express Scripts. While Defendants agreed to a price of **$9,994.37** for each 90-unit fingolimod prescription, the same prescription is

available from Wegmans for $648.00, ShopRite for $677.68, Rite Aid for $891.63, Walmart for $895.63, or from Cost Plus Drugs online pharmacy for $875.09. No prudent fiduciary would agree to make its plan and participants/beneficiaries pay a price that is up to twenty times higher than the price at which the drug is widely available.

Cash Price Using No Insurance



Price Using Wells Fargo Plan



122.     Temozolomide is a generic cancer drug.  According to the NADAC database, the average acquisition cost for pharmacies for temozolomide is $13.84 per 140mg capsule, or $1,245.60 for a 90-unit prescription.  Defendants, however, agreed to make the Plan and its participants/beneficiaries pay Express Scripts *$16,405.38* for each 90-unit temozolomide prescription.  This price reflects a *1,217.07%* markup.

123.     Temozolomide is widely available at retail (non-specialty) pharmacies, including Wegmans, ShopRite, Rite Aid, Costco, Acme, Walgreens, Duane Reade, CVS, Target, and other pharmacies.  The cash price for a temozolomide prescription at *every one* of these pharmacies is lower than the price Defendants agreed to make the Plan and its participants/beneficiaries pay to Express Scripts.  While Defendants agreed to a price of *$16,405.38* for each 90-unit temozolomide prescription, the same prescription is available from ShopRite for $1,085, Wegmans for $1,086, Costco for $1,348, Rite Aid for $2,543, or from Cost Plus Drugs online pharmacy for $371.30.  No prudent fiduciary would agree to make its plan and participants/beneficiaries pay a price that is up to forty times higher than the price at which the drug is widely available.



124.   Teriflunomide is a generic drug used to treat certain forms of multiple sclerosis.  According to the NADAC database, the average acquisition cost for pharmacies for generic teriflunomide is $0.91 per 14mg tablet, or $81.90 for a 90-unit prescription. Defendants, however, agreed to make the Plan and its participants/beneficiaries pay

Express Scripts *$8,775.91* for each 90-unit teriflunomide prescription.  This price reflects a *10,615.38%* markup.

125.   Teriflunomide is widely available at retail (non-specialty) pharmacies, including Wegmans, ShopRite, Walmart, Rite Aid, Costco, Acme, Walgreens, Duane Reade, CVS, Target, and other pharmacies.  The cash price for a teriflunomide prescription at *every one* of these pharmacies is lower than the price Defendants agreed to make the Plan and its participants/beneficiaries pay to Express Scripts.  While Defendants agreed to a price of *$8,775.91* for each 90-unit teriflunomide prescription, the same prescription is available from Wegmans for $40.55, ShopRite for $41.05, Walmart for $76.41, Rite Aid for $77.41, or from Cost Plus Drugs online pharmacy for $28.40.  No prudent fiduciary would agree to make its plan and participants/beneficiaries pay a price that is up to 360 times higher than the price at which the drug is widely available.



Cash Price Using No Insurance

| Price Using Wells Fargo Plan |
| --- |

**Teriflunomide 14 Mg Tablet**

Pharmacy: Delivery

Days supply: 30

Quantity: 90

| | |
| --- | --- |
| Total medication cost: | $ 8,775.91 |
| Plan pays*: | $ 5,475.91 |
| You pay: | $ 3,300.00 |
| Applied to your deductible: | $ 3,250.00 |
| Applied to your out-of-pocket: | $ 3,300.00 |
| Cost per day: | $ 110.00 |

Your plan pays about 62% of the cost for this medicine.

126.    The following table lists the 38 generic-specialty drugs for which NADAC information is publicly available, along with a comparison between the prices Defendants agreed to make the Plan and its participants/beneficiaries pay for a 90-day supply and the acquisition cost of the same drug, quantity, and dosage for the average pharmacy. And as shown above, these drugs are available from many pharmacies at amounts below NADAC averages, such that the markup shown in the chart below actually understates the extent to which the Plan paid inflated prices.

| **Generic Drug Name** | **Quantity** | **Pharmacy Acquisition Cost** | **Price Wells Fargo Agreed to Pay** | **Markup %** |
| --- | --- | --- | --- | --- |
| abacavir | 180 | $111.60 | $678.26 | 507.76% |
| abacavir/lamivudine | 90 | $180.90 | $3,107.47 | 1617.78% |
| abiraterone acetate | 90 | $82.80 | $1,881.00 | 2171.74% |
| atazanavir | 90 | $313.20 | $601.04 | 91.90% |
| azathioprine | 90 | $16.20 | $38.94 | 140.37% |

| | | | | |
|---|---|---|---|---|
| capecitabine | 84 | $44.94 | $691.32 | 1438.32% |
| cyclosporine | 90 | $774.90 | $1,026.05 | 32.41% |
| dalfampridine | 90 | $45.90 | $1,647.90 | 3490.20% |
| deferasirox | 90 | $177.30 | $3,690.00 | 1981.22% |
| dimethyl fumarate | 180 | $120.60 | $5,785.20 | 4697.01% |
| efavirenz | 90 | $277.20 | $2,390.51 | 762.38% |
| efavirenz/emtricitabine/tenofovir disoproxil fumarate | 90 | $115.20 | $7,433.99 | 6353.12% |
| emtricitabine/tenofovir disoproxil fumarate | 90 | $49.50 | $1,260.12 | 2445.70% |
| enoxaparin sodium | 1 | $12.35 | $19.08 | 54.52% |
| etravirine | 180 | $2,889.00 | $3,440.93 | 19.10% |
| everolimus | 90 | $545.40 | $1,337.91 | 145.31% |
| fingolimod | 90 | $876.60 | $9,994.38 | 1040.13% |
| fondaparinux sodium | 72 | $3,854.88 | $5,714.73 | 48.25% |
| glatiramer | 90 | $11,846.70 | $16,987.50 | 43.39% |
| ibandronate IV | 3 | $11.34 | $65.36 | 476.37% |
| imatinib | 90 | $169.20 | $8,199.00 | 4745.74% |
| lamivudine | 90 | $76.50 | $286.14 | 274.04% |
| lamivudine/zidovudine | 90 | $72.00 | $477.61 | 563.35% |
| mycophenolate mofetil | 90 | $25.20 | $60.09 | 138.45% |
| mycophenolic acid | 90 | $16.20 | $265.14 | 1536.67% |
| nevirapine | 90 | $12.60 | $17.03 | 35.16% |
| nevirapine ER | 90 | $386.10 | $1,325.36 | 243.27% |
| octreotide acetate | 15 | $138.00 | $158.67 | 14.98% |
| ribavirin | 90 | $61.20 | $84.06 | 37.35% |
| ritonavir | 90 | $89.10 | $618.67 | 594.35% |
| sirolimus | 90 | $209.70 | $1,139.20 | 443.25% |
| tacrolimus | 90 | $18.00 | $88.43 | 391.28% |
| temozolomide | 90 | $1,245.60 | $16,405.38 | 1217.07% |
| tenofovir disoproxil fumarate | 90 | $42.30 | $114.85 | 171.51% |
| teriflunomide | 90 | $81.90 | $8,775.90 | 10615.38% |
| tetrabenazine | 90 | $292.50 | $5,526.57 | 1789.43% |
| tobramycin | 560 | $1,200.64 | $16,867.29 | 1304.86% |

| zidovudine | 90 | $45.00 | $38.69 | -14.02% |
|---|---|---|---|---|
| **Total** | | **$26,528.25** | **$128,239.77** | **383.41%** |

127.    The Plan's prices for the 53 generic drugs covered by Wells Fargo and designated as specialty on the Express Scripts formulary for which CMS *does not* publish a NADAC (i.e., those not in the table above) are just as unreasonable.  While NADAC information showing average pharmacy acquisition costs is not available as a benchmark, many of those drugs are available at retail or online pharmacies for prices far lower than Defendants agreed to make the Plan and its participants/beneficiaries pay, indicating that the acquisition costs are far lower as well, and that Defendants agreed to unreasonable markups for those drugs.  Four examples follow:

128.    A 90-day supply of bexarotene gel (generic for Targretin) is available for a cash price (*i.e.*, without using insurance) of $3,750 at Rite Aid, $4,129 at Wegmans, $7,256 at Walgreens, and $10,310.07 at Cost Plus Drugs.  Defendants agreed to make the Plan and its participants/beneficiaries pay $69,806.75.

129.    A 90-day prescription of fosamprenavir (generic for Lexiva) is available for a cash price of $457.14 at Rite Aid, $476.94 at Wegmans, $840.12 at Walgreens, and $1,217.80 at Cost Plus Drugs.  Defendants agreed to make the Plan and its participants/beneficiaries pay $2,784.06.

130.    A 90-day supply of betaine powder (generic for Cystadane) is available for a cash price of $742.04 at Wegmans, $1,315 at Walgreens, $1,193 at Rite Aid, and $1,784

at CVS.  Defendants agreed to make the Plan and its participants/beneficiaries pay $4,438.24.

