# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| SERGIO NAVARRO, THERESA GAMAGE, DAYLE BULLA, and JANE KINSELLA, *on their own behalf, and on behalf of all others similarly situated, and on behalf of the Wells Fargo & Company Health Plan and its component plans*, | Case No. 24-cv-3043 (LMP/DTS) |
| Plaintiffs, | **ORDER GRANTING DEFENDANT'S MOTION TO DISMISS** |
| v. | |
| WELLS FARGO & COMPANY,[1] MICHAEL BRANCA, MARK HICKMAN, DREW WINELAND, DAVID GALLOREESE, BEI LING, and DOES 1–20, | |
| Defendants. | |

Kai H. Richter and Eleanor E. Frisch, **Cohen Milstein Sellers & Toll, PLLC, Minneapolis, MN**; Michelle C. Yau and Allison Pienta, **Cohen Milstein Sellers & Toll, PLLC, Washington, DC**; Michael B. Eisenkraft, **Cohen Milstein Sellers & Toll, PLLC, New York, NY**; Jamie Crooks and Michael D. Lieberman, **Fairmark Partners, LLP, Washington, DC**; and Daniel E. Gustafson and Amanda M. Williams, **Gustafson Gluek PLLC, Minneapolis, MN**, for Plaintiffs.

Russell L. Hirschhorn, Joseph E. Clark, and Sydney L. Juliano, **Proskauer Rose LLP, New York, NY**; and Jeffrey P. Justman, and Kiera Murphy, **Faegre Drinker Biddle & Reath LLP, Minneapolis, MN**, for Defendants.

---

[1]    Wells Fargo & Company agreed to assume responsibility for "all acts or omissions relating to the allegations and claims in this action" and for "any judgment entered in this action," and Plaintiffs agreed to dismiss all claims asserted against all defendants without prejudice except Wells Fargo.  ECF No. 27 ¶¶ 2–4.  Accordingly, the Court herein refers to Wells Fargo & Company as the Defendant in this case.

Plaintiffs Sergio Navarro, Theresa Gamage, Dayle Bulla, and Jane Kinsella (collectively, "Plaintiffs") are former employees of Defendant Wells Fargo & Company ("Wells Fargo"), and former participants in the Wells Fargo & Company Health Plan (the "Plan"). Plaintiffs allege that Wells Fargo mismanaged the Plan's employee prescription drug benefits program, resulting in Plaintiffs and other Plan participants paying substantially more in premiums and out-of-pocket costs for certain prescription drug benefits than they would have absent Wells Fargo's mismanagement. Plaintiffs contend this mismanagement constitutes a breach of Wells Fargo's fiduciary duties to Plan participants in violation of the Employee Retirement Income Security Act ("ERISA"). Wells Fargo moves to dismiss Plaintiffs' complaint for lack of Article III standing or, alternatively, for failure to state a claim upon which relief can be granted. Because Plaintiffs are unable to show concrete individual harm, causation, and redressability, the Court finds that Plaintiffs lack standing to bring their claims.

## FACTUAL BACKGROUND[2]

### I.    The Plan

The Plan is an employee welfare benefit plan[3] established to provide medical benefits to Wells Fargo employees who choose to enroll. *See* ECF No. 1 ¶ 20. Wells Fargo,

---

[2]    For purposes of assessing Wells Fargo's motion to dismiss, the Court must accept the factual allegations in Plaintiffs' complaint as true. *L.H. v. Indep. Sch. Dist.*, 111 F.4th 886, 892 (8th Cir. 2024). As such, the Factual Background here is drawn largely from the complaint.

[3]    As relevant here, an "employee welfare benefit plan" is "any plan, fund, or program which was . . . established or maintained by an employer . . . for the purpose of providing

as the Plan sponsor and a fiduciary of the Plan, is responsible for appointing and removing the individual administrators of the Plan, among whom are several Wells Fargo executives. *Id.* ¶ 22–23. As such, Wells Fargo retains decision-making authority with respect to the management of the Plan. *Id.* Plaintiffs are each former employees of Wells Fargo and former participants[4] in the Plan. *Id.* ¶¶ 14–17.

To cover the expenses incurred in administering benefits to Plan participants, Wells Fargo established the Wells Fargo & Company Employee Benefit Trust (the "Trust"). *Id.* ¶ 21. The Trust is funded by a combination of employer and employee contributions, along with unspecified amounts of investment income. *Id.* From 2018 to 2022, Wells Fargo consistently required participants to contribute, in the form of premiums, approximately 25% of the Plan's costs annually, with Wells Fargo contributing the remaining 75%. *Id.* ¶ 206. Wells Fargo nevertheless retains "sole discretion" to set and modify participant contribution amounts. ECF No. 31-3 at 9; *see also* ECF No. 31-2 at 22 ("The Plan Sponsor may establish different contribution rates for different classes of Participants . . . for any Benefit Option."). The Trust's funds, regardless of their source, are considered assets of the Plan. ECF No. 1 ¶ 21.

---

for its participants or their beneficiaries, through the purchase of insurance or otherwise . . . medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment." 29 U.S.C. § 1002(1).

[4]    A "participant" is "any employee or former employee of an employer . . . who is or may become eligible to receive a benefit of any type from an employee benefit plan which covers employees of such employer." 29 U.S.C. § 1002(7).

## II.    The Plan's Prescription Drug Program

### A.    Pharmacy Benefit Managers Generally

Many employer-sponsored prescription drug plans, including the Plan, retain third-party service providers called pharmacy benefit managers ("PBMs") to administer the plans' prescription drug benefits. *Id.* ¶ 52. PBMs handle the day-to-day administrative tasks for a plan's prescription drug program, like processing claims, and typically offer other services like negotiating with pharmacies to establish coverage networks and determining which prescription drugs a plan will cover (and the extent to which they are covered). *Id.* ¶¶ 52–53. Generally, when a plan participant is prescribed a drug and fills that prescription at a pharmacy, the participant pays the portion for which she is responsible—like her co-pay or deductible—and the PBM pays the pharmacy the remaining balance and is later reimbursed by the Plan. *Id.* ¶ 53. The overall price of the prescription drug is negotiated by the PBM and the plan fiduciaries, *id.* ¶ 56, while the portion for which the participant is responsible is typically dictated by the terms of the plan, *see, e.g.*, *id.* ¶ 97.