131.   A 300-tablet prescription of tiopronin (generic for Thiola) is available for a cash price of $1,208 at Wegmans, $2,142 at Walgreens, $2,260 at CVS, and $1,939 at Rite Aid.  Defendants agreed to make the Plan and its participants/beneficiaries pay $7,862.75.

132.   For many or most of the generic-specialty drugs on the Plan's formulary, there is no medical necessity for that designation.  As shown above, most of these drugs are available at traditional retail pharmacies, do not require handling that traditional retail pharmacies are unable to provide, and do not require the kinds of medical services traditionally provided by specialty pharmacies.  For many or most of the generic-specialty drugs on the Plan's formulary, no special handling is provided by the pharmacies at which Plan beneficiaries obtain generic-specialty drugs, including at Accredo, which is owned by Express Scripts.  The "specialty" designation serves little purpose other than to enrich Express Scripts at the expense of the Plan and its beneficiaries.

133.   The Plan's extraordinarily high prices for generic drugs are not offset by special discounts from Express Scripts for other kinds of drugs.  For the 50 most common high-cost *brand-name* drugs (including Humira, Ozempic, Trulicity, and many more), Defendants agreed to prices that are roughly equivalent to pharmacy acquisition cost for those drugs.  These prices are generally consistent with market pricing, and do not reflect special discounts that would offset or justify the atypical and extraordinary overcharges for generic specialty drugs under the Plan.  Defendants' failure to act prudently in negotiating

the prices of generic drugs has cost the Plan millions of dollars each year, which has not been offset by any corresponding discounts on other drugs.

**B. Defendants Imprudently Agreed to Steer Participants/Beneficiaries Toward Higher Prices**

134. Defendants agreed to require Plan beneficiaries/participants to obtain *all* prescriptions of specialty drugs from Express Scripts' mail-order pharmacy, Accredo, even though Accredo's prices are routinely higher than the prices retail pharmacies charge for the same drugs. On information and belief, this resulted from Defendants' lack of oversight of Express Scripts and lack of attention to the ways in which it would attempt to enrich itself and its own pharmacy at the Plan's expense. A prudently administered plan would steer beneficiaries toward the option with a lower overall price, or at least would not *require* beneficiaries to obtain their prescriptions from a higher-priced pharmacy owned by the Plan's PBM.

135. "Steering" refers to various methods by which health plans incentivize their participants/beneficiaries to obtain medical care (including prescription drugs) from lower-cost and higher-quality providers. For example, health plans might offer their participants/beneficiaries lower co-pays or lower co-insurance percentages if they use lower-cost providers who offer the same or better quality services than higher-cost providers. Alternatively, health plans might remove a particular provider or pharmacy from their networks if that provider or pharmacy charges above-market prices.

136. Extensive research demonstrates that steering can significantly reduce the cost of healthcare for health plans and their participants/beneficiaries. For prescription

drugs, these savings result for two principal reasons. First, steering causes more participants/beneficiaries to obtain prescriptions from lower-cost pharmacies when they might otherwise have selected a higher-cost pharmacy, which reduces their out-of-pocket expenditures, their health plan's expenditures, and the premiums for all participants/beneficiaries. Second, steering—and the threat of steering—places competitive pressure on higher-cost pharmacies to lower their prices. Pharmacies are motivated to have health plans steer towards them (or at least not to steer away from them) because of the increased patient volume that steering generates for the pharmacies to whom patients are steered (and the decreased volume for pharmacies patients are steered away from). Thus, the ability of health plans to steer gives pharmacies a powerful incentive to be as efficient as possible, maintain low prices, and offer high quality and innovative services. Health plans and their participants/beneficiaries benefit tremendously from this because they can lower their healthcare expenses.

137. Defendants have done the opposite. For generic-specialty drugs, instead of steering participants/beneficiaries toward lower-priced pharmacies, Defendants *require* the Plan's participants/beneficiaries to obtain their prescriptions from the *higher-priced* pharmacy owned by Express Scripts, which is Accredo. According to plan documents, specialty medications are "not covered" at any retail pharmacy and instead are "only covered through Accredo specialty pharmacy delivery." Plan documents further state that "Specialty medications must be filled through Accredo, your specialty pharmacy." Plan participants/beneficiaries therefore cannot use their insurance to obtain specialty drugs anywhere other than Accredo.

138.   As noted above, however, Accredo's prices for specialty drugs are substantially higher than the prices at numerous retail pharmacies.  No prudent fiduciary would allow (much less force) plan participants/beneficiaries to obtain their prescriptions at a pharmacy that charges substantially more for those prescriptions than other common and popular retail pharmacies.   Defendants' imprudent decision to steer participants/beneficiaries to a higher-priced pharmacy has increased overall spending by the Plan—thereby leading to increased premiums for all participants/beneficiaries—and has forced participants/beneficiaries to pay more out-of-pocket for prescription drugs subject to this steering.

### C.   Defendants Agreed to Pay Excessive Administrative Fees to Express Scripts

139.   As noted above, traditional PBMs like Express Scripts make most of their money through spread pricing, rebate retention, and ownership of their own pharmacies. Traditional PBMs also typically charge relatively small amounts in administrative fees. Defendants, in addition to agreeing to unreasonable prices for prescription drugs, agreed to pay Express Scripts unreasonably high administrative fees.  The administrative fees Defendants agreed to make the Plan pay Express Scripts exceed market rates and the amounts that comparable companies paid in administrative fees to Express Scripts for equivalent PBM services.

140.   In 2019, Defendants caused the Plan to pay $9,235,645 in administrative fees to Express Scripts. In 2020, Defendants caused the Plan to pay $12,219,570 in administrative fees to Express Scripts. In 2021, Defendants caused the Plan to pay

$14,117,839 in administrative fees to Express Scripts.  In 2022, Defendants caused the Plan

to pay $25,639,955 in administrative fees to Express Scripts.  These amounts do not include

the cost of actual prescription drugs paid for by the Plan; rather, they represent

administrative fees only.

141.   These fees greatly exceed the administrative fees paid to Express Scripts by

other large plan sponsors with health plans providing benefits for at least 30,000

participants, as is clear from a comparison of each plans' reported direct payments to

Express Scripts on their Form 5500s.  On information and belief, Express Scripts provided

equivalent or substantially equivalent PBM services to each of the plans sponsored by the

plan sponsors listed below:

**2022 - Administrative Fees**

| Plan Sponsor | PBM | Total Fee | Participants | Admin Fee Per Participant |
|---|---|---|---|---|
| Wells Fargo | Express Scripts | $25,639,955 | 188,798 | $135.81 |
| Automatic Data Processing, Inc. | Express Scripts | $2,908,850 | 31,351 | $92.78 |
| Joint Board Of Trustees, Southwest Carpenters Health And Welfare Trust | Express Scripts | $2,346,882 | 31,701 | $74.03 |
| Charter Communications, Inc. | Express Scripts | $6,248,216 | 91,433 | $68.34 |
| Select Medical Corporation | Express Scripts | $1,833,984 | 32,156 | $57.03 |
| Joint Plan Committee, Railroad Employees National Health and Welfare Plan | Express Scripts | $4,250,101 | 213,981 | $19.86 |

142.    The administrative fees that Defendants agreed to pay are so high that they exceed even the administrative fees charged by pass-through PBMs, who generally charge about $6 per-member, per-month and do not collect any spread or retain any rebates on top of that flat fee.  SmithRx for example, charges $6 per-member, per-month for its PBM services, which are equivalent in substance and quality to the services provided by Express Scripts.  Defendants agreed to make the Plan pay over $11 per-member, per-month, and then on top of that, agreed to a contract that allows Express Scripts to charge inflated prices and then collect spread and retain rebates.  In other words, even if Defendants had agreed to reasonable prices for prescription drugs, their contract with Express Scripts would still be imprudent due to excessive fees—but in fact, they agreed to both excessive administrative fees *and* unreasonably high drug prices.

### D.    Defendants' Fiduciary Processes Were Fundamentally Flawed

143.    Defendants failed to engage in a prudent and reasoned decision-making process before agreeing to a PBM contract (and extending/renewing a contract) that requires the Plan and its participants/beneficiaries to pay Express Scripts the above-described prices and includes the above-described fees and other terms.  Prudent plan fiduciaries would have taken readily available steps to reduce the Plan's costs, which Defendants failed to take.  Because of the extraordinarily high prices and fees to which Defendants agreed, the Plan paid substantially more for prescription drugs than they would have absent the conduct described herein.  Likewise, participants and beneficiaries of the Plan paid more in premiums and out-of-pocket costs than they would have absent the conduct described herein.