PBMs are typically for-profit entities, and the largest PBMs tend to be publicly traded companies. *Id.* ¶ 54. As such, two dominant PBM models have emerged: (1) "traditional" PBMs, which generate profit through some mix of spread pricing,[5] rebates

---

[5]    "Spread pricing" is a practice whereby a PBM negotiates a price with pharmacies for a particular prescription drug that is lower than the price the PBM charges the plan for that drug, then retains the difference as profit. ECF No. 1 ¶ 62. For example, if a PBM negotiates a price of $10 for a participant's prescription with the pharmacy, it may (if its

they negotiate with pharmacies, administrative fees charged to the plans they serve, and ownership of their own pharmacies; and (2) "pass-through" PBMs that generate profit through charging administrative fees alone. *Id.* ¶¶ 54–55. According to Plaintiffs, traditional PBMs are incentivized, to some degree, to charge the highest price to which a plan's administrators will agree for prescription drugs, regardless of the price pharmacies charge the PBM for the same drugs. *Id.* ¶ 65. Plaintiffs assert that traditional PBMs that own their own pharmacies also may be able to represent to plans that they are not engaging in spread pricing which, while technically true, could be misleading since they are effectively negotiating with themselves for pricing. *See id.* ¶ 69. In other words, a PBM-owned pharmacy may quote an artificially high price for a certain drug to the PBM, and the PBM may then represent that it is charging the same price to the plans it serves—that is, with no markup—but the effect is that the plans pay a higher price for the drug, and the PBM generates a windfall. *See id.*

Traditional PBMs and plan fiduciaries negotiate the prices that the plan will pay the PBM for various prescription drugs. *Id.* ¶ 56. Given the sheer volume of prescription drugs available today, however, it would be impractical for PBMs and plan fiduciaries to negotiate pricing for each drug individually, so some PBMs and plan fiduciaries structure their agreements to create formularies[6] that set prices for groups of drugs by reference to

---

agreement with the plan at issue permits) charge the plan $15 for that prescription and retain the $5 difference. *See id.*

[6]    A "formulary," in this context, is a list of prescription drugs that a health plan agrees to cover. *See Formulary*, Black's Law Dictionary (12th ed. 2024).

an external benchmark price. *See id.* ¶ 57. Such benchmarks include the National Average Drug Acquisition Cost ("NADAC"), which is generated by the Centers for Medicare and Medicaid Services using survey data to determine the average cost to pharmacies to acquire certain prescription drugs; and the Average Wholesale Price ("AWP"), which purports to do the same thing as NADAC, but which Plaintiffs allege is inaccurate and susceptible to industry manipulation. *Id.* ¶¶ 58–59.

### B.    Wells Fargo's Agreement with Express Scripts, Inc.

Wells Fargo entered an agreement with Express Scripts, Inc. ("ESI"), a traditional PBM, to serve as the Plan's PBM. *Id.* ¶ 100. ESI, along with CVS Caremark and OptumRx, is one of the "Big 3" PBMs. *Id.* ¶ 86. Wells Fargo did not conduct an open bid process before it decided to retain ESI. *Id.* ¶ 101. Rather, Wells Fargo engaged an employee benefit consultant to identify potential PBM candidates for the Plan. *See id.* ¶ 103. The agreement between Wells Fargo and ESI is not publicly available, but ESI's standard contract with other companies and plans typically spells out various terms regarding prescription drug pricing, formulary management, pharmacy networks, and administrative services. *Id.* ¶¶ 100, 104. ESI's standard contract also makes clear that plan sponsors and fiduciaries like Wells Fargo, not ESI, have final authority over decisions relating to plan management and assets. *Id.* ¶ 102.[7]

---

[7]    Wells Fargo does not dispute the substance of Plaintiffs' allegations regarding the details of its agreement with ESI.

The Plan's formulary includes a list of approximately 300 generic drugs that are designated as "preferred alternatives," meaning participants are encouraged to use those generic versions rather than the brand-name versions. *See id.* ¶ 108. The prices ESI negotiated with the Plan for those drugs, using AWP as a benchmark—rather than NADAC, for example—are substantially higher than the acquisition costs paid by pharmacies. *See id.* ¶¶ 105, 108–09. A comparison between the pharmacy acquisition cost for the 260 "preferred alternative" drugs for which NADAC information is available shows that, on average, ESI charges the Plan more than twice as much as what pharmacies paid to acquire those "preferred alternative" drugs. *Id.* ¶ 109.

The agreement between ESI and the Plan requires Plan participants to acquire so-called "generic-specialty" drugs exclusively from ESI's wholly owned pharmacy, Accredo. *Id.* ¶ 112. For example, abiraterone acetate, a prescription drug used to treat prostate cancer, is designated as a "generic-specialty" drug in the Plan's formulary and has an average pharmacy acquisition cost of $82.80 for a ninety-count prescription. *See id.* ¶ 116. Under the terms of Wells Fargo's agreement with ESI, however, ESI charges the Plan $1,881.00 for the same prescription, more than a 2,100% markup over the acquisition cost. *Id.* A Plan participant would be required to pay the full cost for that prescription—that is, $1,881.00—out of pocket until the participant met his annual deductible. *Id.* ¶ 33. By contrast, an uninsured person filling the same prescription could obtain it from various retail pharmacies for between $90.50 and $115.30. *Id.* ¶ 117.

The administrative fees ESI charges to the Plan exceed the fees paid by other large plan sponsors for seemingly comparable or equivalent services. *Id.* ¶ 141. In 2019, the

Plan had about 218,000 participants and paid about $9.2 million in administrative fees to ESI, or roughly $42 per participant. *See id.* ¶¶ 140, 205. Just three years later, despite the Plan's enrollment decreasing to about 189,000 participants in 2022, the Plan paid about $25.6 million in administrative fees—about $136 per participant. *Id.* ¶ 141. Wells Fargo acknowledges that the services offered by the Plan were unchanged throughout this period. ECF No. 30 at 26 n.11. For comparison, the Railroad Employees National Health and Welfare Plan, for which ESI is the PBM, paid roughly $4.25 million in administrative fees for its 214,000 participants in 2022, or about $20 per participant. ECF No. 1 ¶ 141.