144.   *First*, even setting aside whether prudent fiduciaries would have contracted with Express Scripts for all of their prescription-drug benefits, Defendants failed to adequately negotiate (or re-negotiate) the Plan's contract with Express Scripts and failed to prudently exercise their rights under that contract.  As a Fortune 50 employer with hundreds of thousands of employees, Wells Fargo has substantial bargaining power with vendors, including PBMs.  Prudent fiduciaries would have—and other similarly sized companies' plan fiduciaries have—used that bargaining power to demand and obtain substantially better contractual terms, including terms relating to prices and the way in which prices are determined.  Defendants could have taken these steps and obtained savings while retaining their prescription-drug plan's features and level of PBM services.

145.   For example, prudent fiduciaries would have—and Defendants could have—ensured that the Plan's prices for generic drugs are set forth in a fixed unit-cost schedule or NADAC-based price instead of with reference to AWP.  By taking this one step, Defendants would have reduced their spending on generic drugs by 30% or more. Fiduciaries of comparable plans have done exactly that in their negotiations with Express Scripts and have reduced their prescription-drug spending by 30% or more as a result.  This option was available to Defendants and would have saved the Plan millions of dollars across the prescription-drug program as a whole.  Put another way, Defendants' fiduciary breaches caused the Plan to overpay by millions of dollars each year on prescription-drug costs compared to available alternatives.

146.   Prudent fiduciaries also would have—and Defendants could have—ensured that generic specialty drugs are priced as generic drugs and not placed in the specialty drug

category with branded specialty drugs.   Prudent fiduciaries also would have—and
Defendants could have—more closely supervised Express Scripts' formulary management
and more effectively exercised their own rights to make decisions about formulary
inclusion and placement.  Had Defendants adequately negotiated with Express Scripts and
exercised their rights under the Plan's contracts, the Plan and its participants/beneficiaries
would have saved millions of dollars.

147.   Prudent fiduciaries also would have—and Defendants could have—ensured
that Plan participants/beneficiaries were not steered toward a PBM-owned pharmacy that
has higher prices than other pharmacies.

148.   Prudent fiduciaries also would have—and Defendants could have—ensured
that the Plan's administrative fees were in line with the fees paid by other plans of
comparable size that also used Express Scripts as their PBM.  Had Defendants adequately
negotiated with Express Scripts regarding fees, the Plan and its participants/beneficiaries
would have saved millions of dollars.

149.   ***Second****,* Defendants failed to adequately consider contracting with a pass-
through PBM, instead of Express Scripts, for all of the Plan's prescription-drug needs.
Fiduciaries of similar plans across the country have conducted comprehensive plan reviews
and concluded that their plans' interests were best served by switching from a traditional
PBM to a pass-through PBM.  This option was equally available to Defendants.  Given the
extremely high prices that Defendants agreed to pay, the Plan and its
participants/beneficiaries would have been better served by switching from a traditional
PBM to a pass-through PBM, and those benefits would have been clear at the time of

contracting. Defendants failed to adequately solicit bids from pass-through PBMs, or alternatively, did solicit such bids but failed to act in the best interests of the Plan and its beneficiaries when choosing among competing bids. A prudent process would have made clear that the Plan would save a substantial amount of money by contracting with one or more pass-through PBMs instead of entering into and/or renewing their contract with Express Scripts, without meaningfully (or at all) sacrificing availability of drugs, scope of pharmacy network, quality of service, convenience, or any other factor related to plan features or services. Had Defendants adequately considered alternative PBMs and made the prudent choice, the Plan and its beneficiaries would have saved millions of dollars.

150.    SmithRx is a pass-through PBM that services a wide range of healthcare plans. SmithRx is capable of providing a high level of service comparable or superior to that provided by Express Scripts, and it currently services multiple clients who formerly used Express Scripts as their PBM. Defendants could have, but did not, include SmithRx in their procurement process. If Defendants had contracted with SmithRx instead of agreeing to its contract with Express Scripts, Defendants would have saved the Plan and its participants/beneficiaries substantial amounts of money while retaining the prescription-drug plan's features and the level of PBM services.

151.    The following public price list from SmithRx includes most of the generic drugs highlighted in paragraph 126 of this Complaint, with a comparison between the prices that Defendants agreed to make the Plan and its participants/beneficiaries pay Express Scripts and the prices that SmithRx charges its plan clients with its pass-through model:

- 66 -

| Generic Drug Name | Quantity | Smith Rx Price | Price Wells Fargo Agreed to Pay | Wells Fargo Markup from SmithRx% |
|---|---|---|---|---|
| abacavir | 180 | $35.20 | $678.26 | 1826.88% |
| abacavir/lamivudine | 90 | $109.90 | $3,107.47 | 2727.54% |
| abiraterone acetate | 90 | $95.50 | $1,881.00 | 1869.63% |
| atazanavir | 90 | $75.82 | $601.04 | 692.72% |
| azathioprine | 90 | $25.30 | $38.94 | 53.91% |
| capecitabine | 84 | $33.40 | $691.32 | 1969.82% |
| cyclosporine | 90 | $28.90 | $1,026.05 | 3450.35% |
| dalfampridine | 90 | $28.00 | $1,647.90 | 5785.36% |
| deferasirox | 90 | $82.90 | $3,690.00 | 4351.15% |
| dimethyl fumarate | 180 | $113.50 | $5,785.20 | 4997.09% |
| efavirenz | 90 | $76.09 | $2,390.51 | 3041.69% |
| efavirenz/emtricitabine/tenofovir disoproxil fumarate | 90 | $75.85 | $7,433.99 | 9700.91% |
| emtricitabine/tenofovir disoproxil fumarate | 90 | $43.30 | $1,260.12 | 2810.21% |
| etravirine | 180 | $1,021.60 | $3,440.93 | 236.82% |
| fingolimod | 90 | $880.09 | $9,994.38 | 1035.61% |
| ibandronate | 3 | $15.29 | $65.36 | 327.47% |
| imatinib | 90 | $99.10 | $8,199.00 | 8173.46% |
| lamivudine | 90 | $34.30 | $286.14 | 734.23% |
| lamivudine/zidovudine | 90 | $38.80 | $477.61 | 1130.95% |
| mycophenolate mofetil | 90 | $28.00 | $60.09 | 114.61% |
| nevirapine | 90 | $19.00 | $17.03 | -10.37% |
| nevirapine ER | 90 | $89.20 | $1,325.36 | 1385.83% |
| ribavirin | 90 | $76.60 | $84.06 | 9.74% |
| sirolimus | 90 | $129.70 | $1,139.20 | 778.33% |
| tacrolimus | 90 | $21.70 | $88.43 | 307.51% |
| temozolomide | 90 | $376.30 | $16,405.38 | 4259.65% |
| tenofovir disoproxil fumarate | 90 | $40.60 | $114.85 | 182.88% |
| teriflunomide | 90 | $33.40 | $8,775.90 | 26175.15% |
| tetrabenazine | 90 | $70.30 | $5,526.57 | 7761.41% |
| tobramycin | 560 | $962.15 | $16,867.29 | 1653.08% |

| zidovudine | 90 | $34.30 | $38.69 | 12.80% |
|---|---|---|---|---|
| **Total** | | **$4,794.09** | **$103,138.07** | **2051.36%** |

152.    As these comparisons make clear, the prices that Defendants agreed to make the Plan and its participants/beneficiaries pay Express Scripts are excessive not only in comparison to the NADAC, but also in comparison to the actual prices charged by another PBM in the marketplace that is fully capable of providing Wells Fargo the same level of service it receives from Express Scripts.  As the above chart reflects, Defendants agreed to make the Plan and its participants/beneficiaries pay Express Scripts more than ***two thousand percent more*** for these drugs than another PBM charges its clients.

153.    In light of these specific price discrepancies and the broader methodological differences between SmithRx and PBMs using the traditional PBM model, if Defendants had contracted with SmithRx instead of agreeing to their Express Scripts deal, they would have saved the Plan several millions of dollars per year on prescription drug costs across the Plan as a whole, after accounting for all charges for all drugs, fees, and rebates.  Put another way, Defendants' fiduciary breaches caused the Plan to overpay by millions of dollars each year on prescription-drug costs compared to available alternatives.

154.    Comparable savings were available to Defendants by contracting with other pass-through PBMs as well.  For example, Navitus is a pass-through PBM that services a wide range of healthcare plans covering millions of lives.  It is capable of providing a high level of service comparable or superior to that provided by Express Scripts.  For 2022, Navitus's commercial clients paid an average of $89.73 in net total costs per-member, per-month.  On information and belief, the Plan in 2022 paid substantially more in net total

costs per-member, per-month under the terms of the contract Defendants negotiated with Express Scripts. Put another way, Defendants' fiduciary breaches caused the Plan to overpay by millions of dollars each year on prescription-drug costs compared to available alternatives.

155. **_Third_**, Defendants failed to adequately consider carving out their specialty-drug program from their broader contract with Express Scripts. As described below, fiduciaries of similar plans across the country have conducted comprehensive plan reviews and concluded that their plans' interests were best served by carving out specialty pharmacy benefits from their overall PBM contract. This option was equally available to Defendants. A prudent process would have revealed that the Plan would save money by carving out the specialty-drug program from the Plan's contract with Express Scripts. Had Defendants adequately considered this option and made the prudent choice, the Plan and its beneficiaries would have saved millions of dollars.