## III. Plaintiffs Allege Breach of Fiduciary Duty

While they were enrolled in the Plan, Plaintiffs each paid premiums, co-pays, and out-of-pocket costs related to prescription drugs they purchased under the Plan's coverage. *See id.* ¶¶ 196–203. Plaintiffs allege that these costs were excessive and that a prudent plan fiduciary would have carefully monitored those costs and taken action to keep them reasonable. *E.g.*, *id.* ¶¶ 223–24. According to Plaintiffs, Wells Fargo could or should have wielded its substantial bargaining power, derived from the size of the Plan, to negotiate better terms, *id.* ¶¶ 8–10; conducted a more diligent and thorough search through an open bidding process for a PBM which may have resulted in a better deal, *id.* ¶ 11; steered participants toward lower-cost alternatives to Accredo for generic-specialty drugs, *see id.* ¶ 10; or retained a PBM structured under a different model, like a pass-through PBM, *id.* ¶¶ 10, 223–24.

Plaintiffs bring claims on behalf of the Plan under 29 U.S.C. § 1132(a)(2), and individually and on behalf of a putative class of Plan participants under both 29 U.S.C.

§ 1132(a)(2) and (a)(3).  *Id.* ¶¶ 221–46.  Plaintiffs allege that Wells Fargo's failure to monitor costs or to proactively seek ways to keep them low constitutes a breach of Wells Fargo's fiduciary duties under 29 U.S.C. § 1104(a).  *See id.* ¶¶ 221–32.  Plaintiffs also allege that Wells Fargo breached its fiduciary duties by causing the Plan to engage in prohibited transactions with ESI, a party in interest under ERISA.  *See id.* ¶¶ 233–46. Plaintiffs assert that the compensation, including the administrative fees, Wells Fargo agreed to pay ESI was unreasonable, resulting in increased premiums and out-of-pocket costs to Plaintiffs and other Plan participants and losses to the Plan generally.  *Id.* ¶¶ 238, 245.  Plaintiffs seek various forms of monetary and equitable relief, including recovery of losses to the Plan, restitution, disgorgement, surcharge, and permanent injunctive relief such as removal of the current Plan fiduciaries, replacement of ESI as the Plan's PBM, and appointment of an independent Plan fiduciary.  *Id.* ¶¶ 226, 232.

Wells Fargo denies Plaintiffs' allegations and moves to dismiss Plaintiffs' complaint in its entirety under Federal Rule of Civil Procedure 12(b)(1) for lack of standing or, in the alternative, for failure to state a claim upon which relief may be granted under Rule 12(b)(6).  ECF No. 28; ECF No. 30 at 1–3.

## ANALYSIS

### I.    Legal Standard

Challenges to a plaintiff's Article III standing implicate the court's subject matter jurisdiction and thus are analyzed under Federal Rule of Civil Procedure 12(b)(1).  *Mekhail v. N. Mem'l Health Care*, 726 F. Supp. 3d 916, 931 (D. Minn. 2024).  A defendant may raise either a "facial" or a "factual" challenge to a court's jurisdiction under Rule 12(b)(1).

*Scott v. UnitedHealth Grp., Inc.*, 540 F. Supp. 3d 857, 861 (D. Minn. 2021).  On a facial challenge "the court restricts itself to the face of the pleadings" and "the non-moving party receives the same protections as it would defending against a motion brought under Rule 12(b)(6)." *Osborn v. United States*, 918 F.2d 724, 729 n.6 (8th Cir. 1990).  By contrast, "[i]n a factual attack, the court considers matters outside the pleadings." *Id.*

Wells Fargo raises a facial challenge to Plaintiffs' standing, so the Court applies the standard for reviewing motions to dismiss under Rule 12(b)(6).[8]  *See Osborn*, 918 F.2d at 729 n.6.  In reviewing such motions, "the court must accept all factual allegations in the complaint as true and draw all inferences in the plaintiff's favor." *L.H. v. Indep. Sch. Dist.*, 111 F.4th 886, 892 (8th Cir. 2024) (internal quotation marks omitted) (citation omitted).  However, "the Court will not give the plaintiff the benefit of unreasonable inferences . . . and is not bound to accept as true a legal conclusion couched as a factual allegation." *Harris v. Medtronic Inc.*, 729 F. Supp. 3d 869, 877 (D. Minn. 2024) (internal quotation marks omitted) (citations omitted).  To overcome a motion to dismiss, a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A complaint need not contain "detailed factual

---

[8]     Generally, courts may not consider matters outside the pleadings on a motion to dismiss under Rule 12(b)(6). *Enervations, Inc. v. Minn. Mining & Mfg. Co.*, 380 F.3d 1066, 1069 (8th Cir. 2004).  However, a court may consider documents that are "necessarily embraced by the complaint," including documents "whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleadings." *Rossi v. Arch Ins. Co.*, 60 F.4th 1189, 1193 (8th Cir. 2023) (citation omitted).  Here, the Court need not look further than the pleadings and the Plan documents submitted by Wells Fargo, which are "necessarily embraced by the complaint," and thus the Court construes Wells Fargo's motion as a facial attack on Plaintiffs' standing. *See id.*

allegations," but it must contain facts with enough specificity "to raise a right to relief above the speculative level." *Id.* at 555.

## II.    Article III Standing

"Standing to sue under Article III 'is the threshold question in every federal case because it determines the power of the court to entertain the suit.'" *Becker v. N.D. Univ. Sys.*, 112 F.4th 592, 595 (8th Cir. 2024) (cleaned up) (quoting *Warth v. Seldin*, 422 U.S. 490, 498 (1975)). To establish standing, Plaintiffs must plead facts showing they have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision. *Arc of Iowa v. Reynolds*, 94 F.4th 707, 710 (8th Cir. 2024) (citing *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016)). "Plaintiffs, as the parties invoking federal court jurisdiction, bear the burden of establishing these elements." *Id.* And "standing is not dispensed in gross," so Plaintiffs "must demonstrate standing for each claim that they press and for each form of relief that they seek." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021).

To establish injury in fact, a plaintiff "must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Scott*, 540 F. Supp. 3d at 861 (quoting *Spokeo*, 578 U.S. at 339). Whether a plaintiff has shown injury-in-fact "often turns on the nature and source of the claim asserted." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 591 (8th Cir. 2009) (quoting *Warth*, 422 U.S. at 500). This typically means, practically speaking, that "a plaintiff's standing tracks his cause of action. That is, the question whether he has a cognizable injury sufficient to confer standing is closely bound up with the question of

whether and how the law will grant him relief." *Id.* But "[i]t is crucial . . . not to conflate Article III's requirement of injury in fact with a plaintiff's potential causes of action, for the concepts are not coextensive." *Turtle Island Foods, SPC v. Thompson*, 992 F.3d 694, 699 (8th Cir. 2021) (citation omitted).