### E. An Attentive Fiduciary Would Have Recognized and Avoided the Flaws in Defendants' Approach

#### 1. Published Warnings and Guidance

156. Prominent media outlets, industry publications, governmental entities, and research organizations have long reported on the PBM tactics and conflicts of interest detailed above, and have warned plan administrators about the financial harms that result when they fail to act prudently and instead allow PBMs to enrich themselves at the expense of plans and their participants/beneficiaries. Prudent fiduciaries would heed this advice—and many prominent companies' fiduciaries have heeded this advice—by taking steps to

protect their plans from these widely-reported tactics.  Defendants knew or should have known that their PBM contracts unreasonably failed to heed these warnings and failed to protect the Plan and its participants/beneficiaries from these widely reported tactics, despite having ample bargaining power.  Defendants' failure to act prudently and their decision to enter into unreasonable arrangements with their PBM cost the Plan and its participants/beneficiaries millions of dollars during the class period.

157.    As early as 2010, the International Foundation of Employee Benefit Plan was reporting on the ways in which PBMs use specialty drugs to extract profits from plans. One notable article written by a PBM expert warned that "most PBMs increase their profit margins by buying specialty drugs at low prices and selling them at far higher prices, rather than using their marketplace leverage to decrease their clients' costs."  The article advised plans to "require your PBM to provide pass-through pricing for every specialty drug dispensed" and to "invoice your plan based on the PBM's actual acquisition cost."  The article also recommended that plans "can—and should—position [themselves] contractually to carve out specialty drugs after the contract begins, ensuring that you can consistently obtain the best minimum guaranteed discount available, throughout the life of the contract."  The article advised plans that they should "make sure to eliminate … exclusivity provisions and replace them with provisions that allow you to carve out specified services, including the provision of some or all specialty drugs, and the right to negotiate contracts with alternative specialty drug pharmacies."

158.    A 2013 article in Fortune Magazine reported that traditional PBMs "effectively pad bills by $8 to $10 a prescription" and, quoting a consultant who had

audited more than 100 PBM contracts, that "[t]he nation's employers are being taken for a ride" by traditional PBMs.

159.    A 2017 article reported that "[c]ontrolling the formulary gives PBMs a crucial point of leverage over the system" and warned that "PBMs place drugs on their formularies based on how high a rebate they obtain, rather than the lowest cost or what is most effective for the patient."  The same article warned that "[t]he MAC list that goes to the pharmacy does not necessarily match the one for the health plan. By charging the plan sponsor more than they pay the pharmacy in a reimbursement, PBMs can make anywhere from $5 to $200 per prescription."

160.    A 2017 article from Bloomberg titled "Drug Costs Too High?  Fire the Middleman" reported that PBMs "keep about 10 percent of the rebates from manufacturers vying to get their medicines covered; they sometimes charge health-plan clients more for generics than they reimburse the pharmacies dispensing them; and they channel clients to their own specialty or mail-order pharmacies."  The article recounted numerous success stories of companies that had moved away from the traditional PBM model and delivered millions of dollars in savings to their plans and their employees.

161.    A 2018 article from Axios reported that PBM contracts are often "written with the PBM's financial interests in mind" and that "those kinds of provisions can result in lost savings for everyone, especially for small companies and their employees."  The article warned that "[e]ven some of the largest companies think they are protected because they have in-house and outside attorneys vetting contracts, yet that's not necessarily the

case." The article warns that "a major tactic to maximize profits" by PBMs is controlling how different drugs are designated on the formulary.

162. A 2018 article from Axios quoted a prominent consultant who warned that "One of the key components of the system is that transition of brand-name drug to generic drug … [a]nd if you would allow a PBM or any third-party vendor to over-inflate that amount ... you are being set up to lose every time."

163. A 2018 report by drug price nonprofit 46Brooklyn Research detailed PBMs' use of spread pricing to reap massive profits, at the expense of payers, on generic imatinib mesylate. As that report explained, payers who agree to pay prices that are determined independently of what PBMs pay to pharmacies "lose all visibility into what their underlying drugs actually cost, handing the keys over to the PBM," while "the PBM can effectively just sit back as generic prices plummet, knowing that it is under no requirement whatsoever to pass the full extent of those savings back" to the payer.

164. An extensive probe by the Columbus Dispatch, reporting on which began in 2018, revealed "that CVS Caremark routinely billed the state [of Ohio] for drugs at a far higher amount than it paid pharmacies to fill the prescriptions," retaining "tens of millions of dollars" in spread pricing. Among many other things, the Dispatch reported that the traditional PBM "system has a built-in incentive for CVS Caremark and other PBMs to maximize the price spreads: They get to keep the money" and that "the largest spreads occurred among generic drugs." The Dispatch's reporting was picked up and widely reported by national outlets.

165.    A 2018 USA Today article about PBMs quoted a prominent consultant describing a supposedly new pricing model by CVS Caremark as follows: "CVS Caremark is using different language only to make it appear that it is being more transparent. And the new pricing approach also doesn't eliminate rebates on brand-name drugs or spread pricing.   When negotiating contracts with manufacturers, CVS Caremark can label manufacturers' payments with whatever labels Caremark wants: rebates, manufacturer fees, health management fees, etc. Therefore, the question is what percentage of total manufacturer payments Caremark passes through."

166.    A 2019 article quoted a prominent consultant who identified "[a] lack of clear definitions of types of drugs" as an important issue, and explained that "PBMs often play with the definitions of [specialty] drugs in ways that promote the health of their own bottom line."   The consultant advised that a payer "should make its own list of specialty drugs" and "set minimum guaranteed discounts off public prices for each."   The same consultant stated: "If you write a better contract, you can eliminate a lot of this stuff."

167.    A 2020 report commissioned by The Florida Pharmacy Association and American Pharmacy Cooperative, Inc. warned that "as more brand name specialty drugs … lose patent exclusivity in the coming years, there is growing risk that the extreme pricing manipulation and steering we have identified on imatinib mesylate could become more commonplace," and recommended moving "to an acquisition cost-based model to mitigate the risk of a dramatic rise in price exploitation on specialty generic drugs."

168.    A 2020 report on pharmacy benefits advised that traditional PBMs have "misaligned incentives which can lead to price increases without providing equivalent

value for the purchasers of benefits" and advised that "Employers need to: • Think differently about how to manage the pharmacy benefit. • Take action on addressing waste, low-value drugs and excess costs often caused by PBMs and other pharmacy benefit middlemen. • Make ethical and logical decisions over what a drug is worth and the employer's ability to pay – as plan sponsor and fiduciary, it's critical that dollars are used efficiently for plan beneficiaries. • Focus on innovative approaches to specialty drug management."

169.   A 2021 report prepared by the House Committee on Oversight and Reform Minority Staff warned that "PBMs engage in a number of questionable practices, one of which is spread pricing, in which PBMs pay a pharmacy a lower amount than they report to a health plan sponsor."   The report further stated that PBMs use their control of formularies to "drive patients to more expensive drugs."

170.   A 2022 BenefitsPro article directed at human resources officers advised that "plan sponsors have more power than they may realize when evaluating a PBM," that "your PBM contract must be free of any ambiguities regarding the PBM's obligation to act in your best interests at all times," that plan fiduciaries should "prohibit the PBM from using any internal 'proprietary' algorithm that determines whether a drug will be priced as a brand or generic drug," that plan fiduciaries should "prohibit the MAC Game by requiring the PBM to use the same MAC List to pay the pharmacy and to bill you for generic drugs," that plan fiduciaries should "make it clear that … the PBM must pass through and not retain any rebates" and "define the term 'rebate' to include any and all renumeration that the PBM receives from drug manufacturers based on your plan's utilization," that plan fiduciaries

should "require the PBM to … place drugs on your formulary based on efficacy, safety and the true net cost of the drugs," and that plan fiduciaries should "audit your PBM to confirm that the PBM has delivered the contracted pricing and has implemented your plan designs correctly."

171.   A February 2022 white paper on specialty drug management reported that "the savings with Specialty PBM Carve-Out can be quite substantial, with savings ranging from 25-50%. Sources of savings go beyond the supply chain elements of rebates and drug discounts to incorporate benefits of the clinical and coverage model, including a more cost-effective formulary, health economics-based coverage, more rigorous [prior authorization], and more robust copay assistance programs."

172.   A 2022 white paper from the University of Southern California (USC) reported that "U.S. consumers and employers and the government often overpay for generics as pharmacy benefit managers (PBMs) and their affiliated insurer companies game opaque and arcane pricing practices to pad profits."   The paper continues: "Commercial tactics such as spread pricing, copay clawbacks and formularies that advantage branded drugs over less expensive generics have funneled the savings from low-cost generics into intermediaries' pockets, rather than the pockets of patients."

173.   A 2023 report documented that PBMs regularly decline to replace expensive brand-name drugs on formularies with newly released generics, stating that "PBMs are persistently excluding generic competition from the market, resulting in higher prices and less choice for patients and the healthcare system."  The report explained that "PBMs prefer the high-list price, high-rebate drugs because they benefit from it."