Plaintiffs' theory of standing is fairly straightforward: (1) Plaintiffs individually were harmed in the form of high out-of-pocket costs and increased monthly premiums for their healthcare coverage, and the Plan was harmed by Wells Fargo causing it to pay excessive fees to ESI; (2) both harms are traceable to Wells Fargo's purported breaches of fiduciary duty; and (3) the relief Plaintiffs request will both redress the past harms and prevent them from recurring. *See* ECF No. 38 at 9. In challenging Plaintiffs' pleadings, Wells Fargo largely attacks Plaintiffs' alleged harm as insufficient to confer standing and asserts that, to the extent Plaintiffs' harm qualifies as injury-in-fact, the relief Plaintiffs request would not redress it. *See* ECF No. 30 at 9–20.

The Court agrees with Plaintiffs—in theory—that the individual harm they allege could constitute injury-in-fact for standing purposes. But on the actual facts Plaintiffs allege, these Plaintiffs cannot satisfy Article III's standing requirements because their alleged harm is speculative and, ultimately, not redressable.

A.    **Breach of Fiduciary Duty Under ERISA**

Plaintiffs bring claims under both 29 U.S.C. § 1132(a)(2) and (a)(3). Section 1132(a)(2) provides that a plan participant may bring a civil action "for appropriate relief under section 1109 of this title." 29 U.S.C. § 1132(a)(2). Section 1109, in turn, makes fiduciaries of an ERISA-governed plan personally liable for breaches of "any of the

responsibilities, obligations, or duties imposed upon fiduciaries" by ERISA. *Id.* § 1109(a). Among the duties ERISA imposes are the duties to act "solely in the interest of the participants and beneficiaries" of the plan, and to act "with the care, skill, prudence, and diligence" of a prudent person "acting in a like capacity and familiar with such matters." *Id.* § 1104(a)(1). Fiduciaries are also prohibited from causing a plan to engage in certain transactions with a "party in interest." *Id.* § 1106(a)–(b). ERISA fiduciaries found liable for breach of fiduciary duty can be required to "make good" any losses to the plan that results from a breach of fiduciary duty, and to "restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary." *Id.* § 1109(a). Section 1109 also empowers courts to award "such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary." *Id.*

Section 1132(a)(3), meanwhile, provides that a plan participant may bring a civil action to enjoin a plan fiduciary from engaging in any act that violates ERISA or the terms of the plan at issue, or to obtain other equitable relief redressing such violations or enforcing the provisions of ERISA or the terms of the plan. *Id.* § 1132(a)(3). In other words, Section 1132(a)(3) "is a 'catch-all' provision that 'act[s] as a safety net, offering appropriate equitable relief for injuries caused by violations that [§ 1132] does not elsewhere adequately remedy.'" *Thole v. U.S. Bank, Nat'l Ass'n* ("*Thole I*"), 873 F.3d 617, 629 (8th Cir. 2017) (alterations in original) (quoting *Soehnlen v. Fleet Owners Ins. Fund*, 844 F.3d 576, 583 (6th Cir. 2016)), *aff'd sub nom. Thole v. U.S. Bank N.A.*, 590 U.S. 538 (2020).

Whether claims are brought under Section 1132(a)(2) or (a)(3), "[t]here is no ERISA exception to Article III." *Thole v. U.S. Bank N.A.* ("*Thole II*"), 590 U.S. 538, 547 (2020). Thus, "the plaintiffs must show actual injury . . . to fall within the class of plaintiffs whom Congress has authorized to sue under [ERISA]." *Thole I*, 873 F.3d at 630.

### 1.    Claims Under 29 U.S.C. § 1132(a)(2) (Counts I and III)

Key to the standing analysis is whether Plaintiffs have pleaded a concrete and particularized injury that can be remedied by this Court.  In the context of Plaintiffs' allegations here, whether Plaintiffs have established standing requires the Court first to determine whether the Plan is a defined-benefit or a defined-contribution plan.  *See Thole II*, 590 U.S. at 540 (explaining the "decisive importance" that the plan at issue was a "defined-benefit" plan, as opposed to a "defined-contribution" plan).  A defined-benefit plan is "in the nature of a contract." *Thole II*, 590 U.S. at 542–43.  Such plans are typically "funded by employer or employee contributions, or a combination of both," and consist of "a general pool of assets rather than individual dedicated accounts."  *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 439 (1999); *see Scott*, 540 F. Supp. 3d at 862.  "The structure of a defined benefit plan reflects the risk borne by the employer.  Given the employer's obligation to make up any shortfall, no plan member has a claim to any particular asset that composes a part of the plan's general asset pool."  *Hughes Aircraft*, 525 U.S. at 440.  Defined-contribution plans, by contrast, "provide[] for an individual account for each participant and for benefits based solely upon the amount contributed to the participant's account, and any income, expenses, gains and losses."  *Scott*, 540 F. Supp. 3d at 862 (quoting 29 U.S.C. § 1002(34)).

14

The key difference, as courts have explained, is that "in a defined-contribution plan, such as a 401(k) plan, the [participants'] benefits are typically tied to the value of their accounts," *Thole II*, 590 U.S. at 540, while "benefits under a defined-benefit plan 'do not fluctuate with the value of the plan or because of the plan fiduciaries' good or bad investment decisions," *Scott*, 540 F. Supp. 3d at 862 (quoting *Thole II*, 590 U.S. at 540); *see also Thole II*, 590 U.S. at 543 ("The plan participants' benefits are fixed and will not change, regardless of how well or poorly the plan is managed."). Thus, "a necessary predicate to a participant bringing broader claims on behalf of [a defined-benefit] plan is a showing of a concrete and particularized injury to the participant herself," not just the plan, and that individual harm must "affect [the participant's] benefits" to confer standing to sue. *Scott*, 540 F. Supp. 3d at 865; *see also Thole II*, 590 U.S. at 542–43.