174.   A 2023 guide to PBM contracting for employers identified "[t]he lack of unit cost pricing for ALL generics" as the "most substantial cost excess seen in PBM contracting," and informed employers that "[a]n objective ($/unit) price for EVERY generic entity must be presented in the proposal and integrated into the executed PBM contract."  The same guide warns that "[i]f a plan sponsor (fiduciary) allows generics to be priced at AWP-X%, ALL cost modeling and projections are not credible."

175.   A 2023 article reported on the "flow of money between major consulting conglomerates and PBMs," and quoted an industry attorney's statement that "[t]he broker not only gives bad advice to the employer that's in the broker's self-interest, but the broker also allows the big PBM to write crazy terms into a contract."  The article further warned employers that "PBMs … favor brand-name drugs over generic equivalents, delay coverage of new generics and biosimilars, mark up prices of generic drugs, and require employers to use the PBM's mail-order pharmacy," all to "boost the PBM's bottom line."

176.   The federal government has long recognized the cost savings that result from basing prices on actual pharmacy acquisition costs rather than an AWP-based model.  The United States Office of Personnel Management ("OPM"), which manages the civil service of the federal government, regularly issues guidelines and standards applicable to insurance carriers that provide health care coverage to federal employees.  Since at least 2011, those standards have required that carriers' contracts with PBMs "base Carrier costs on negotiated price with network pharmacies or the actual acquisition cost for PBM-owned or affiliated pharmacies."  According to the latest guidelines, carriers must ensure that the price of drugs filled by pharmacies not affiliated with the PBM are based on the negotiated

price in each pharmacy agreement plus a dispensing fee, without spread pricing. Likewise, carriers must ensure that the price of drugs filled by PBM-owned or affiliated pharmacies are based on the actual acquisition cost, plus a dispensing fee, without spread pricing. PBMs must also disclose to carriers the MAC lists used for carriers' pricing.

177.   OPM also requires carriers to negotiate for full audit rights to all PBM network pharmacy contracts, claims data, manufacturer payments (including all rebates, however denominated), invoices, and clinical services coverage criteria. OPM further requires carries to include in their PBM contracts terms related to having access to information at each claim and aggregate level between PBMs and pharmacies (including PBMs and PBM-owned or affiliated pharmacies).

### 2.   Defendants' Own Business Experience

178.   Wells Fargo, one of the largest financial services companies in the world, is an active participant in the pharmaceutical market. Wells Fargo regularly publishes research about the economics of the pharmaceutical industry and hosts an annual healthcare conference that routinely features PBM market participants.

179.   Wells Fargo has also operated a leading employee benefits consulting practice and brokerage, advising clients on topics including pharmacy benefits and conducting RFP processes on behalf of companies seeking new PBM contracts. In a 2017 "Employee Benefits Outlook" report, Wells Fargo advisors warned of rising prescription drugs costs and specialty drug spending, and noted: "In today's environment, employers must work a little harder to improve the health of their population while minimizing increasing costs for their employees." Another 2017 article by a Wells Fargo advisor listed

PBM consolidation as a primary driver of rising prescription drug costs and encouraged employers to "[r]eview your current pharmacy benefit manager contract to ensure that the most aggressive unit cost and appropriate-use strategies are in place." In 2013, a Wells Fargo advisor explained that "substantial savings" were possible when employers act prudently in assessing PBM options, pricing strategies, and contracts.

180.    Wells Fargo analysts have noted that Express Scripts' growth in earnings has been driven the very practices alleged here, including markups on specialty drug prescriptions, steering of plan members its own pharmacy, and clients' repeated failure to identify and switch to alternative PBMs with better prices and terms.

### 3.    Practices of Other Plans

181.    Throughout the class period, the fiduciaries of other prescription-drug plans publicly took one or more of the steps detailed above and saved their plans and their beneficiaries millions of dollars, with savings that far outweighed any costs (financial or otherwise) of implementation.  These options were equally available to Defendants, who could have retained their prescription-drug plan's features and the level of PBM services while obtaining substantial savings for the Plan (in the form of lower payments for prescription drugs) and their participants/beneficiaries (in the form of lower premiums, lower deductibles, lower coinsurance, lower copays, and higher wages or greater wage growth).

182.    The following examples are illustrative and taken from public reporting. Many other companies have taken similar steps and achieved similar results.

183.    PepsiCo, Inc. is a multinational food, snack, and beverage corporation that provides prescription-drug benefits for thousands of employees and their dependents.  In 2018, PepsiCo joined the National Drug Purchasing Coalition, which reports described as a "group of the nation's largest, most forward-thinking employers that use their collective purchasing power to negotiate high quality, cost-effective and innovative solutions for managing pharmacy benefits."  PepsiCo continues to use Express Scripts as its PBM, but it has used its bargaining power to secure prices for generic drugs that are far lower than Defendants' prices.  For the generic drugs in the table at paragraph 116 above, Defendants agreed to make the Plan and its participants/beneficiaries pay, on average, *2.3 times as much* as PepsiCo's plan and participants/beneficiaries pay for the same drugs.  For the generic drugs in the table at paragraph 124 above, Defendants agreed to make the Plan and its participants/beneficiaries pay, on average, *four times* as much as PepsiCo's plan and participants/beneficiaries pay for the same drugs.

184.    Caterpillar Inc. is an equipment manufacturer that provides prescription-drug benefits for approximately 100,000 employees and their dependents.  In 2010, Caterpillar began exercising full control over its formulary instead of deferring to the formulary recommendations of its traditional PBM, and used that control to ensure that decisions about formulary inclusion and placement were being made in the interests of its plan rather than its PBM.  Since making these changes, Caterpillar has saved millions of dollars per year on its prescription-drug costs, with far lower per-patient and per-prescription costs.  Bloomberg News reported on Caterpillar's success in exercising formulary control, reporting that "Caterpillar has saved tens of millions of dollars a year" and quoting the

company's global benefits manager stating that Caterpillar's "model is as successful today as it's ever been."

185.   Wayne Farms is a poultry processor that provides prescription-drug benefits for approximately 12,000 employees and their dependents.  In August 2020, Wayne Farms carved out specialty drugs from its traditional PBM contract and implemented a pass-through PBM model for its specialty drugs through Archimedes, a pass-through PBM.  This change resulted in substantial savings for Wayne Farms: When comparing the first six months of the specialty carve-out program to the same time period in the year prior, Wayne Farms' expenditures on specialty drugs decreased from $26.75 to $16.03 in per-member per-month costs ("PMPM," a common cost metric for prescription-drug plans), representing a 40% decrease in plan spend.  Net of fees, Wayne Farms experienced a 31% decrease in plan spend for the first six months compared to the same period the prior year.  This change in plans was implemented with negligible member disruption.  Wayne Farms's Director of Compensation and Benefits stated: "Implementing this program was one of the best decisions our team has made. The savings are exceeding projections and our members are extremely happy."

186.   American Casino & Entertainment Properties LLC ("ACEP") was a gaming company (which has since been acquired by a larger gaming company) that provided prescription-drug benefits for thousands of employees and their dependents.  In 2012, ACEP dropped its traditional PBM and switched to Navitus, a pass-through PBM.  Its prescription-drug costs decreased by 28 percent as a result of the switch.  ACEP's

Corporate Vice President of Human Resources stated that the company was able to "maintain excellent coverage while providing substantial savings to our employees."

187.   Dean Foods was a food and beverage company (which has since been acquired by another company) that provided prescription-drug benefits for approximately 15,000 employees and their dependents.  In 2019, Dean Foods carved out all specialty drugs from its traditional PBM contract, and Vivio, a pass-through PBM, began managing all specialty drug benefits under Dean Foods' prescription-drug plan.  Prior to carving out specialty drugs, Dean Foods was projected to spend approximately $8.798 million on specialty drugs in 2019.  But after carving out specialty drugs, Dean Foods spent only $5.569 million in specialty drugs in 2019, for a savings of $4.35 million in a single year.

188.   Self-Insured Schools of California (SISC) is a public school Joint Powers Authority that provides health care benefits to staff and their families at over 400 school districts in California, covering approximately 330,000 total members.  In 2014, SISC engaged in a comprehensive review of its prescription-drug benefit and concluded that it could save money by no longer deferring to its traditional PBM's formulary management decisions (which SISC recognized were favoring more expensive drugs with large rebates over cheaper drugs without rebates) and by identifying a PBM that was not focused on driving usage of its own mail-order pharmacy.  SISC conducted a prudent process, hired a non-conflicted consultant, and eventually contracted a pass-through PBM.  By working with its pass-through PBM to design a custom formulary, and through the more favorable pricing model of pass-through PBMs, SISC achieved substantial savings with minimal member disruption.  SISC's Deputy Executive Officer stated: "We were very surprised

with what we were uncovering and confident that we weren't cutting into effectiveness, just trimming waste. Clinical effectiveness and safety always came first."