The Plan in this case is "closely analogous to the defined-benefit plan at issue in *Thole* [*II*], as participants are entitled to their contractually defined benefits regardless of the value of the [Plan's] assets." *Scott*, 540 F. Supp. 3d at 864. In *Scott*, the plaintiffs were participants in a defined-benefit health plan administered by UnitedHealth Group ("UHG"). *Id.* The plaintiffs challenged UHG's practice of "cross-plan offsetting," whereby UHG used assets of the plaintiffs' plan to recoup alleged overpayments made by a different UHG plan in which the plaintiffs were not participants. *See id.* at 859–60. The plaintiffs alleged that this cross-plan offsetting constituted harm to the plan and a breach of UHG's fiduciary duties under ERISA. *Id.* at 861. As to their individual harm, the plaintiffs asserted that UHG "misus[ed] their payroll contributions" and "caus[ed] them financial injury" when it used the plaintiffs' plan's assets to cover another plan's losses. *Id.*

15

at 862. The court rejected the plaintiffs' argument, explaining that the plaintiffs relinquished any individual interest in their contributions once those contributions became part of the plan's "general pool of assets," and that "[a] diminution of those assets [did] not affect plaintiffs' entitlement to benefits in any way and therefore [did] not cause plaintiffs any injury." *Id.* (citation omitted). The court, citing *Thole II*, ultimately concluded that "an injury to a plan that does not affect a plaintiff's benefits does not give that plaintiff standing to sue on behalf of the plan." *Id.* at 865.

Wells Fargo relies on *Scott* to assert that Plaintiffs do not plead a concrete injury sufficient to confer standing. Specifically, Wells Fargo emphasizes that Plaintiffs have not alleged that they did not receive all the benefits to which they were entitled while they were members of the Plan. *See* ECF No. 30 at 10–12. But while instructive, *Scott* is distinguishable from the facts and allegations in this case. In *Scott*, the plaintiffs' theory of individual harm was premised on their allegations that the plan at issue mismanaged plan assets, including the plaintiffs' contributions, but that argument was expressly foreclosed by the Supreme Court's decision in *Thole II*. *See Scott*, 540 F. Supp. 3d at 862–63. The *Scott* plaintiffs did not specifically allege that the contributions they were required to pay were excessive, as Plaintiffs do here. And the *Scott* court was explicit that the plaintiffs in that case lacked standing because they had only alleged the defendants' breaches of fiduciary duty "caused injury to the *plan*—and not injury to [the] *plaintiffs themselves*." *Id.* at 861. Importantly, the *Scott* court did not reach the issue of whether "additional or replacement contributions" could satisfy the injury-in-fact requirement for Article III

purposes because the *Scott* plaintiffs "[did] not allege that they personally had to make" such contributions. *See id.* at 863 n.4.

Plaintiffs here avoid that pitfall—at least to some extent. They assert that the contributions and out-of-pocket costs they were required to pay under the Plan's terms were excessively high given Wells Fargo's alleged breaches of fiduciary duty. *See, e.g.*, ECF No. 1 ¶ 208. Unlike the *Scott* plaintiffs, Plaintiffs here do not premise their theory of individual harm *solely* on Wells Fargo's purported misuse of participant contributions after Plaintiffs relinquished any legal interest in them. And the hypothetical "additional or replacement contributions" discussed in *Scott* are analogous to the excessive contributions Plaintiffs allege here. *See id.* ("[Plaintiffs] paid more in premiums than they would have paid absent [Wells Fargo's] fiduciary breaches.").

A more recent Third Circuit case on which Plaintiffs rely, *Knudsen v. MetLife Group, Inc.*, provides a closer analogy. 117 F.4th 570 (3d Cir. 2024). There, the plaintiffs were participants in an employee-sponsored defined-benefit health plan that retained a PBM—coincidentally, ESI—to manage its prescription-drug benefits. *Id.* at 573–74. As part of that agreement, ESI negotiated volume discounts and rebates with drug manufacturers, and under the plan's terms, MetLife was to apply those rebates toward plan expenses. *Id.* at 574. The plaintiffs alleged that MetLife directed the rebates to itself instead and that they would have received "multiple benefits," including lower contributions and out-of-pocket costs, had MetLife applied the rebates to plan expenses. *Id.* at 574–75. Citing *Thole II*, MetLife argued, and the district court agreed, that "a beneficiary of an ERISA regulated defined-benefit plan has no injury unless the plan participants plead that they did not

receive promised benefits . . . or that there is a substantial likelihood that the plan will default." *Id.* at 579.

On appeal, the *Knudsen* plaintiffs convincingly distinguished the employee-sponsored health plan in their case with the pension plan at issue in *Thole II*:

> [Plaintiffs] point out that benefits in pension plans accrue over years, and once earned, the benefits, i.e., pension payments, are fixed and paid at regular intervals. In contrast, participants in a self-funded health plan pay for their benefits through payroll deductions in the form of premiums, and the plan sponsor can annually change both the amount of the premium (and other out-of-pocket costs) and the benefits to which a participant is entitled.

*Id.* The Third Circuit agreed with the plaintiffs as a "purely theoretical proposition":

> [W]e decline to hold that *Thole* [*II*] . . . require[s] dismissal, under Article III, *whenever* a participant in a self-funded healthcare plan brings an ERISA suit alleging that mismanagement of plan assets increased his/her out-of-pocket expenses. While MetLife is correct that sponsors of self-funded health insurance plans, like pension plans, bear all the risk of distributing benefits to beneficiaries, we cannot ignore a more fundamental tenet of injury-in-fact: financial harm, even if only a few pennies, is a concrete, non-speculative injury. A contrary conclusion, would mean that MetLife could charge Plan participants thousands of dollars more in premiums than is allowed under Plan documents, resulting in potential ERISA violations, and Plan participants would have no judicial recourse to seek return of their overpayments. *Thole* [*II*] . . . command[s] no such result, and in a different case, a plaintiff may well establish such a financial injury sufficient to satisfy Article III.

*Id.* at 579–80 (citations omitted). Still, despite its theoretical agreement with the plaintiffs' argument, the Third Circuit concluded that the plaintiffs had not alleged concrete financial harm because "it is speculative that MetLife's alleged misappropriation of drug rebate money resulted in Plaintiffs paying more for their health insurance or had any effect at all." *Id.* at 582.