189.    The University of Southern California (USC) is a private research university that provides prescription-drug benefits for more than 20,000 employees and their dependents.   By refusing to accept the formularies offered by its PBM and designing its own higher-value formulary, USC reduced its drug spend by 40 percent in one year.

190.    Golden Entertainment, Inc. is a gaming company that provides prescription-drug benefits for more than 5,000 employees and their dependents.  In or around 2019, Golden Entertainment switched from a traditional PBM to a pass-through PBM.  Just four months after implementation of its new approach, Golden Entertainment achieved overall plan and member savings of 33.5%, including a 24% decrease in member cost and a 29% decrease in PMPM costs.

191.    The city of Kenosha, Wisconsin provides prescription-drug benefits for approximately 2,400 employees and their dependents.   In 2018, Kenosha replaced its traditional PBM with a pass-through PBM.   In its first three years with the pass-through PBM, Kenosha saved $2.3 million in pharmacy costs, achieved a 38% decrease in net plan PMPM costs, and achieved a 318% increase in rebates received.  Kenosha's Director of Human Resources referred to the move to a pass-through PBM as "a rousing success" with "complete transparency and significant cost savings," and reported that "the City's pharmacy costs have dropped 38 percent, resulting in more than $2.3 million in cumulative savings."

192.   The Montana Credit Union League (MCUL) Group Benefit Trust provides health and life insurance benefits to nearly half of the 45 credit unions in the state of Montana. In 2021, MCUL issued an RFP for a new pharmacy benefits manager and contracted with a pass-through PBM.  By making the change, MCUL achieved significant reductions in PMPM costs, from $143 in 2021 to $88 in 2022.

193.   Foot Locker is a sportswear and footwear retailer that provides prescription-drug benefits for approximately 8,500 employees and their dependents.  In 2021, Foot Locker switched from a traditional PBM to Navitus, a pass-through PBM.  During the first year after the switch, spending on drugs dropped 5%.

194.   Phifer Incorporated is a fabrics company that provides prescription-drug benefits for approximately 1,000 employees and their dependents.  At the end of 2022, Phifer dropped its traditional PBM in favor of MedOne Pharmacy Benefit Solutions. According to Phifer's vice president of human resources, Phifer was able to hold its premiums for 2024 flat because of the money it saved on drug spending.

195.   The Teamsters Health and Welfare Trust Fund of Philadelphia and Vicinity, a union fund that provides prescription-drug benefits for approximately 16,000 employees and their dependents, replaced their traditional PBM with Capital Rx in 2019.  The fund saved 17% on drug spending in its first year away from its traditional PBM, and has saved more on drug spending each year than it projected.  The executive director of the fund referred to the fund's decision to move away from a traditional PBM as the "best decision ever."

## V.    ADDITIONAL FACTS REGARDING NAMED PLAINTIFFS

196.    Plaintiff Sergio Navarro was enrolled in the Plan while he worked at Wells Fargo.  While he was enrolled in the Plan, Navarro paid premiums for his health insurance coverage, part of which was for prescription-drug coverage.  He also paid co-pays and other out-of-pocket amounts attributable to his use of prescription drugs.  Navarro paid more in premiums and out-of-pocket costs than he would have paid absent Defendants' fiduciary breaches and prohibited transactions.

197.    While enrolled in the Plan, Navarro obtained numerous prescriptions for generic drugs for which Defendants agreed to unreasonable prices, including [redacted drug 1] (218.37% markup at time of prescriptions), [redacted drug 2] (375.78%), and [redacted drug 3] (80.08%).  For example, in August 2023, Navarro filled a 30-day prescription of [redacted drug 1].  At the time, the acquisition cost for that prescription was only $5.70.  However, Defendants agreed to terms with Express Scripts under which that prescription cost nearly three times as much, $16.06.  Navarro was required to pay that full amount out-of-pocket, directly bearing the cost for the overcharge.  Similarly, in September 2023, Navarro filled another 30-day prescription of [redacted drug 1].  At the time, the acquisition cost for that prescription was only $4.80.  However, Defendants agreed to terms with Express Scripts under which that prescription cost more than three times as much, $17.47.  Navarro was required to pay that full amount out-of-pocket, directly bearing the cost for the overcharge.

198.    Plaintiff Jane Kinsella was enrolled in the Plan while she worked at Wells Fargo.  While she was enrolled in the Plan, Kinsella paid premiums for her health insurance

coverage, part of which was for prescription-drug coverage. She also paid co-pays and other out-of-pocket amounts attributable to her use of prescription drugs. Kinsella paid more in premiums and out-of-pocket costs than she would have paid absent Defendants' fiduciary breaches and prohibited transactions.

199. While enrolled in the Plan, Kinsella obtained numerous prescriptions for generic drugs for which Defendants agreed to unreasonable prices, including [redacted drug 4] (95.77% markup at time of prescriptions), [redacted drug 5] (93.92%), and [redacted drug 6] (66.05%). For example, in September 2020, Kinsella filled a 90-day prescription of [redacted drug 5]. At the time, the acquisition cost for that prescription was only $1.80. However, Defendants agreed to terms with Express Scripts under which that prescription cost more than three times as much, $6.31. Kinsella was required to pay that full amount out-of-pocket, directly bearing the cost for the overcharge. In November 2020, Kinsella filled a 90-day prescription of [redacted drug 4]. At the time, the acquisition cost for that prescription was only $28.80. However, Defendants agreed to terms with Express Scripts under which that prescription cost almost twice as much, $52.95.

200. Plaintiff Dayle Bulla was enrolled in the Plan while she worked at Wells Fargo. While she was enrolled in the Plan, Bulla paid premiums for her health insurance coverage, part of which was for prescription-drug coverage. She also paid co-pays and other out-of-pocket amounts attributable to her use of prescription drugs. Bulla paid more in premiums and out-of-pocket costs than she would have paid absent Defendants' fiduciary breaches and prohibited transactions.

201.    While enrolled in the Plan, Bulla obtained numerous prescriptions for generic drugs for which Defendants agreed to unreasonable prices, including [redacted drug 7] (117.98% markup at time of prescriptions), [redacted drug 8] (85.33%), [redacted drug 9] (127.88%), and [redacted drug 9] (231.60%). For example, in December 2019, Bulla filled a 30-day prescription of [redacted drug 9].  At the time, the acquisition cost for that prescription was only $4.80.  However, Defendants agreed to terms with Express Scripts under which that prescription cost more than three times as much, $14.52.  Bulla was required to pay $10 out-of-pocket, directly bearing most of the cost for the overcharge.  In October 2019, Bulla filled a 30-day prescription of [redacted drug 7].  At the time, the acquisition cost for that prescription was only $8.70.  However, Defendants agreed to terms with Express Scripts under which that prescription cost almost three times as much, $25.35.  Bulla was required to pay $10 out-of-pocket, directly bearing part of the cost for the overcharge.

202.    Plaintiff Theresa Gamage was enrolled in the Plan while she worked at Wells Fargo.  While she was enrolled in the Plan, Gamage paid premiums for her health insurance coverage, part of which was for prescription-drug coverage.  She also paid co-pays and other out-of-pocket amounts attributable to her use of prescription drugs.  Gamage paid more in premiums and out-of-pocket costs than she would have paid absent Defendants' fiduciary breaches and prohibited transactions.

203.    While enrolled in the Plan, Gamage obtained numerous prescriptions for generic drugs for which Defendants agreed to unreasonable prices, including [redacted drug 10] (52.65% markup at time of prescriptions), [redacted drug 11] (89.15%), and

[redacted drug 12] (136.80%).   For example, in July 2019, Gamage filled a 30-day prescription of [redacted drug 10].  At the time, the acquisition cost for that prescription was only $5.40.  However, Defendants agreed to terms with Express Scripts under which that prescription cost nearly twice as much, $9.45. Gamage was required to pay that full amount out-of-pocket, directly bearing the cost for the overcharge.   In December 2019, Gamage filled a six-day prescription of [redacted drug 12].   At the time, the acquisition cost for that prescription was only $4.62.   However, Defendants agreed to terms with Express Scripts under which that prescription cost more than twice as much, $10.94. Gamage was required to pay $10.00 out-of-pocket, directly bearing most of the cost for the overcharge.

204.   Enrollees in the Plan share in the cost of healthcare coverage with Wells Fargo.  In particular, the Plan's expenses are paid from the Trust, and the Trust is funded by a combination of employer and employee contributions, along with investment income. Employee contributions are generally made via bi-weekly payroll deductions.  The amount of the required employee contributions in each calendar year is set by Defendants, who set that amount based on the Plan's expected spending in that year.  The more that Defendants expect the Plan to spend on healthcare (including on prescription drugs and related fees), the more they require employees to pay into to the Trust to cover a portion of those expected costs.  Accordingly, when the Plan's healthcare expenses (including expenses on prescription drugs and related fees) increase in one year, employees are required to pay more in premiums in future years.  In this way, the Plan's overpayments for prescription

drugs and related fees lead directly to increases in premiums for the Plan's participants, regardless of whether they fill any prescriptions during the year.