18

The Court agrees with the Third Circuit's "purely theoretical proposition" in *Knudsen*. *Thole II* controls this case, as it controlled in *Scott*, 540 F. Supp. 3d at 862. But the Court does not read *Thole II* to hold, as a matter of law, that a plaintiff suing a fiduciary of an ERISA-governed defined-benefit health plan cannot ever establish standing on a theory of harm premised on excessive out-of-pocket costs. As the *Knudsen* court explained, such a conclusion would lead to absurd results where fiduciaries of defined-benefit plans could flagrantly violate ERISA, up to and including plainly breaching the terms of the plans they serve, while effectively enjoying immunity from any liability so long as participants receive the benefits to which they are entitled. Such an outcome would frustrate ERISA's core purpose: to "protect contractually defined benefits." *US Airways, Inc. v. McCutchen*, 569 U.S. 88, 100 (2013) (citation omitted); *see also, e.g.*, *Boggs v. Boggs*, 520 U.S. 833, 845 (1997) ("The principal object of [ERISA] is to protect plan participants and beneficiaries."). And more broadly, it would undermine the well-established principle that "[f]or standing purposes, a loss of even a small amount of money is ordinarily an 'injury.'" *Demarais v. Gurstel Chargo, P.A.*, 869 F.3d 685, 693 (8th Cir. 2017) (quoting *Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 464 (2017)); *cf. Thole II*, 590 U.S. at 547 ("There is no ERISA exception to Article III.").

Unfortunately for Plaintiffs, that is not the end of this Court's agreement with the *Knudsen* court, and the Third Circuit's theoretical proposition runs aground when confronted with the facts alleged here, just as it did there. The underlying argument Plaintiffs advance, while different in the specifics, is essentially the same as in *Knudsen*: had Wells Fargo more closely monitored the Plan's prescription drug costs and negotiated

a better deal with ESI, replaced ESI with a different PBM,[9] or adopted a different model altogether, the Plan would have paid less in administrative fees and other compensation to ESI, which would have resulted in lower participant contributions and out-of-pocket costs. Plaintiffs' theory appears tempting at first blush, but it withers upon closer scrutiny.

To begin, the connection between what Plan participants were required to pay in contributions and out-of-pocket costs, and the administrative fees the Plan was required to pay ESI, is tenuous at best. Of critical importance here is that the Plan vests Wells Fargo with "sole discretion" to set participant contribution rates. ECF No. 31-3 at 9; *see also* ECF No. 31-2 at 22. The Plan's terms are clear that participant contribution amounts may be affected by several factors having nothing to do with prescription drug benefits, like

---

[9]      On this point, the Court struggles to see how Wells Fargo selecting ESI as the Plan's PBM could form a basis for a claim of breach of fiduciary duty under ERISA on the facts alleged here. Plaintiffs themselves acknowledge that ESI is one of the "Big 3" PBMs. *See* ECF No. 1 ¶ 86. Even if Wells Fargo had conducted an "open RFP process," as Plaintiffs insist it should have, *id.* ¶ 82, it appears quite plausible that Wells Fargo still would have selected ESI—as many other companies evidently have, *see id.* ¶ 86—leaving Plaintiffs in precisely the same situation. Further, Plaintiffs do not offer any meaningful or relevant comparison between ESI and the other two of the "Big 3" PBMs—CVS Caremark and OptumRx. *See id.* Plaintiffs allege that other large companies generally "use the specialty carve-out model for their prescription-drug plans," which purportedly "offer[s] substantial savings to plans and their participants," and cite two specific companies who implemented such carve-outs in their agreements with CVS Caremark and OptumRx. *Id.* ¶ 90. But these allegations, even accepted as true, are missing critical information. Plaintiffs do not allege facts regarding the relative size and scope of those companies' plans or explain how much those companies' plans saved by implementing those carve-outs. Indeed, Plaintiffs do not clearly or specifically allege that the carve-outs reduced those plan participants' contributions or out-of-pocket costs *at all*. Nor do Plaintiffs offer specific facts relating to *why* those companies chose to implement carve-outs. Ultimately, Plaintiffs' allegation that such a carve-out in Wells Fargo's agreement with ESI necessarily would have resulted in lower contributions and out-of-pocket costs is speculative and conclusory.

whether a participant uses tobacco, whether a participant obtains coverage for her spouse or children in addition to herself, and a participant's "compensation category."  ECF No. 31-3 at 9.  And notwithstanding that Wells Fargo supplied the bulk of Plan funding during the relevant period, *see* ECF No. 30 at 4 n.1, the Plan authorizes Wells Fargo to require participants to fund *all* Plan expenses, not just expenses related to their own individual benefits.  *See* ECF No. 31-2 at 22 (emphasis added) (providing that "[p]articipants *shall* be responsible for payment of applicable premiums and contributions to the Plan," but that "[Wells Fargo] *may* pay such contributions to the Plan"); ECF No. 31-2 at 22 (emphasis added) ("*All fees and expenses* incurred in connection with the operation and administration of the Plan *may be paid out of the Trust or any other Plan asset . . . .*").

Taken together, it is speculative that the allegedly excessive fees the Plan paid to ESI "had any effect at all" on Plaintiffs' contribution rates and out-of-pocket costs for prescriptions.  *Knudsen*, 117 F.4th at 582.  And Plaintiffs' attempts to establish a direct connection between their increased costs and the increases in administrative fees paid by the Plan to ESI are unconvincing. For example, Plaintiffs offer comparisons between the purchase prices for certain prescription drugs under the Plan vis-à-vis the prices an uninsured person would pay at retail pharmacies for the same prescriptions or the acquisition costs paid by the pharmacies to obtain those drugs.  *See* ECF No. 1 ¶¶ 114–31. But as Wells Fargo notes, those comparisons relate to only 260 of the drugs in the Plan's formulary, a relatively narrow subset of the "thousands" of drugs in the Plan's full formulary.  ECF No. 30 at 7.  And a Plan participant is only responsible for the full out-of-

pocket costs for prescription drugs—whether "preferred alternative," "generic-specialty," or otherwise—until the participant meets their annual deductible, after which the Plan covers most of the costs for that participant's prescription drugs for the remainder of the year.  *See* ECF No. 1 ¶ 33.  Plaintiffs' selective allegations regarding the markups on a subset of prescription drugs in the Plan's formulary, ECF No. 1 ¶¶ 108–31, which itself represents only a subset of the total benefits whose costs Plan participants' contributions may be used to cover, ECF No. 31-2 at 22, are not sufficient to establish a causal connection between Plaintiffs' increased costs and ESI's administrative fees.  There are simply too many variables in how Plan participants' contribution rates are calculated to make the inferential leaps necessary to elevate Plaintiffs' allegations from merely speculative to plausible.  *See Harris*, 729 F. Supp. 3d at 877.

*Knudsen* is instructive on this point as well.  There, the plaintiffs asserted they would have received "multiple benefits" had the defendant not breached its fiduciary duties:

> *First*, it may have been consistent with its fiduciary duties for [MetLife] to reduce ongoing contributions on account of the rebates collected by the Plan. *Second*, [MetLife] may have . . . reduced co-pays and co-insurance for pharmaceutical benefits.  *Third*, [MetLife] may have distributed rebates to participants in proportion to their contributions to the Plan.