205.    Plaintiffs, as employees of Wells Fargo and participants in the Plan, were required to pay, and did pay, healthcare premiums into the Trust.  In 2019, the Plan's 218,107 participants made approximately $682.155 million in contributions to the Trust. In 2020, the Plan's 215,998 participants made approximately $695.73 million in contributions to the Trust.  In 2021, the Plan's 214,353 participants made approximately $692.51 million in contributions to the Trust.  In 2022 (the most recent year of reporting), the Plan's 188,798 participants made approximately $650.94 million in contributions to the Trust.

206.    Defendants set the required employee contributions each year as a percentage of expected spending by the Plan.  Over the past five years for which data is available (from 2018 to 2022), Defendants intentionally set employee contributions at the level necessary to maintain a consistent and stable ratio of employer contributions to employee contributions.  Specifically, Defendants set employee contributions at amounts they projected would result in employees contributing premiums equal to 25% of overall Plan healthcare costs, with Wells Fargo contributing the remaining 75%.  In 2018, employees made 26.65% of overall contributions to the Trust; in 2019, employees made 26.82% of overall contributions to the Trust; in 2020, employees made 26.63% of overall contributions to the Trust; in 2021, employees made 25.00% of overall contributions to the Trust; and in 2022, employees made 25.21% of overall contributions to the Trust.

207.   This stability in employee contribution percentage is the result of Defendants' intentional efforts to maintain a consistent ratio between employer and employee contributions.  In light of these efforts, if overall healthcare spending were lower in any given year—*e.g.*, if Defendants stopped causing the Plan to overspend on prescription drugs and related fees by millions of dollars each year—employee contributions would be lower as well, in order to maintain the same 75-25 split between employer and employee contributions to which Defendants have demonstrated their commitment.

208.   If Defendants had not committed the fiduciary breaches and engaged in the prohibited transactions alleged here, the Plan's annual spending would have been substantially lower, which in turn would have reduced the amount of the required employee contributions each year, including the contributions made by Plaintiffs.  They paid more in premiums than they would have paid absent Defendants' fiduciary breaches.

209.   In addition, if Defendants had not agreed to terms that forced the Plan to overpay for prescription drugs and related fees, the Plan would have used plan assets to deliver additional healthcare benefits to Plaintiffs and other participants/beneficiaries.  In 2022, for example, the Trust received $2,583,732,474 in additional plan assets, from a combination of employee contributions, employer contributions, and investment income.  Pursuant to ERISA, those $2,583,732,474 in plan assets were required to be spent for the exclusive purpose of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan.  In the same year, the Trust used $2,576,947,413 of plan assets on claims payments and plan expenses.  A significant

portion of that $2,576,947,413 was spent on overpayments for prescription drugs and fees. If Defendants had not forced the Plan to waste that money by paying excessive prices for prescription drugs and related fees, the Plan would have been required by ERISA to use— and would have used—that money to deliver additional benefits to participants/beneficiaries, including Plaintiff Navarro. The same is true of prior Plan years, and in those years, all Plaintiffs.

## PLAN-WIDE RELIEF

210.    29 U.S.C. § 1132(a)(2) authorizes any participant or beneficiary of an ERISA plan to bring an action on behalf of such plan and to obtain the plan-wide remedies provided by 29 U.S.C. § 1109(a). Plaintiffs seek relief on behalf of the Plan pursuant to this statutory provision for purposes of their Causes of Action in Counts One and Three.

211.    Plaintiffs seek recovery for injuries to the Plan sustained as a result of the breaches of fiduciary duties referenced in Count One, the prohibited transactions referenced in Count Three, and throughout this Complaint from the beginning of the statute of limitations period through judgment in this matter.

212.    Plaintiffs are adequate to bring this derivative action on behalf of the Plan, and their interests are aligned with the Plan's participants and beneficiaries. Plaintiffs do not have any conflicts of interest with any participants or beneficiaries that would impair or impede their ability to pursue this action.

## CLASS ACTION ALLEGATIONS

213.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil

Procedure 23 on behalf of the following proposed class:[1]

> All persons who were participants in or beneficiaries of the
> Plan from July 30, 2018 through judgment in this matter (the
> "Class Period").

214.    The members of the putative class are so numerous that joinder of all

potential class members is impracticable.  Plaintiffs do not know the exact size of the class

but are informed and believe that the proposed class includes tens of thousands of persons

residing across the United States.

215.    Plaintiffs' claims are typical of the claims of other members of the proposed

class.  Like other class members, Plaintiffs participated in the Plan and suffered injuries as

a result of Defendants' mismanagement of the Plan.   Defendants treated Plaintiffs

consistently with other class members with respect to their prescription drug coverage and

payment obligations.  Plaintiffs' claims and the claims of all class members arise out of the

same conduct, policies, and practices of Defendants as alleged herein, and all members of

the class have been similarly affected by Defendants' wrongful conduct.

216.    There are questions of law and fact common to the class that predominate

over any individual issues that might exist.  Common questions include, but are not limited

to, whether the Defendants are fiduciaries of the Plan; whether Defendants breached their

---

[1] Plaintiffs reserve the right to propose other or additional classes or subclasses in
their motion for class certification or subsequent pleadings in this action.

fiduciary duties by engaging in the conduct described in this Complaint; whether Defendants engaged in prohibited transactions; whether these alleged violations caused the Plan to overpay for prescription drugs and class members to share in that financial burden; whether these alleged violations caused the Plan to overpay in administrative fees and class members to share in that financial burden; and whether the Plan and the class member participants and beneficiaries are entitled to monetary, injunctive, and other equitable relief.

217.   Plaintiffs will fairly and adequately protect the interests of the class members.  Plaintiffs have no interests antagonistic to those of other members of the class, and they are committed to the vigorous prosecution of this action.  In addition, Plaintiffs have retained counsel competent and experienced in class-action litigation, including ERISA class actions.

218.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy because numerous identical lawsuits alleging similar or identical causes of action would not serve the interests of judicial economy and would create a risk of inconsistent or varying adjudications with respect to individual potential class members that would establish incompatible standards of conduct.   A class action would save time, effort, and expense and assure uniformity of decision for persons similarly situated without sacrificing procedural unfairness or any undesirable result.

219.   Plaintiffs are unaware of any members of the putative class who are interested in presenting their claims in a separate action, nor would it be economically feasible for them to do so.

220.    This class action will not be difficult to manage due to the uniformity of claims among the class members and the susceptibility of the claims to class litigation.  The proposed class has a high degree of cohesion.

## CAUSES OF ACTION

### COUNT ONE
**Breach of Fiduciary Duties – 29 U.S.C. §§ 1104(a), 1132(a)(2)**
**(on behalf of Plaintiffs, the Class, and the Plan against All Defendants)**

221.    Plaintiffs, on behalf of all others similarly situated, and on behalf of the Wells Fargo & Company Health Plan, incorporate by reference all previous paragraphs of this Complaint as if fully re-written herein.

222.    Defendants were required to discharge their duties with respect to the Plan solely in the interest of the Plan's participants and beneficiaries, and for the exclusive purpose of providing benefits to participants and beneficiaries and defraying reasonable expenses of administering the Plan.  In addition, Defendants were required to act with the care, skill, prudence, and diligence required by ERISA.

223.    These duties required Defendants to (among other things) prudently manage the Plan's prescription-drug benefit, carefully monitor the Plan's PBM and prescription drug costs and fees to ensure that the Plan and participants/beneficiaries paid only reasonable amounts for each prescription drug and for administrative fees, and independently assess the formulary placement of each drug and not simply follow the conflicted advice of an EBC or PBM.  In making decisions about the prescription-drug program, Defendants were required to consider all relevant factors and options under the circumstances, including alternative arrangements that were available to the Plan, PBM

alternatives, the conflicts of interest of its vendors, whether the prices of drugs under its contract were reasonable, and steps taken by other companies that successfully lowered their prescription-drug costs.

224.    Instead of prudently managing the Plan's prescription-drug program and carefully monitoring the Plan's PBM and prescription drug costs, Defendants effectively abdicated their fiduciary duties to a for-profit PBM, gave the PBM free rein without any meaningful monitoring or review, allowed the Plan and its participants/beneficiaries pay extraordinarily high prices for prescription drugs and administrative fees, ceded control of the Plan's formulary to conflicted third parties, failed to supervise those conflicted third parties or otherwise ensure that decisions were made in the best interests of the Plan and its participants/beneficiaries, failed to conduct adequate reviews of the Plan's prescription-drug costs, failed to steer participants/beneficiaries to lower-cost options, failed to engage in a prudent process for monitoring the Plan's formulary, and failed to take available steps that would have saved the Plan and its participants/beneficiaries millions of dollars.  Harms to the Plan have taken the form of excessive payments for prescription drugs and excessive fees.  Harms to participants/beneficiaries have taken the form of higher premiums, higher deductibles, higher coinsurance, higher copays, and lower wages or limited wage growth.