*Knudsen*, 117 F.4th at 582 (alterations in original).  The Third Circuit was not convinced, reasoning that "[t]hese allegations readily permit an inference that even if MetLife had not committed ERISA violations, it *may not* have taken any of these listed actions and Plaintiffs' out-of-pocket costs would have still increased." *Id.*

Such is the case here.  Plaintiffs attempt to avoid *Knudsen*'s conclusion by substituting "may" with "would."  For instance, Plaintiffs allege that "if [Wells Fargo]

stopped causing the Plan to overspend on prescription drugs and related fees by millions of dollars each year[,] employee contributions *would* be lower as well, in order to maintain the same 75-25 split between employer and employee contributions to which [Wells Fargo has] demonstrated [its] commitment." ECF No. 1 ¶ 207 (emphasis added); *see* ECF No. 38 at 12–13. But this argument assumes that Wells Fargo would maintain the 75-25 employer-employee contribution ratio, and nothing in the Plan *requires* Wells Fargo to do so. *See* ECF No. 31-3 at 9; ECF No. 31-2 at 22. Plaintiffs' argument also fundamentally misses the point: if Plaintiffs prevailed in this case and received every bit of the relief they request, *see id.* ¶¶ 249–57, Wells Fargo could *still* increase Plan participants' contribution amounts under the Plan's terms without any violation of ERISA having occurred. Merely changing "may" to "would" is a semantic sleight of hand that does not make the proposition any more certain or its conclusion any less speculative.[10] *See Horvath v. Keystone Health Plan E., Inc.*, 333 F.3d 450, 457 (3d Cir. 2003) (concluding that whether plan savings would have passed to plan participants was "too speculative to serve as the basis for a claim of individual loss").

Plaintiffs also seem to suggest this Court could alter the terms of the Plan to expressly require Wells Fargo to reduce (or even maintain) participants' contribution amounts, but the Court is not convinced. The Court is unaware of any mechanism by which

---

[10]    In fact, *Knudsen* characterized the plaintiffs' allegations in exactly the way Plaintiffs here framed their allegations: "According to Plaintiffs, they *would have* received 'multiple benefits' if MetLife had not misallocated drug rebates[.]" *Knudsen*, 117 F.4th at 582 (emphasis added).

it could force Wells Fargo to reduce participant contribution rates. Nor have Plaintiffs identified one.[11] Whether "surcharge, restitution, or other make-whole equitable relief," "[r]emoving the Plan's fiduciary" and "appointing an independent fiduciary," "[r]emoving and replacing the Plan's PBM and/or requiring a search for [an] alternative PBM," or injunctive relief, ECF No. 1 ¶¶ 251–54, Plaintiffs' theory of redressability stumbles on the same obstacle: Wells Fargo's "sole discretion" to set participant contribution rates. ECF No. 31-3 at 9. Simply put, while Plaintiffs' requested relief *could* result in lower contribution rates and out-of-pocket costs, there is no guarantee that it *would*, and "pleadings must be something more than an ingenious academic exercise in the conceivable" to meet the standing threshold. *United States v. Students Challenging Regul. Agency Procs.*, 412 U.S. 669, 688 (1973). Plaintiffs' theory is plainly rooted in speculation and conjecture, and "[s]uch pleadings are not sufficient to support Article III standing." *Knudsen*, 117 F.4th at 582.

While compelling and detailed, Plaintiffs' allegations are simply too speculative to show concrete individual harm, too tenuous to show causation, and too conjectural to show

---

[11]    Reformation, which Plaintiffs do not request, would ostensibly fit the bill, and it is an available remedy under Section 1132(a)(3). *Powell v. Minn. Life Ins. Co.*, 60 F.4th 1119, 1123 (8th Cir. 2023). Reformation is only appropriate, however, in instances of mistake or fraud, neither of which Plaintiffs allege here. *See, e.g., Ibson v. United Healthcare Servs., Inc.*, 877 F.3d 384, 389 (8th Cir. 2017) (alteration in original) (quoting *Silva v. Metro. Life Ins. Co.*, 762 F.3d 711, 723 (8th Cir. 2014)) ("The 'reformation remedy available under § 1132(a)(3) . . . allow[s] courts to reform contracts that failed to express the agreement of the parties.'"); *CIGNA Corp. v. Amara*, 563 U.S. 421, 440 (2011) ("The power to reform contracts (as contrasted with the power to enforce contracts as written) is a traditional power of an equity court . . . and was used to prevent fraud.").

redressability.  Accordingly, Plaintiffs lack Article III standing to sue under 29 U.S.C. § 1132(a)(2).

### 2.    Claims Under 29 U.S.C. § 1132(a)(3) (Counts II and IV)

As even Wells Fargo concedes, Plaintiffs' individual claims under Section 1132(a)(3) "do not suffer from" all the same issues as their representative claims on behalf of the Plan under Section 1132(a)(2).[12]  ECF No. 30 at 14.  Nevertheless, Plaintiffs cannot establish standing under Section 1132(a)(3) both because they have not alleged concrete individual harm and because these Plaintiffs "have no concrete stake in the lawsuit" regarding any prospective injunctive relief.  *Thole II*, 590 U.S. 541–42.

Section 1132(a)(3) "allows an individual plan participant to seek equitable remedies for breach of fiduciary duty in his [or her] individual capacity."  *Knieriem v. Grp. Health Plan, Inc.*, 434 F.3d 1058, 1061 (8th Cir. 2006).  Recovery under Section 1132(a)(3), however, is limited to traditional equitable remedies "such as injunctive, restitutionary, or mandamus relief."  *Id.* (quoting *Kerr v. Charles F. Vatterott & Co.*, 184 F.3d 938, 943 (8th Cir. 1999)).  Importantly, Section 1132(a)(3) "does not . . . authorize appropriate equitable relief *at large*, but only appropriate equitable relief for the purpose of redressing any violations or . . . enforcing any provisions of ERISA or an ERISA plan."  *Peacock v. Thomas*, 516 U.S. 349, 353 (1996) (cleaned up) (citation omitted).