225.    Defendants' breaches of fiduciary duty increased the amounts that the Plan paid for prescription drugs and in fees, and also increased the amounts that Plaintiffs and members of the class were required to pay in premiums, deductibles, co-pays, and co-insurance, and resulted in lower wages or limited wage growth.

226.    Pursuant to 29 U.S.C. § 1132(a)(2), Plaintiffs are entitled to obtain relief under 29 U.S.C. § 1109(a) for Defendants' fiduciary breaches, including: (i) recovery of losses to the Plan; (ii) disgorgement of profits; and (iii) other equitable or remedial relief as the Court deems appropriate, such as permanent injunctive relief, removal of the current fiduciaries, replacement of the Plan's PBM, appointment of an independent fiduciary, surcharge, and other remedies.

### COUNT TWO
### Breach of Fiduciary Duties – 29 U.S.C. §§ 1104(a), 1132(a)(3)
### (on behalf of Plaintiffs and the Class against All Defendants)

227.    Plaintiffs, on behalf of all others similarly situated, and on behalf of the Wells Fargo & Company Health Plan, incorporate by reference all previous paragraphs of this Complaint as if fully re-written herein.

228.    Defendants were required to discharge their duties with respect to the Plan solely in the interest of the Plan's participants and beneficiaries, and for the exclusive purpose of providing benefits to participants and beneficiaries and defraying reasonable expenses of administering the Plan.  In addition, Defendants were required to act with the care, skill, prudence, and diligence required by ERISA.

229.    These duties required Defendants to (among other things) prudently manage the Plan's prescription-drug benefit, carefully monitor the Plan's PBM and prescription drug costs and fees to ensure that the Plan and participants/beneficiaries paid only reasonable amounts for each prescription drug, and independently assess the formulary placement of each drug and not simply follow the conflicted advice of an EBC or PBM. In making decisions about the prescription-drug program, Defendants were required to

consider all relevant factors and options under the circumstances, including alternative arrangements that were available to the Plan, alternative PBMs, the conflicts of interest of its vendors, whether the high prices of drugs under its contract were justified by any other features of its PBM agreement, and steps taken by other companies that successfully lowered their prescription-drug costs.

230.   Instead of prudently managing the Plan's prescription-drug program and carefully monitoring the Plan's PBM and prescription drug costs, Defendants effectively abdicated their fiduciary duties to a for-profit PBM, gave the PBM free rein without any meaningful monitoring or review, allowed the Plan and its participants/beneficiaries to pay extraordinarily high prices for prescription drugs and administrative fees, ceded control of the Plan's formulary to conflicted third parties, failed to supervise those conflicted third parties or otherwise ensure that decisions were made in the best interests of the Plan and its participants/beneficiaries, failed to conduct adequate reviews of the Plan's prescription-drug costs, failed to steer participants/beneficiaries to lower-cost options, failed to engage in a prudent process for monitoring the Plan's formulary, and failed to take available steps that would have saved the Plan and its participants/beneficiaries millions of dollars.

231.   Defendants' breaches of fiduciary duty increased the amounts that Plaintiffs and members of the class were required to pay in premiums, deductibles, co-pays, and other out-of-pocket costs, and resulted in lower wages or limited wage growth.

232.   Pursuant to 29 U.S.C. § 1132(a)(3), Plaintiffs and members of the class are entitled to injunctive relief and equitable relief including, without limitation, the removal

of the current fiduciaries, replacement of the Plan's PBM, and appointment of an independent fiduciary, surcharge, and other remedies.

**COUNT THREE**
**Prohibited Transactions – 29 U.S.C. § 1106(a)(1), 1132(a)(2)**
**(on behalf of Plaintiffs and the Class against All Defendants)**

233.   Plaintiffs, on behalf of all others similarly situated, and on behalf of the Wells Fargo & Company Health Plan, incorporate by reference all previous paragraphs of this Complaint as if fully re-written herein.

234.   As a service provider to the Plan, Express Scripts is a party in interest.  29 U.S.C. § 1002(14)(B).

235.   By causing the Plan to enter into contracts with Express Scripts throughout the class period, Defendants caused the Plan to engage in transactions that Defendants knew or should have known constituted an exchange of property between the Plan and Express Scripts prohibited by 29 U.S.C. § 1106(a)(1)(A), a furnishing of services between the Plan and Express Scripts prohibited by 29 U.S.C. § 1106(a)(1)(C), and a transfer of the Plan's assets to, or use by or for the benefit of Express Scripts prohibited by 29 U.S.C. § 1106(a)(1)(D).

236.   The compensation that Defendants agreed to pay Express Scripts was not reasonable.

237.   These prohibited transactions are not subject to any other exemption under ERISA or applicable regulations.

238.   Defendants' prohibited transactions increased the amounts that the Plan was required to pay in fees and for prescription drugs, and as a result increased the amounts

that Plaintiffs and members of the class were required to pay in premiums.  Total losses to the Plan will be determined after complete discovery in this case.

239.    Defendants are personally liable under 29 U.S.C. § 1109(a) to make good to the Plan any losses to the Plan resulting from the prohibited-transaction violations alleged in this Count and are subject to other equitable, injunctive, and remedial relief as appropriate.

**COUNT FOUR**
**Prohibited Transactions – 29 U.S.C. § 1106(a)(1), 1132(a)(3)**
**(on behalf of Plaintiffs and the Class against All Defendants)**

240.    Plaintiffs, on behalf of all others similarly situated, and on behalf of the Wells Fargo & Company Health Plan, incorporate by reference all previous paragraphs of this Complaint as if fully re-written herein.

241.    As a service provider to the Plan, Express Scripts is a party in interest.  29 U.S.C. § 1002(14)(B).

242.    By causing the Plan to enter into contracts with Express Scripts throughout the class period, Defendants caused the Plan to engage in transactions that Defendant knew or should have known constituted an exchange of property between the Plan and Express Scripts prohibited by 29 U.S.C. § 1106(a)(1)(A), a furnishing of services between the Plan and Express Scripts prohibited by 29 U.S.C. § 1106(a)(1)(C), and a transfer of the Plan's assets to, or use by or for the benefit of Express Scripts prohibited by 29 U.S.C. § 1106(a)(1)(D).

243.    The compensation that Defendants agreed to pay Express Scripts was not reasonable.

244.    These prohibited transactions are not subject to any other exemption under ERISA or applicable regulations.

245.    Defendants' prohibited transactions increased the amounts that Plaintiffs and members of the class were required to pay in premiums, deductibles, co-pays, and co-insurance.

246.    Pursuant to 29 U.S.C. § 1132(a)(3), Plaintiffs and members of the class are entitled to injunctive relief and equitable relief including, without limitation, surcharge, the removal of the current fiduciary, and appointment of an independent fiduciary.

## DEMAND FOR JUDGMENT

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment on their behalf and that of the Plan and Proposed Class as follows:

247.    Certifying and maintaining this action as a class action, with Plaintiffs designated as class representatives and with their counsel appointed as class counsel;

248.    Finding and declaring that Defendants breached their fiduciary duties and engaged in prohibited transactions as described above;

249.    Enjoining Defendants from any further such violations of ERISA;

250.    Ordering Defendants to make good to the Plan all losses to the Plan resulting from each breach of fiduciary duty and prohibited transaction, and to otherwise restore the Plan to the position it would have occupied but for the breaches of fiduciary duty and prohibited transactions;

251.    Awarding surcharge, restitution, or other make-whole equitable relief to Plaintiffs and members of the class to remedy Defendants' breaches of fiduciary duty and prohibited transactions;

252.    Removing the Plan's fiduciary or fiduciaries and appointing an independent fiduciary or fiduciaries to run the Plan;

253.    Removing and replacing the Plan's PBM and/or requiring a search for alternative PBM candidates to replace the Plan's PBM;

254.    Awarding, as appropriate, other forms of monetary, injunctive, and other equitable relief;

255.    Awarding pre-judgment, post-judgment, and statutory interest;

256.    Awarding attorneys' fees and costs; and

257.    Awarding such other and further relief as the Court may deem just and proper.


Dated: July 30, 2024                    Respectfully Submitted,


                                        _/s/ Amanda M. Williams_
                                        Daniel E. Gustafson (#202241)
                                        Amanda Williams (#341691)
                                        GUSTAFSON GLUEK PLLC
                                        Canadian Pacific Plaza
                                        120 South 6th Street, Suite 2600
                                        Minneapolis, MN 55402
                                        Telephone: (612) 333-8844
                                        dgustafson@gustafsongluek.com
                                        awilliams@gustafsongluek.com

Jamie Crooks
(*pro hac vice* application forthcoming)
Michael Lieberman
(*pro hac vice* application forthcoming)
FAIRMARK PARTNERS, LLP
1001 G Street NW
Suite 400 East
Washington, DC 20001
Telephone: (619) 507-4182
jamie@fairmarklaw.com
michael@fairmarklaw.com

*Attorneys for Plaintiffs and the Proposed Class*