---

[12]    Wells Fargo largely focuses its argument on the distinction between "fiduciary" and "settlor" acts, contending that the conduct Plaintiffs challenge—"setting premiums, co-pays, and deductibles"—are settlor functions that are not subject to review under ERISA. ECF No. 30 at 15–17.  Wells Fargo does not "explain how this analysis goes to the Court's standing inquiry."  *Sigetich v. Kroger Co.*, No. 1:21-cv-697, 2023 WL 2431667, at *8 (S.D. Ohio Mar. 9, 2023).

Plaintiffs must show "'actual or imminent injury to the Plan itself' that caused injury to the plaintiffs' interests in the Plan" to establish standing under Section 1132(a)(3). *Thole I*, 873 F.3d at 630 (quoting *Soehnlen*, 844 F.3d at 583). The Supreme Court affirmed that approach in *Thole II*, reasoning that the plaintiffs there lacked standing because they had received all benefits to which they were entitled, and "the outcome of [the] suit would not affect their future benefit[s]." *Thole II*, 590 U.S. at 541. *Thole II* instructs that ERISA plaintiffs must "have [a] concrete stake" in the outcome of the suit, as Article III requires of plaintiffs in all cases. *Id.* at 542; *see also id.* at 547 ("There is no ERISA exception to Article III.").

Again, *Thole II* controls here, and Plaintiffs clearly do not have a stake in any of the prospective equitable relief they request. They are no longer participants in the Plan, *see* ECF No. 1 ¶¶ 14–17, so any changes to the Plan's structure or administration going forward—like replacing ESI as the Plan's PBM or removing the Plan's fiduciaries and appointing an independent fiduciary, *id.* ¶¶ 252–53—will not personally affect them in any way, much less redress the individual harm they allege. *See e.g.*, *DeFazio v. Hollister Emp. Share Ownership Tr.*, 612 F. App'x 439, 441 (9th Cir. 2015) ("The Plan Participants, who have already cashed out of the Plan, lack Article III standing as to redressability vis-à-vis their claims for prospective equitable relief."); *Trauernicht v. Genworth Fin. Inc.*, No. 3:22-cv-532, 2023 WL 5961651, at *6 (E.D. Va. Sept. 13, 2023) (holding former plan participants lacked standing because "any changes to the process in the future would not affect them, making their claim for prospective injunctive relief non-redressable"); *Peters v. Aetna, Inc.*, No. 1:15-cv-109-MR, 2023 WL 3829407, at *7 (W.D.N.C. June 5, 2023)

("[T]he Plaintiff's lack of continued participation in the Mars Plan is fatal to her standing to assert claims for prospective injunctive relief."); *Savage v. Sutherland Glob. Servs., Inc.*, No. 6:19-cv-6840 EAW, 2024 WL 3982831, at *6 (W.D.N.Y. Aug. 28, 2024) (holding "Plaintiffs lack Article III standing to seek prospective relief" because "none of Plaintiffs are still enrolled in the Plan" and "thus are not in danger of any future injury from the selection of ADP as recordkeeper").

As it relates to Plaintiffs' request for non-injunctive (that is, retrospective) equitable relief, Plaintiffs do not dispute that they received all the benefits to which they were entitled when they were participants in the Plan, even if they believe they had to pay more for those benefits than they should have. *See, e.g.*, ECF No. 1 ¶¶ 196–203. And as already discussed, Plaintiffs' allegations of individual harm are speculative at best and insufficient to establish Article III standing. Other courts have reached the same conclusion in similar circumstances—even before *Thole II* was decided. *See Cox v. Blue Cross Blue Shield of Mich.*, 216 F. Supp. 3d 820, 826 (E.D. Mich. 2016) (finding no standing to seek "restitution, disgorgement, [and] surcharge" under Section 1132(a)(3) because "[a]t most, it is Plaintiffs' healthcare plans that suffered concrete and particularized injuries when they paid BCBSM the hidden fees" which was "not concrete or particularized harm to Plaintiffs."). Further, much of the retrospective equitable relief Plaintiffs request bears the characteristics of monetary or compensatory relief. *See* ECF No. 1 ¶¶ 251, 254 (requesting "make-whole" and "monetary" relief). But such relief is not available under Section 1132(a)(3). *See, e.g.*, *Kerr*, 184 F.3d at 943 ("[S]ection 1132(a)(3) recovery . . . does not extend to compensatory damages."); *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 256 (1993) (holding plaintiffs could

27

not seek relief under Section 1132(a)(3) because their claims sought "monetary relief for all losses their plan sustained as a result of the alleged breach of fiduciary duties," which is the "classic form of *legal* relief"); *Paulsen v. CNF Inc.*, 559 F.3d 1061, 1076 (9th Cir. 2009) (finding no standing to sue under Section 1132(a)(3) where plaintiffs requested to be made "whole in the amounts by which their pension benefits have been reduced as a result of [fiduciary] breaches").

Plaintiffs have no stake in the outcome of this case as it relates to the prospective equitable relief they seek. Nor can they show a concrete and particularized injury sufficient to establish standing to seek retrospective equitable relief, and some of the retrospective equitable relief they request is "foreclosed by Supreme Court precedent." *Paulsen*, 559 F.3d at 1076; *see also Mertens*, 508 U.S. at 256. Consequently, Plaintiffs lack standing to pursue their claims under 29 U.S.C. § 1132(a)(3).[13]

## CONCLUSION

The Court is not unsympathetic to Plaintiffs' concerns. Prescription drug costs are high—even for those who are insured, as forcefully set forth in Plaintiffs' complaint. Plaintiffs' frustration is understandable, and this Court will not tell them otherwise.

But however sympathetic the Court may be, it cannot ignore the law. Under ERISA, as interpreted in decisions that bind this Court, Plaintiffs' allegations are insufficient to establish Article III standing. As a result, Plaintiffs' complaint must be dismissed.

---

[13]    Because the Court dismisses Plaintiffs' complaint for lack of standing, the Court need not address Wells Fargo's alternative basis for dismissal under Rule 12(b)(6). *See* ECF No. 30 at 20–31.

**ORDER**

Based on the foregoing, and on all of the files, records, and proceedings in the above-captioned matter, **IT IS HEREBY ORDERED** that:

1.      Wells Fargo's Motion to Dismiss (ECF No. 28) is **GRANTED**; and

2.      Plaintiffs' Complaint (ECF No. 1) is **DISMISSED WITHOUT PREJUDICE**.

      **LET JUDGMENT BE ENTERED ACCORDINGLY.**


Dated: March 24, 2025          *s/Laura M. Provinzino*
                               Laura M. Provinzino
                               United States District Judge