# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

SERGIO NAVARRO, THERESA
GAMAGE, DAYLE BULLA, JANE
KINSELLA, and ERICA MCKINLEY, on
their own behalf, on behalf of all others
similarly situated, and on behalf of the Wells
Fargo & Company Health Plan and its
component plans,

                       Plaintiffs,

      v.

WELLS FARGO & COMPANY,

                 Defendant.

Case No. 0:24-cv-03043-LMP-DLM

# PLAINTIFFS' MEMORANDUM IN OPPOSITION TO
# DEFENDANT WELLS FARGO & COMPANY'S MOTION TO DISMISS
# THE AMENDED CLASS ACTION COMPLAINT

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ....................................................................................................... 1

BACKGROUND ........................................................................................................ 3

ARGUMENT............................................................................................................. 7

I.    PLAINTIFFS HAVE STANDING TO PURSUE THEIR CLAIMS ......................................... 7

    A.    The Allegations of Higher Out-of-Pocket Costs Support Standing
        Under 29 U.S.C. § 1132(a)(3) ...................................................................... 8

        1.    Injury-in-Fact .................................................................................. 8

        2.    Traceability.................................................................................... 10

        3.    Redressability ................................................................................ 11

    B.    The Allegations of Higher Premiums Support Standing Under 29 U.S.C.
        §§ 1132(a)(2) and (a)(3). ........................................................................... 12

        1.    Injury-in-Fact ................................................................................ 13

            a.    Plaintiffs' Premium Contributions Were Tied to Overall
                Plan Spending.......................................................................... 13

            b.    Because Plaintiffs' Contributions Were Directly Tied to
                Plan Spending, Plaintiffs Were Injured by the Plan's
                Overpayments ................................................................... 19

            c.    Wells Fargo's Unfounded Speculation is Unavailing...........20

            d.    Plaintiff McKinley Was Undisputedly Injured by
                Increased Premiums ...............................................................22

        2.    Traceability.................................................................................... 23

        3.    Redressability ................................................................................ 23

II.    PLAINTIFFS STATE PLAUSIBLE CLAIMS UNDER ERISA ......................................... 27

    A.    Plaintiffs State Plausible Prohibited Transaction Claims........................... 27

    B.    Plaintiffs State Plausible Breach of Fiduciary Duty Claims ...................... 28

1.    Monitoring Plan Expenses and Service Providers Is a
       Fundamental Fiduciary Role ............................................................ 28

2.    Wells Fargo Breached Its Duties in Multiple Ways ........................ 32

       a.    Excessive Prescription Drug Costs ....................................... 33

       b.    Excessive Administrative Fees ............................................. 40

       c.    Steering to a High-Cost Pharmacy Affiliated with ESI ........ 43

3.    Wells Fargo's Argument that Plaintiffs Cannot Assert an
       Individual Claim for Fiduciary Breach Is Repetitive and
       Meritless .......................................................................................... 43

CONCLUSION .................................................................................................. 44

## TABLE OF AUTHORITIES

**Cases**                                                                                    **Page(s)**

*AARP v. EEOC,*
    226 F.Supp.3d 7 (D.D.C. 2016) .................................................................. 19

*Abraha v. Colonial Parking, Inc.,*
    243 F.Supp.3d 179 (D.D.C. 2017) .............................................................. 31

*Acosta v. Bd. of Trs. of Unite Here Health,*
    2023 WL 2744556 (N.D. Ill. Mar. 31, 2023) ............................................. 44

*Am. Farm Bureau Fed'n v. United States EPA,*
    836 F.3d 963 (8th Cir. 2016) ...................................................................... 7

*Barrett v. O'Reilly Auto., Inc.,*
    112 F.4th 1135 (8th Cir. 2024) .............................................................. 33, 41

*Beck v. PACE Int'l Union,*
    551 U.S. 96 (2007) ...................................................................................... 31

*Biden v. Nebraska,*
    600 U.S. 477 (2023) .................................................................................... 26

*Blue Cross & Blue Shield of N.C. v. Rite Aid Corp.,*
    519 F.Supp.3d 522 (D. Minn. 2021) ....................................................... 7, 9

*Boggs v. Boggs,*
    520 U.S. 833 (1997) .................................................................................... 28

*Braden v. Wal-Mart Stores, Inc.,*
    588 F.3d 585 (8th Cir. 2009) ............................................................ *passim*

*Brown v. J.B. Hunt Transp. Servs., Inc.,*
    586 F.3d 1079 (8th Cir. 2009) ................................................................... 29

*Carrigan v. Xerox Corp.,*
    2022 WL 1137230 (D. Conn. Apr. 18, 2022) ............................................ 42

*Cates v. Trs. of Columbia Univ.,*
    2020 WL 1528124 (S.D.N.Y. Mar. 30, 2020) ........................................... 37

*CIGNA Corp. v. Amara,*
    563 U.S. 421 (2011) .................................................................................... 11

iv

*City of Columbus v. Trump,*
 453 F.Supp.3d 770 (D. Md. 2020) ........................................................ 13, 19

*Coppel v. Seaworld Parks & Ent., Inc.,*
 2023 WL 2942462 (S.D. Cal. Mar. 22, 2023) ............................................. 42

*Cunningham v. Cornell University,*
 145 S.Ct. 1020 (2025) ........................................................... 2, 27, 28

*David v. Alphin,*
 2008 WL 5244504 (W.D.N.C. Dec. 15, 2008) ............................................. 26

*Davis v. Washington Univ. in St. Louis,*
 960 F.3d 478 (8th Cir. 2020) ................................................................ 32

*Diebler v. SanMedica Int'l, LLC,*
 488 F.Supp.3d 169 (D.N.J. 2020) ......................................................... 16

*DiFelice v. U.S. Airways, Inc.,*
 497 F.3d 410 (4th Cir. 2007) ................................................................ 36

*Doe One v. CVS Pharmacy, Inc.,*
 348 F.Supp.3d 967 (N.D. Cal. 2018) ..................................................... 31

*Donovan v. Bierwirth,*
 754 F.2d 1049 (2d Cir. 1985) ............................................................... 21

*Dover v. Brit. Airways, PLC (UK),*
 2013 WL 5970688 (E.D.N.Y. Nov. 8, 2013) ............................................. 16

*Evans v. Akers,*
 534 F.3d 65 (1st Cir. 2008) ........................................................ 24, 25, 26

*Geissal v. Moore Med. Corp.,*
 524 U.S. 74 (1998) .............................................................................. 22

*George v. Kraft Foods Glob., Inc.,*
 641 F.3d 786 (7th Cir. 2011) ................................................................ 40

*Gimeno v. NCHMD, Inc.,*
 38 F.4th 910 (11th Cir. 2022) .............................................................. 11

*Glanton v. AdvancePCS, Inc.,*
 465 F.3d 1123 (9th Cir. 2006) ......................................................... 9, 26

*Gonzalez de Fuente v. Preferred Home Care of N.Y. LLC*,
    2020 WL 5994957 (E.D.N.Y. Oct. 9, 2020) .................................................................... 19

*Gonzalez de Fuente v. Preferred Home Care of N.Y. LLC*,
    858 F. App'x 432 (2d Cir. 2021) ...................................................................................... 9

*Harris v. Amgen*,
    573 F.3d 728 (9th Cir. 2009) ..................................................................................... 24, 25

*Hawkins v. Cintas Corp.*,
    32 F.4th 625 (6th Cir. 2022) ........................................................................................... 24

*Horvath v. Keystone Health Plan E., Inc.*,
    333 F.3d 450 (3d Cir. 2003) ............................................................................................. 9

*Hughes v. Nw. Univ.*,
    595 U.S. 170 (2022) .................................................................................................. 10, 36

*ICTSI Or., Inc. v. Int'l Longshore & Warehouse Union*,
    2022 WL 16924139 (D. Or. Nov. 14, 2022) ................................................................... 20

*Knudsen v. MetLife Grp., Inc.*,
    117 F.4th 570 (3d Cir. 2024) ....................................................................... 7, 9, 18, 19

*Kruger v. Novant Health, Inc.*,
    131 F.Supp.3d 470 (M.D.N.C. 2015) ............................................................................. 42

*Larson v. Allina Health Sys.*,
    350 F.Supp.3d 780 (D. Minn. 2018) .............................................................................. 40

*Lee v. Verizon Commc'ns., Inc.*,
    837 F.3d 523 (5th Cir. 2016) ......................................................................................... 31

*Lewandowski v. Johnson & Johnson*,
    2025 WL 288230 (D.N.J. Jan. 24, 2025) ......................................................................... 9

*Loren v. Blue Cross & Blue Shield of Mich.*,
    505 F.3d 598 (6th Cir. 2007) ......................................................................................... 18

*Lucero v. Credit Union Ret. Plan Ass'n*,
    2023 WL 2424787 (W.D. Wis. Mar. 9, 2023) ............................................................... 41

*Mahoney v. J.J. Weiser & Co.*,
    564 F.Supp.2d 248 (S.D.N.Y. 2008) .............................................................................. 31

*Mator v. Wesco Distrib., Inc.*,
102 F.4th 172 (3d Cir. 2024) ................................................................ 41, 42

*Matousek v. MidAmerican Energy Co.*,
51 F.4th 274 (8th Cir. 2022) ................................................................ 33

*McConchie v. Scholz*,
567 F.Supp.3d 861 (N.D. Ill. 2021) ...................................................... 16

*McNaught v. Nolen*,
76 F.4th 764 (8th Cir. 2023) ................................................................ 12

*Meehan v. United Consumers Club Franchising Corp.*,
312 F.3d 909 (8th Cir. 2002) ................................................................ 16

*Meiners v. Wells Fargo & Co.*,
898 F.3d 820 (8th Cir. 2018) ................................................................ 32, 33

*Moeckel v. Caremark*,
622 F.Supp.2d 663 (M.D. Tenn. 2017) ................................................ 31

*Morin v. Essentia Health*,
2017 WL 4083133 (D. Minn. Sept. 14, 2017) ...................................... 32

*Mulder v. PCS Health Sys., Inc.*,
432 F.Supp.2d 450 (D.N.J. 2006) ........................................................ 31

*In re Mut. Funds Inv. Litig.*,
529 F.3d 207 (4th Cir. 2008) ................................................................ 25, 26

*Pharm. Care Mgmt. Ass'n v. Mulready*,
78 F.4th 1183 (10th Cir. 2023) ............................................................ 32

*In re Pre-Filled Propane Tank Antitrust Litig.*,
860 F.3d 1059 (8th Cir. 2017) .............................................................. 13

*Pub. Pension Fund Grp. v. KV Pharm. Co.*,
679 F.3d 972 (8th Cir. 2012) ................................................................ 16

*Roth v. Sawyer-Cleator Lumber Co.*,
61 F.3d 599 (8th Cir. 1995) .................................................................. 21

*Sacerdote v. New York Univ.*,
9 F.4th 95 (2d Cir. 2021) ...................................................................... 36

*Silva v. Metro. Life Ins. Co.*,
762 F.3d 711 (8th Cir. 2014) ............................................................. 11

*Snyder v. UnitedHealth Group, Inc.*,
2021 WL 5745852 (D. Minn. Dec. 2, 2021) .................................... 34

*Sweda v. Univ. of Pa.*,
923 F.3d 320 (3d Cir. 2019) ............................................................. 39

*Tibble v. Edison Int'l*,
575 U.S. 523 (2015) ................................................................ 29, 30

*Tibble v. Edison Int'l*,
843 F.3d 1187 (9th Cir. 2016) ......................................................... 29

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021) ......................................................................... 7

*Tussey v. ABB, Inc.*,
2007 WL 4289694 (W.D. Mo. Dec. 3, 2007) .................................. 43

*Tussey v. ABB, Inc.*,
746 F.3d 327 (8th Cir. 2014) ........................................................... 29

*Varity Corp. v. Howe*,
516 U.S. 489 (1996) ......................................................................... 44

*Waller v. Blue Cross of Cal.*,
32 F.3d 1337 (9th Cir. 1994) ............................................... 30, 31, 32

*Wildman v. Am. Century Servs., LLC*,
237 F.Supp.3d 902 (W.D. Mo. 2017) .............................................. 33

*Winsor v. Sequoia Benefits & Ins. Servs. LLC*,
62 F.4th 517 (9th Cir. 2023) ..................................................... *passim*

*In re Xyrem (Sodium Oxybate) Antitrust Litig.*,
555 F.Supp.3d 829 (N.D. Cal. 2021) ........................................ 15, 22

**Statutes**

29 U.S.C. § 1002(7) ............................................................................... 24

29 U.S.C. § 1002(14) ............................................................................. 27

29 U.S.C. § 1002(14)(B) ........................................................................ 28

29 U.S.C. § 1104(a)(1)(A) ................................................................. 29

29 U.S.C. § 11104(a)(1)(A)(ii) ........................................................ 10

29 U.S.C. § 1104(a)(1)(B) ................................................................. 29

29 U.S.C. § 1164(2) .......................................................................... 22

## Other Authorities

Congressional Budget Office, *Prescription Drugs: Spending, Use, and Prices* (Jan. 2022) ................................................................................ 37

Fed. Judicial Center, *Reference Guide on Estimation of Econ. DamageReference Manual on Scientific Evid.* 432 (3d ed. 2011) .................. 20

Fed. R. Civ. P. 10(c) ......................................................................... 16

Restatement (Third) of Trusts § 88 cmt. a (2007) ............................ 29

U.S. Dep't of Labor, MEETING YOUR FIDUCIARY RESPONSIBILITIES (Sept. 2021) .......... 30

## INTRODUCTION

This is a textbook case of fiduciary neglect: Wells Fargo failed to prudently select the pharmacy benefits manager ("PBM") for its health plan, and then failed to monitor the PBM and the prices it charged. Those prices were more than double a reasonable amount, with markups for some drugs as high as 1,000% or even 10,000%. And the PBM charged exorbitant administrative fees *on top of* those inflated drug prices, as much as ***835%*** more than other plans paid the same PBM for the same services. ERISA exists precisely to prevent fiduciaries from squandering plan assets and injuring plan participants like this, and provides appropriate relief when they do so.

In dismissing Plaintiffs' claims as originally pled, the Court stated that it is "not unsympathetic to Plaintiffs' concerns" regarding excessive prescription-drug costs, and further stated that "Plaintiffs' frustration is understandable." ECF 57 at 28.  The only reason it dismissed Plaintiffs' claims was on the basis of Article III standing, *id.* at 28 & n.13, and it did so "without prejudice," *id.* at 29.

The Amended Complaint addresses the standing issues identified by the Court. With respect to Article III injury, Plaintiffs allege they directly paid the PBM's inflated prices prior to their coverage kicking in, and indirectly paid for charges covered by the Plan through their monthly premium contributions—which were directly tied to overall plan spending. The former allegation is undisputed, and the latter allegation is now supported by new, extensive factual content regarding the self-funded nature of the plan, *see* Amended Complaint, ECF 64 ("AC") ¶¶ 22, 30-32, 108, 231, Wells Fargo's use of a percentage-based methodology to set participant contribution levels, *id.* ¶¶ 233-43,

1

numerous government reports and academic studies, *id.* ¶¶ 245-52, and a new expert report from an experienced professional in the field (Bonnie Albritton), who specifically evaluated the Wells Fargo Plan and concluded that "employees' contributions were directly impacted by … prescription drug costs." ECF 64-1 ("Albritton Report") at 12; AC ¶¶ 261-70. On this record, the only thing that is "speculative" is Wells Fargo's unsupported assertion that the Plan's exorbitant drug prices somehow had no bearing on Plaintiffs' premium contributions for prescription-drug coverage or their out-of-pocket costs for the drugs themselves.

With respect to redressability, the Amended Complaint (1) expressly pleads surcharge as a remedy for recovering Plaintiffs' out-of-pocket financial injuries (consistent with binding Supreme Court and Eighth Circuit law), *see* AC ¶¶ 217, 229, 314; (2) expressly pleads that losses recovered by the plan must be allocated to past participants, *id.* ¶¶ 288, 302; and (3) adds an additional plaintiff, Erica McKinley, who is currently enrolled in the Plan, suffering ongoing drug overcharges, and entitled to seek prospective injunctive relief, *id.* ¶¶ 18, 227, 288, 302.

Finally, on the merits, Plaintiffs' claims are straightforward. The Supreme Court's decision in *Cunningham v. Cornell University*, 145 S.Ct. 1020 (2025), eliminated any argument that the prohibited transaction claims are insufficiently pleaded. The breach of fiduciary duty claims stand on equally solid ground, and rest on the fundamental principle that plan fiduciaries must monitor plan expenses and service providers—a duty Wells Fargo breached by allowing massive drug overcharges and exorbitant administrative fees. The plausibility of Plaintiffs' allegations is powerfully confirmed by Wells Fargo's conduct

since this lawsuit was filed: shaken from its slumber, Wells Fargo promptly lowered overall generic drug costs by 11%, securing millions of dollars in annual savings that had been sitting on the table for years. AC ¶¶ 166-67. Wells Fargo's sudden post-lawsuit progress confirms its pre-lawsuit failure.

## BACKGROUND

Plaintiffs are former Wells Fargo employees who received prescription-drug benefits as participants in the Wells Fargo & Company Health Plan ("Plan"). AC ¶¶ 14-18, 21. Wells Fargo is the Plan sponsor and a Plan fiduciary, *id.* ¶ 24, and has "agree[d] to assume responsibility for all acts or omissions relating to the allegations and claims in this action." ECF 27.

The Plan is self-funded, which means that the Plan bears all insurance risk and pays all covered medical expenses incurred by Plan participants. AC ¶ 30. The Plan pays its expenses, including prescription-drug expenses, from a trust account that is funded by a combination of employer and participant contributions. *Id.* ¶¶ 22, 232. During the class period, Wells Fargo used a percentage-based methodology to divide these contributions between itself and Plan participants. *Id.* ¶¶ 237-42 (describing Wells Fargo's "policy or practice" of setting contributions as a percentage of projected Plan costs). Specifically, Wells Fargo required participants like Plaintiffs to cover about 25% of projected Plan expenses each year. *Id.*

In addition to making contributions into the trust to help cover Plan expenses, participants directly pay the full price for their own prescription drugs until they meet their annual deductible and then continue to pay a copay or coinsurance amount thereafter. *Id.*

3

¶¶ 33, 106. Thus, participants are affected by drug prices in two separate ways: (1) directly through the amounts they pay out-of-pocket for their own prescriptions, and (2) indirectly through their premium contributions that help underwrite the Plan's overall expenses.

Wells Fargo contracted with Express Scripts ("ESI") to serve as the Plan's PBM. *Id.* ¶¶ 21, 110. Plaintiffs allege that Wells Fargo, instead of prudently managing the Plan's prescription-drug program and carefully monitoring drug costs, effectively gave ESI free rein. *Id.* ¶ 292. Wells Fargo's mismanagement allowed ESI to charge unreasonable drug prices and extract excessive administrative fees. *See id.* ¶¶ 101-62.

***Unreasonable Drug Prices.*** The prices that Wells Fargo allowed the Plan and its participants to pay ESI for prescription drugs are unreasonably high. *Id.* ¶¶ 101-49, 166; *see also* ECF 57 at 4-5 & n.5 (describing ESI's "spread pricing"). The Amended Complaint supports this allegation with numerous comparisons between the prices charged by ESI and the prices that a prudent fiduciary could have obtained. Plaintiffs begin by identifying the "most comprehensive" publicly-available list of drugs available under the Plan, which is called the "Express Scripts National Preferred Formulary for Wells Fargo" ("Preferred Formulary"). AC ¶ 118. For *every* generic drug on the formulary for which public data is available, Plaintiffs compared the listed price to the National Average Drug Acquisition Cost ("NADAC") for that same drug. *Id.* ¶¶ 120-21; *see id.* ¶¶ 59-60 (describing NADAC). This analysis shows that on average, the Plan's prices are *more than double* the NADAC average, meaning that Wells Fargo agreed to make the Plan and its participants pay a staggering ***115%*** markup on generic drugs. *Id.* ¶¶ 121-23; *see id.* ¶¶ 285-86.

The Amended Complaint also analyzes a separate ESI formulary of drugs classified as "specialty" drugs. *Id.* ¶¶ 124-44. The markups on these drugs are even more extreme, with Wells Fargo agreeing to pay, on average, ***383%*** more than NADAC. *Id.* ¶ 138. The Amended Complaint also compares the Plan's prices for these drugs to the prices charged to *uninsured* patients at multiple retail pharmacies. *Id.* ¶¶ 127-43. These comparisons likewise show that the Plan's prices are unreasonable. For example, Wells Fargo agreed to make the Plan and its participants pay $9,994.37 for a 90-unit prescription of fingolimod (a multiple sclerosis drug), even though Rite Aid sells it for $891.63, Walmart sells it for $895.63, and Mark Cuban Cost Plus Drug Company sells it for $875.09. *Id.* ¶ 133. Moreover, Plaintiffs provide numerous other comparisons—to other PBMs, other plan sponsors, and other pharmacies—that add further plausibility to their allegations that Wells Fargo imprudently managed and administered its prescription-drug program.

Plaintiffs' allegations are further bolstered by Wells Fargo's post-filing conduct. After Plaintiffs filed their original complaint, Wells Fargo "renegotiated its prices with [ESI] to lower them substantially." *Id.* ¶ 166. Wells Fargo's prices for the generic drugs on the Preferred Formulary are now 11% lower than they were when Plaintiffs filed their original complaint—representing savings of millions per year. *Id.* ¶¶ 166-67. That Wells Fargo was able to achieve such results immediately after this suit was filed confirms the plausibility of Plaintiffs' allegations that Wells Fargo could have obtained lower prices by acting more prudently beforehand.

The Amended Complaint also identifies certain procedural flaws that contributed to the high costs. For example, Wells Fargo required Plan participants to obtain all specialty-

drug prescriptions from ESI's own pharmacy, Accredo, even though Accredo's prices are higher than the prices retail pharmacies charge for the same drugs. *Id.* ¶¶ 150-54. Wells Fargo also used a conflicted consultant (Aon) to guide its PBM selection process, even though Aon receives compensation from ESI for client referrals. *Id.* ¶ 113. And Wells Fargo did not engage in an open request for proposal ("RFP") process, *id.* ¶¶ 111, 116, which was inconsistent with industry norms, *see id.* 72, 77-78.

***Excessive Administrative Fees.*** In addition to the compensation that ESI receives through "spread" pricing on drugs (charging an inflated price to the Plan and its participants while paying a far lower price to procure the drugs, *see id.* ¶ 64; ECF 57 at 4-5 & n.5), ESI also receives administrative fees from the Plan, *see id.* ¶ 155. Between 2019 and 2023, those administrative fees skyrocketed from $9,235,645 to $31,239,311, *id.* ¶ 156, while the number of Plan participants *decreased* from 218,107 to 176,012. *Id.* ¶¶ 157, 235. By 2023, these fees amounted to $177.48 per participant—while comparable plans that used ESI for the same PBM services paid between $18.97 and $102.68 per participant. *Id.* ¶ 157.

\* \* \*

Because of Wells Fargo's fiduciary mismanagement, Plaintiffs' premium contributions and out-of-pocket payments were inflated, and the Plan's own payments were also inflated. *Id.* ¶¶ 105-08, 217-70. Plaintiffs seek to redress those harms through recovery of losses to the Plan, *see id.* ¶ 313, the equitable monetary remedy of "surcharge," *id.* ¶¶ 217, 229, 314, and other relief authorized under ERISA, *id.* ¶ 317. The below chart summarizes the relevant claims and Plaintiffs' bases for standing:

6

| Counts | Cause of Action | Alleged Harm | Plaintiffs' Injury-In-Fact | How to Redress Injury |
|--------|-----------------|--------------|----------------------------|------------------------|
| I, III | 29 U.S.C. § 1132(a)(2) | Plan overpayments for prescription drugs and administrative fees | Inflated premium contributions caused by the Plan's overpayments | Recovery of losses to Plan |
| II, IV | 29 U.S.C. § 1132(a)(3) | Participant overpayments for out-of-pocket costs | Direct overcharges on drug purchases | Surcharge |
|        |                 | Participant overpayments for premium contributions | Inflated premium contributions caused by the Plan's overpayments |  |

## ARGUMENT

### I.    PLAINTIFFS HAVE STANDING TO PURSUE THEIR CLAIMS

To satisfy Article III standing, Plaintiffs must allege: (1) an injury in fact; (2) traceable to defendant's conduct; (3) that would likely be redressed by judicial relief. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). This "is not Mount Everest." *Knudsen v. MetLife Grp., Inc.*, 117 F.4th 570, 577 (3d Cir. 2024). Complaints "that allege 'economic or physical harms' are almost always no-doubters." *Blue Cross & Blue Shield of N.C. v. Rite Aid Corp.*, 519 F.Supp.3d 522, 533 (D. Minn. 2021).

The standing inquiry is separate from the merits. Accordingly, when assessing standing, courts must "assume that on the merits the plaintiffs would be successful in their claims." *Am. Farm Bureau Fed'n v. United States EPA*, 836 F.3d 963, 968 (8th Cir. 2016). The complaint's allegations related to standing must be "accept[ed] as true" and the Court must "grant[] all reasonable inferences to the [plaintiff]." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 591 (8th Cir. 2009). Thus, accepting as true that Wells Fargo agreed to unreasonable drug prices and administrative fees, the question before the Court is whether

it is plausible—not certain, but plausible—that these overcharges harmed Plaintiffs in any amount and can be redressed by judicial relief. The answer is "yes."

### A.    The Allegations of Higher Out-of-Pocket Costs Support Standing Under 29 U.S.C. § 1132(a)(3)

Plaintiffs have standing to pursue their claims under § 1132(a)(3) (Counts II and IV) based on their out-of-pocket overpayments for prescription drugs—*i.e.*, the specific amounts they allege they were personally overcharged when they bought prescription drugs. This basis for standing has nothing to do with harm to the Plan or Plan assets; these harms were experienced directly by Plaintiffs when they filled prescriptions and paid ESI's inflated prices. Plaintiffs seek equitable monetary relief for these harms in the form of a fiduciary surcharge, as well as other equitable relief as provided by § 1132(a)(3).

### 1.    Injury-in-Fact

Plaintiffs allege that they personally paid for prescriptions they purchased through the Plan, either in full (when they had not met their deductible) or in part (when subject to co-pays or co-insurance). *See* AC ¶¶ 219-28; *see generally* AC ¶ 106. Plaintiffs also allege that the amounts they paid were higher than they would have been if Wells Fargo had prudently monitored Plan expenses. *See id.* ¶¶ 219-28. For example:

- Navarro paid $16.06 of his own money for a prescription that should have cost $5.70. *Id.* ¶ 220.

- Kinsella paid $6.31 of her own money for a prescription that should have cost $1.80. *Id.* ¶ 222.

- Bulla paid $10.00 of her own money for a prescription that should have cost $4.80. *Id.* ¶ 224.

- Gamage paid $9.45 of her own money for a prescription that should have cost $5.40. *Id.* ¶ 226.

- McKinley paid $7.75 of her own money for a prescription that should have cost $3.25. *Id.* ¶ 228.

Contrary to Wells Fargo's arguments, there is nothing "speculative" about these allegations. These are completed financial transactions in documented amounts. Plaintiffs personally used their own money to make these purchases and precisely identify the amounts they were overcharged. *See* AC ¶¶ 219-28. As in any case alleging that a defendant caused the plaintiff to overpay for goods or services, these allegations demonstrate an injury-in-fact. *See Lewandowski v. Johnson & Johnson*, 2025 WL 288230, at *5 (D.N.J. Jan. 24, 2025) ("It is clear to the Court based on these allegations that Plaintiff has suffered an injury-in-fact that is traceable to Defendants' alleged ERISA violations.").[1] As another court in this District put it, "Plaintiffs (obviously) plead an injury in fact" when they "allege that they were overcharged" for prescription drugs. *Blue Cross*, 519 F.Supp.3d at 532.

The cases Wells Fargo cites are inapposite because none involved a plaintiff's direct overpayment for goods or services. *See Knudsen*, 117 F.4th at 582 (allegations that revenue to plan should have been shared with participants); *Gonzalez de Fuente v. Preferred Home Care of N.Y. LLC*, 858 F. App'x 432, 433 (2d Cir. 2021) (same); *Glanton v. AdvancePCS, Inc.*, 465 F.3d 1123, 1125 (9th Cir. 2006) (allegations that plan, not plaintiff, overpaid); *Horvath v. Keystone Health Plan E., Inc.*, 333 F.3d 450, 457 (3d Cir. 2003) (same).

---

[1] Although the *Lewandowski* court found on the facts of that case that the plaintiff's injuries were not "redressable" because she had hit her out-of-pocket maximum, *id.*, Wells Fargo makes no such argument here.

Wells Fargo's contention that "Plaintiffs … received all benefits to which they were entitled under the Plan," ECF 79 ("MTD") at 17, ignores the nature of Plaintiffs' claims. This is not an action under 29 U.S.C. § 1132(a)(1)(B) "to recover benefits due to [plaintiffs] under the terms of [the] plan." Even when a plan provides all promised benefits, ERISA requires fiduciaries to monitor expenses and not waste money in providing those benefits. *See id.* § 1104(a)(1)(A)(ii); *infra* at § II.B.1. In *Braden*, for example, Wal-Mart promised its 401(k) plan participants an assortment of investment options. *See* 588 F.3d at 590. Even though the plaintiff received access to those investment options, he stated a claim by alleging that the plan fiduciaries agreed to "significantly higher fees" on those investments than necessary. *Id.* at 595; *accord Hughes v. Nw. Univ.*, 595 U.S. 170, 176 (2022). This case is no different: Plaintiffs received access to promised prescription drugs, but Wells Fargo imprudently made Plaintiffs pay "substantially higher" out-of-pocket costs for those drugs than necessary. AC ¶ 116.

## 2.    Traceability

Wells Fargo does not offer any traceability argument with respect to Plaintiffs' out-of-pocket harms. Nor could it. Plaintiffs expressly allege that their higher out-of-pocket costs were the "result of Wells Fargo's inattentiveness to prescription drug costs and other fiduciary failures." AC ¶ 217. Plaintiffs also explain exactly why imprudent fiduciary conduct leads to higher out-of-pocket costs for Plan participants—because participants must pay the full cost for drugs until meeting their deductible, and then part of the cost thereafter. *Id.* ¶ 106.

### 3.    Redressability

Plaintiffs' out-of-pocket harms are redressable in the normal way that financial harm is remedied: monetary relief. Specifically, Plaintiffs seek equitable monetary relief in the form of a "surcharge." *See* AC ¶¶ 217, 294, 314. As the Supreme Court explained in *CIGNA Corp. v. Amara*, 563 U.S. 421 (2011), courts in § 1132(a)(3) cases have "the power to provide relief in the form of monetary 'compensation' for a loss resulting from a [fiduciary's] breach of duty, … called a 'surcharge.'" *Id.* at 441-42. Wells Fargo does not deny that surcharge is available, as the Eighth Circuit has expressly approved "equitable surcharge under § 1132(a)(3)." *Silva v. Metro. Life Ins. Co.*, 762 F.3d 711, 722 (8th Cir. 2014). Indeed, "every circuit court to address the issue has recognized that Section 1132(a)(3) creates a cause of action for monetary relief for breaches of fiduciary duty." *Gimeno v. NCHMD, Inc.*, 38 F.4th 910, 914-15 (11th Cir. 2022).[2]

Wells Fargo argues that Plaintiffs lack standing to obtain *prospective* relief, MTD at 18, but that does not affect their entitlement to retrospective monetary relief in the form of surcharge. Similarly, this Court's prior opinion suggested that Wells Fargo's discretion to adjust *future* cost-sharing requirements means that Plaintiffs' claims are not redressable. *See* ECF 57 at 24 ("While Plaintiffs' requested relief *could* result in lower … out-of-pocket costs, there is no guarantee that it *would*."). Again, however, this has no bearing on retrospective monetary relief. Furthermore, any future changes to Wells Fargo's cost-

---

[2] This Court's prior ruling that retrospective monetary relief "is not available under Section 1132(a)(3)" (ECF 57 at 27) was based on pre-*Amara* case law and did not discuss *Amara*, *Silva*, or other post-*Amara* cases. The parties had not briefed the issue because Wells Fargo did not (and still does not) argue that surcharge is unavailable.

sharing requirements would have no bearing on at least four of the Plaintiffs (Navarro, Kinsella, Gamage, and Bulla) because they are no longer in the Plan. *See* AC ¶¶ 14-17.

Because Ms. McKinley remains in the Plan, she also has standing to seek injunctive relief and other prospective relief in addition to the surcharge remedy for past overcharges. Although Wells Fargo notes that she will lose her ability to participate in the Plan when her 18-month COBRA period expires, *see* MTD at 10 & n.4, "standing is assessed 'at the time the action commences.'" *McNaught v. Nolen*, 76 F.4th 764, 769 (8th Cir. 2023).

## B. The Allegations of Higher Premiums Support Standing Under 29 U.S.C. §§ 1132(a)(2) and (a)(3)

Plaintiffs also have standing based on inflated premium contributions resulting from Wells Fargo's fiduciary breaches. Unlike the out-of-pocket injuries discussed above, these injuries are based in the first instance on excessive amounts *the Plan paid*, both in inflated prescription drug costs and inflated administrative fees. *See* AC ¶¶ 101-49 (excessive drug prices); ¶¶ 150-54 (steering to more expensive pharmacy); ¶¶ 155-62 (excessive administrative fees). Plaintiffs allege that these excessive payments by the Plan also harmed them personally because, each year during the class period, their monthly premium contributions were set as a percentage of overall Plan spending. Thus, when the Plan overpaid for prescription drugs, Plan participants like Plaintiffs were proportionally harmed as well. Plaintiffs seek relief for these harms in two ways: relief on behalf of the Plan under 29 U.S.C. § 1132(a)(2), and relief on their own behalf under 29 U.S.C. § 1132(a)(3). Plaintiffs have standing to sue under both provisions, and the analysis is the same other than for redressability, which is addressed separately below.

### 1.    Injury-in-Fact

An "increase in premiums constitutes economic harm and is therefore 'a classic and paradigmatic form of injury in fact.'" *City of Columbus v. Trump*, 453 F.Supp.3d 770, 787 (D. Md. 2020). While this Court previously ruled that this theory of harm was speculative in the original complaint, the Amended Complaint bolsters Plaintiffs' allegations by (1) detailing the self-funded nature of the Plan; (2) adding factual support to their allegation that Wells Fargo set employee contributions as a percentage of overall plan costs; (3) attaching and incorporating an expert report from an experienced professional; and (4) citing extensive research confirming the link between higher drug costs and participant premium contributions. Plaintiffs' new allegations "nudge[] their claims across the line from conceivable to plausible." *In re Pre-Filled Propane Tank Antitrust Litig.*, 860 F.3d 1059, 1069 (8th Cir. 2017).

### a.    Plaintiffs' Premium Contributions Were Tied to Overall Plan Spending

The Plan is self-funded, which means that the Plan bore all insurance risk and paid all covered expenses, including prescription-drug costs and administrative fees. AC ¶¶ 29-30, 108. But the fact that *the Plan* was responsible for all covered expenses does not mean that *Wells Fargo* footed the entire bill. Rather, the Plan paid its bills through a trust fund that was financed by a combination of employer contributions *and* participant contributions. *Id.* ¶¶ 22, 232.

Wells Fargo, as the Court previously noted, had "sole discretion" to determine participant contribution levels. ECF 57 at 20. But the way in which it exercised that

discretion during the class period is critical here: it set participant contributions each year as a fixed percentage of the Plan's projected expenses. Specifically, Plaintiffs allege that "Wells Fargo intentionally set participant contributions at 25-26% of overall Plan health care costs." AC ¶ 240. The specific percentage is not important; what matters is that unlike the cases on which Wells Fargo relies, the Amended Complaint alleges that "employee contributions [were] calculated as a *pro rata* share of the total benefits cost," *Winsor v. Sequoia Benefits & Ins. Servs. LLC*, 62 F.4th 517, 525 (9th Cir. 2023), not based on some other method that would not inherently cause them to rise and fall in lockstep with Plan spending. Plaintiffs support this allegation with historical data, expert testimony, and empirical research.

*Historical Data*. In support of their allegation that Wells Fargo used a percentage-based methodology for setting employee contributions, Plaintiffs included historical data showing remarkable consistency in participant contribution percentages during the class period:



AC ¶ 240; *see also id.* ¶ 234 (listing percentages). Any non-percentage-based methodology would have been highly unlikely to produce such consistency. *See id.* ¶ 241. This historical data make it extremely likely, and certainly plausible, that "employee contributions [were] calculated as a *pro rata* share of the total benefits cost" rather than through some other method. *Winsor*, 62 F.4th at 525.

**Expert Report**. Plaintiffs' expert confirms that Wells Fargo used a percentage-based methodology. Based on her extensive experience, AC ¶ 262; Albritton Report at 2-3, she describes how self-funded plans generally determine participant contribution levels and how the Wells Fargo Plan specifically did so.

As to general practices, Ms. Albritton explains that "[f]or most large employers, the contribution split is based on a percentage of total expected costs," meaning that "employers target a fixed percentage for employee contributions." Albritton Report at 8; *see also* AC ¶ 266. That large employers *generally* use percentage-based methodologies supports the plausibility of Plaintiffs' allegation that Wells Fargo followed that industry practice. *See, e.g.*, *In re Xyrem (Sodium Oxybate) Antitrust Litig.*, 555 F.Supp.3d 829, 858 (N.D. Cal. 2021) ("Here, at the motion to dismiss stage, it is plausible that [the company] would follow prevailing industry practice."). Ms. Albritton also confirms that "prescription drug spending plays a significant role in the calculation of premium contributions," as a company's "actual and anticipated claim costs" are "the largest factor" in determining contribution levels. AC ¶ 263; Albritton Report at 2, 8-10.

In addition to offering these overall observations, Ms. Albritton specifically reviewed the Wells Fargo Plan and concluded that "like most large employers, Wells Fargo

uses percentage-based cost sharing for its employee contributions." Albritton Report at 12; *see* AC ¶¶ 268-69. Ms. Albritton analyzed the relative share of employee contributions to total contributions for the Plan from 2018 through 2023 (the last year for which reported data is available). AC ¶ 268. Her analysis of the Wells Fargo Plan shows that the total contributions per employee changed at roughly the same rate as the total Plan expenses each year, confirming that (1) Plan expenses impact contribution rates; and (2) Wells Fargo used a percentage-based allocation methodology, *id.* ¶ 269; Albritton Report at 12.

This new analysis, which was not previously before the Court, must be considered for purposes of the present motion. *See Pub. Pension Fund Grp. v. KV Pharm. Co.*, 679 F.3d 972, 988-89 (8th Cir. 2012) (district court abused its discretion in denying motion to amend where "the proposed amended complaint included an expert report" that "[t]he district court did not specifically address").[3] Ms. Albritton's fact-based analysis strongly supports Plaintiffs' allegations of injury here. *See, e.g.*, *Dover v. Brit. Airways, PLC (UK)*, 2013 WL 5970688, at *4 (E.D.N.Y. Nov. 8, 2013) (relying on expert's "statistical analysis" to find plausibility); *McConchie v. Scholz*, 567 F.Supp.3d 861, 877 n.13 (N.D. Ill. 2021) (holding plaintiffs may "rely on [an] expert report as a supplement to the pleadings" to help

---

[3] Ms. Albritton's expert report was attached to the Complaint, and "an exhibit to a pleading is a part of the pleading for all purposes." Fed. R. Civ. P. 10(c); *see also Meehan v. United Consumers Club Franchising Corp.*, 312 F.3d 909, 913 (8th Cir. 2002). Plaintiffs not only attached her report, but included specific factual allegations based on her analysis. *See* AC ¶¶ 263-69. Although Wells Fargo states that "expert *opinions* … are not entitled to an assumption of truth," MTD at 16 (emphasis added), it does not dispute that courts may rely on factual statements and analyses in expert reports in deciding a motion to dismiss. *See Diebler v. SanMedica Int'l, LLC*, 488 F.Supp.3d 169, 179 (D.N.J. 2020) ("[T]he Court will consider these expert reports for the purposes of this motion.").

establish injury-in-fact).[4]

*Empirical Research*. Government studies and empirical research consistently find a link between increased plan spending on prescription drugs and increased employee premium contributions. For example, in an analysis not previously included in the Complaint, the Federal Trade Commission found that inflated drug costs "result in higher premiums" for recipients of employer-provided insurance. AC ¶ 246. Other independent research confirms this link. *See id.* ¶¶ 247-51.

- A 2023 report by The Center for American Progress found that inflated drug prices "ultimately raise[] costs for consumers through higher cost sharing and premiums." *Id.* ¶ 247.

- An article from the Peterson Center on Healthcare states, "Prescription drugs are one of the leading contributors to health spending growth," and that "growth in prescription drug spending may have a relatively large effect on employer-sponsored health insurance premiums." *Id.* ¶ 250.

- In a 2024 report, RAND Corporation found that "[h]igher drug spending will, holding all else constant, lead to higher premiums." *Id.* ¶ 251.

The RAND report also found that "[t]he employer share of the premium remained steady at 82-83 percent per year across 2014-2023" even as healthcare expenses increased. *Id.* This aligns perfectly with Wells Fargo's practice of maintaining employee contributions

---

[4] Wells Fargo focuses on Ms. Albritton's statement that individual "'premium amounts may be based on a number of factors,' including several unrelated to prescription drugs." MTD at 15 (citing Albritton Report at 2, 8); *see also* ECF 57 at 20-21 (noting that individual premiums may be affected by, *e.g.*, "whether a participant uses tobacco"). As Ms. Albritton explains, however, these "granular" adjustments for individual risk factors are applied only *after* the "the overall employer/employee contribution level" is set. Albritton Report at 8. Moreover, "[b]y far the largest component of contribution rates is the expected claim costs." AC ¶ 264; Albritton Report at 7. The fact that costs are not the *only* factor in setting employee contributions hardly makes them a *non*-factor.

steady at approximately 25 percent of the total premium. AC ¶ 252. The only difference is that Wells Fargo required its employees to pay a *greater* share of total premiums (25%) than the average employer (17-18%). *Id.* ¶ 251.

* * *

Plaintiffs' extensive allegations and expert analysis set this case apart from the cases cited by Wells Fargo. In those cases, the plaintiffs either did not allege they paid *any* premiums or did not allege that their premium contributions rose and fell in lockstep with plan spending. Indeed, some of Wells Fargo's cases directly support *Plaintiffs'* position because they expressly acknowledge that allegations like those in the Amended Complaint would state a claim for relief.

In *Loren v. Blue Cross & Blue Shield of Mich.*, 505 F.3d 598 (6th Cir. 2007), for example, the court acknowledged that plaintiffs would have alleged injury-in-fact if (like Plaintiffs here) they alleged that they "paid percentage contributions." *Id.* at 608. The court dismissed the case only because the plaintiffs made no such allegation. *Id.* Similarly, in *Winsor*, the court suggested that the plaintiffs would have pleaded injury-in-fact if they plausibly alleged (like Plaintiffs here) that "employee contributions [were] calculated as a *pro rata* share of the total benefits cost." 62 F.4th at 525. Instead, however, they only vaguely alleged that employee contributions were set "based on 'various factors and discussion.'" *Id.*

The *Knudsen* case is distinguishable because the plaintiffs failed to allege that their premium contributions were historically tied to the particular type of monies at issue in the case—windfall income to the plan in form of "rebates." *Knudsen*, 117 F.4th at 574-75.

18

The plaintiffs did not allege that "rebate" money had *ever* been used in setting participant premiums, so they could only speculate about how the Plan would have used such funds. *Knudsen*, 117 F.4th at 581-82 & n.91 (citing *Winsor*). Here, in contrast, Plaintiffs now plausibly allege that Wells Fargo *always* calculated participant contributions as a percentage of total Plan expenses. Finally, in *Gonzalez de Fuente v. Preferred Home Care of N.Y. LLC*, 2020 WL 5994957 (E.D.N.Y. Oct. 9, 2020), the plaintiffs did not allege they paid *any* premiums, let alone premiums that moved in lockstep with overall plan spending. *Id.* at *2.

> **b.     Because Plaintiffs' Contributions Were Directly Tied to Plan Spending, Plaintiffs Were Injured by the Plan's Overpayments**

Plaintiffs' plausible allegation that Wells Fargo used a percentage-based methodology necessarily means that Plaintiffs were injured by the Plan's overpayments. In 2021, for example, Wells Fargo required participants to pay 25% of total Plan expenses, with Wells Fargo covering the remaining 75%. AC ¶ 234; *see* Albritton Report at 11. If Wells Fargo had acted prudently and reduced prescription drug costs by $100 million, participants' 25% share would have been $25 million less, or $132.40 less per participant. *See* AC ¶ 235; *see* Albritton Report at 12 ("[R]educed prescription drug spending would have resulted in reduced employee contributions."). Courts regularly find this kind of injury sufficient for standing. *See, e.g.*, *City of Columbus*, 453 F.Supp.3d at 787; *AARP v. EEOC*, 226 F.Supp.3d 7, 18 (D.D.C. 2016) ("An increase in premiums would certainly constitute an injury.").

### c.    Wells Fargo's Unfounded Speculation is Unavailing

Wells Fargo does not deny that it used a percentage-based methodology or that this necessarily means Plan overpayments increased participants' premium contributions. Instead, Wells Fargo resorts to speculation. It repeatedly points to its "'sole discretion' to set participant contributions," MTD at 13, implying that in a hypothetical world in which it acted prudently and reduced the Plan's drug spending, it might have changed the participant contribution percentage so that Plaintiffs' annual contributions remained the same despite overall Plan savings. This Court's prior opinion relied on similar reasoning. *See* ECF 57 at 22-23 ("[T]his argument assumes that Wells Fargo would maintain the 75-25 employer-employee contribution ratio, and nothing in the Plan *requires* Wells Fargo to do so.").

This hypothetical possibility is legally irrelevant to injury-in-fact. In assessing the "but-for" world in which a defendant did not engage in unlawful conduct, "the but-for scenario differs from what actually happened *only with respect to the harmful act*." Fed. Judicial Center, Reference Guide on Estimation of Econ. Damages, Reference Manual on Scientific Evid. 432 (3d ed. 2011) (emphasis added). The "actual real world conditions during the entire damages period" are held constant, "with the only fantastical element being that the unlawful conduct did not occur." *ICTSI Or., Inc. v. Int'l Longshore & Warehouse Union*, 2022 WL 16924139, at *9 (D. Or. Nov. 14, 2022). Thus, the real-world contribution percentage that Wells Fargo selected remains the same, and there is no factual or legal basis to assume or infer otherwise.

This is a well-established principle under ERISA. When a fiduciary imprudently invests plan assets, the measure of loss is the difference between "what the Plan actually earned on the [imprudent] investment [and] what the Plan would have earned had the funds been available for other Plan purposes." *Donovan v. Bierwirth*, 754 F.2d 1049, 1056 (2d Cir. 1985). In determining "what the Plan would have earned" in the but-for world, courts look at what the defendant actually did in the real world—they "presume that the funds would have been treated like other funds being invested during the same period in proper transactions." *Id.*; *see also Roth v. Sawyer-Cleator Lumber Co.*, 61 F.3d 599, 604 (8th Cir. 1995) (adopting *Donovan*'s analysis). Wells Fargo cannot speculate away its real-world decision about contribution percentages.

Furthermore, even if—contrary to established ERISA law—Plaintiffs needed to rebut Wells Fargo's speculation, the Amended Complaint does so. Specifically, it alleges that "Wells Fargo would not have materially changed the pass-through proportion from the proportion it actually used each year during the class period." AC ¶ 236. This allegation is supported by specific facts showing Wells Fargo's intentional 75-25 contribution split was not dependent on the overall level of Plan spending. In 2018, when Plan spending was $11,947 per-participant, Wells Fargo required participants to pay 26.6%. In 2023, when spending was substantially higher—$15,373 per participant—Wells Fargo made participants pay the same percentage, 26.6%. AC ¶¶ 234, 268. We therefore already know whether Wells Fargo would have kept the same split if overall spending were substantially

lower, because overall spending *was* substantially lower several years ago, and Wells Fargo had the same split.[5]

Plaintiffs also analyze aggregate data for health plans, showing it is rare for *any* health plan to make substantial changes to the participant contribution percentage from year to year. AC ¶ 253. This underscores the plausibility of Plaintiffs' allegation that Wells Fargo would not have materially changed its practice. *See In re Xyrem*, 555 F.Supp.3d at 858. At the pleading stage, all inferences must be drawn in Plaintiffs' favor, *Braden*, 588 F.3d at 591, and it is reasonable to infer that Wells Fargo would have done the same thing it did for the entire class period.

### d. Plaintiff McKinley Was Undisputedly Injured by Increased Premiums

Wells Fargo entirely ignores that Ms. McKinley is enrolled in the Plan through COBRA and therefore paid 100% of the premium contributions (not just the employee share). *See* AC ¶¶ 18, 256-60. COBRA is a federal law that allows former employees to continue their health insurance after a job loss, but requires them to cover both the employer and the participant contributions. *Id.* ¶ 257; *Geissal v. Moore Med. Corp.*, 524 U.S. 74, 80 (1998). Moreover, COBRA requires that the total contribution amount be based on total plan expenses. *Id.* ¶ 258; *see* 29 U.S.C. § 1164(2). Thus, by operation of law, Ms.

---

[5] Wells Fargo goes outside the Amended Complaint and outside the class period to claim that "employee contributions varied between 25.00% and 28.59%." MTD at 15 n.6. The Amended Complaint, appropriately focusing on the class period, shows a tighter range of 25.0% to 26.6%, and expressly alleges that the "minor variation was due to forecasting error." AC ¶¶ 234, 240; *see also* Albritton Report at 11 ("The variation from year to year is likely due to differences between the expected and actual distribution of employees by … rating characteristics").

McKinley's contributions were calculated as a share of overall Plan expenses. Wells Fargo does not dispute this, instead arguing only that Ms. McKinley has not alleged a plausible claim on the merits "that the Plan's costs should have been lower." MTD at 16; *see also infra* Part II (addressing merits arguments).

### 2.    Traceability

Wells Fargo does not make any unique argument with respect to traceability, arguing only that Plaintiffs' supposed "failure to plead a connection between the plan's costs and participants also can be understood as a failure to plead causation." MTD at 12. For the reasons previously discussed, Wells Fargo is wrong—its percentage-based methodology means that participant contributions moved in lockstep with overall Plan spending.

### 3.    Redressability

Plaintiffs' harms are redressable under both § 1132(a)(3) (Counts II and IV) and § 1132(a)(2) (Counts I and III).

***Section 1132(a)(3) claims.*** Plaintiffs' § 1132(a)(3) claims to recover their premium overpayments are redressable in the same way as their § 1132(a)(3) claims to recover their out-of-pocket overpayments: equitable monetary relief in the form of surcharge. *See supra* Part I.A.3. Wells Fargo does not deny that this relief is available and would redress the alleged harms.

This Court's prior opinion suggested that Wells Fargo's discretion to adjust *future* contributions might mean that Plaintiffs' *past* overpayments are not redressable. *See* ECF 57 at 23 ("[I]f Plaintiffs prevailed in this case and received every bit of the relief they

request, Wells Fargo could *still* increase Plan participants' contribution amounts under the Plan's terms."). But this has no bearing on the retrospective surcharge remedy, and in all events, four of the five Plaintiffs are no longer Plan participants so any future adjustment to contribution rates could not possibly affect them. *See supra* at 11-12. More broadly, it is *always* true that an employer could react to a litigation loss by cutting employee compensation or altering future benefits. That is true in employment discrimination cases, wage-and-hour cases, ERISA cases, and any similar litigation. But that does not mean an employee lacks standing to seek retrospective relief in the form of damages, backpay, or in this case, surcharge. If an employer's discretion regarding pay and benefits were enough to eliminate Article III standing, no plaintiff could ever pursue those causes of action.

*Section 1132(a)(2) claims.* Plaintiffs' § 1132(a)(2) claims also satisfy the redressability requirement because "Plaintiffs will indirectly benefit from a remedy accruing to the Plan." *Hawkins v. Cintas Corp.*, 32 F.4th 625, 634 (6th Cir. 2022). Under ERISA, "the fiduciaries should, in accord with their statutory duty of care, strive to allocate any recovery to the affected participants in relation to the impact the fiduciary breaches had on [them]." *Evans v. Akers*, 534 F.3d 65, 74 (1st Cir. 2008); *see also* 29 U.S.C. § 1002(7) (defining "participant" as "any employee or former employee").

Wells Fargo argues that redressability is not satisfied because relief under §1132(a)(2) flows to the Plan first, and "nothing in the Plan (or elsewhere) obligates Wells Fargo to pass on to Plaintiffs any potential recovery by the Plan." MTD at 13. That is not the law: "there is no lack of redressability merely because a plaintiff's recovery under Section [1132](a)(2) might go first to the [] plan rather than directly to the plaintiff." *Harris*

24

*v. Amgen*, 573 F.3d 728, 736 (9th Cir. 2009). Instead, redressability is satisfied as long as plaintiffs allege a concrete financial injury caused by a fiduciary breach, the fiduciaries are before the court, and a favorable judgment would restore plan assets in a way that fiduciaries—bound by their duties of prudence and loyalty—are likely to equitably allocate to those harmed, including former participants.

Case law is clear that fiduciaries cannot avoid accountability by speculating that they might not equitably allocate plan assets to former participants. For example, in *In re Mut. Funds Inv. Litig.*, 529 F.3d 207 (4th Cir. 2008) ("*Wangberger*"), "former employees" who had already "cashed out" their 401(k) accounts sued under § 1132(a)(2) for fiduciary breaches. *Id.* at 210. The defendant made the same argument Wells Fargo makes here—that the plaintiffs' alleged injuries were not redressable because "[p]laintiffs have failed to adduce *any* facts showing that the plan fiduciaries are *likely* to distribute any award in this action to former employees, nor have they demonstrated that the district court would have the authority to order the plan fiduciaries to do so in this case." *Id.* at 217. The court rejected this argument, holding that the speculative concern that plan fiduciaries might later act arbitrarily or disloyally in allocating a recovery is not a basis for denying standing. *Id.* at 217-18. Other courts have likewise rejected arguments identical to Wells Fargo's. *See Harris*, 573 F.3d at 735 (rejecting argument that "any benefit to [plaintiff] is 'merely speculative' because any recovery from Harris's suit would go to the Amgen Plan, and plan administrators have discretion in allocating plan assets"); *Evans*, 534 F.3d at 74 (rejecting argument that "the harm suffered by [plaintiffs] is unlikely to be redressed because …

fiduciaries could decide to allocate the recovery only to the accounts of current employees").

Indeed, if the fiduciaries refused to allocate recovered plan assets to those who were harmed, that refusal could itself violate ERISA's fiduciary duties. *Evans*, 534 F.3d at 74 ("We doubt that such a decision would be consistent with the fiduciaries' duty to act in the interest of participants."). Redressability does not require certainty of relief; it requires only a showing that a favorable judgment would *likely* lead to meaningful relief, which Plaintiffs have shown. *See generally Biden v. Nebraska*, 600 U.S. 477, 489 (2023).

Wells Fargo's cited cases are distinguishable. First, those plaintiffs failed to plausibly allege that they had been harmed, so plan fiduciaries had no obligation to allocate any recovery to them. *See Glanton*, 465 F.3d at 1125; *Winsor*, 62 F.4th at 525; *David v. Alphin*, 2008 WL 5244504, at *2 (W.D.N.C. Dec. 15, 2008). The *Wangberger* court expressly distinguished such cases on the basis that the plaintiffs have no financial "interest in recovering losses caused by fraud or other misconduct." 529 F.3d at 218. Second, the plaintiffs in *Glanton* and *Winsor* sued third parties, not plan sponsors. As *Wangberger* explained when distinguishing *Glanton*, this distinction is critical: "if the [plan] fiduciaries are not before the courts and they have discretion that cannot be controlled or predicted, then any relief for the plaintiffs would be entirely speculative. But that is not the case here…. the fiduciaries *are* in fact before the court in these cases and can respond to court orders to redress wrongs." 529 F.3d at 217.

## II.    PLAINTIFFS STATE PLAUSIBLE CLAIMS UNDER ERISA

Wells Fargo's argument that Plaintiffs have not adequately pled their claims is meritless. Plaintiffs' allegations are more than sufficient to state plausible claims under ERISA.

### A.    Plaintiffs State Plausible Prohibited Transaction Claims

Wells Fargo identifies no reason why Plaintiffs' prohibited transaction claims (Counts III and IV) should be dismissed, other than an unsupported assertion that the claims are "conclusory." MTD at 30. Wells Fargo's real beef is with the Supreme Court, not Plaintiffs' pleading.

In connection with its original motion to dismiss, Wells Fargo stated that "the U.S. Supreme Court is expected to rule this term on the pleading standard applicable to prohibited transaction claims like the ones asserted here." ECF 41 at 14. Now that the Supreme Court has issued its ruling, however, Wells Fargo says nothing about the opinion. The reason is obvious: in *Cunningham*, 145 S.Ct. 1020, the Supreme Court **rejected** Wells Fargo's prior argument that Plaintiffs needed do anything more than "allege that Wells Fargo caused the Plan to contract with ESI." *See* MTD at 30. The Court held that a plaintiff may "plead only that a transaction [with a service provider] barred by § 1106(a)(1)(C)'s plain text occurred," and is not required to plead anything more. *Cunningham*, 145 S.Ct. at 1031. As the Court explained, ERISA "defines 'party in interest'" to include entities 'providing services to [the] plan.'" *Cunningham*, 145 S.Ct. at 1025 (citing 29 U.S.C. § 1002(14)). And "Section 1106(a)(1)(C) contains [just] three elements … (1) 'caus[ing a] plan to engage in a transaction' (2) that the fiduciary 'knows or should know ... constitutes

27

a direct or indirect ... furnishing of goods, services, or facilities' (3) 'between the plan and a party in interest.'" *id.* at 1027.

Plaintiffs allege all three elements here: (1) Wells Fargo "entered into and/or renewed a contract with [ESI]" during the class period, AC ¶ 110; (2) "Wells Fargo caused the Plan to engage in transactions that Wells Fargo knew or should have known constituted … a furnishing of services between the Plan and [ESI] prohibited by 29 U.S.C. § 1106(a)(1)(C)," *id.* ¶¶ 297, 305;[6] and (3) "[a]s a service provider to the Plan, [ESI] is a party in interest." *id.* ¶¶ 296, 304 (citing 29 U.S.C. § 1002(14)(B)). Wells Fargo does not argue that any of these elements is insufficiently pled.

Although Plaintiffs' claims under § 1106(a)(1) will ultimately be subject to an affirmative defense under § 1108 that "no more than reasonable compensation was paid," *Cunningham*, 145 S. Ct. at 1028, the Court held that "Plaintiffs are not required to plead and prove that the … § 1108 exemption[] pose[s] no barrier to ultimate relief." *Id.* at 1025, 1032. This approved *Braden*'s holding that "no additional pleading requirements beyond § 1106(a)(1) apply to prohibited-transaction claims." *Cunningham*, 145 S.Ct. at 1027.

## B.    Plaintiffs State Plausible Breach of Fiduciary Duty Claims

### 1.    Monitoring Plan Expenses and Service Providers Is a Fundamental Fiduciary Role

Plaintiffs also plead plausible breach of fiduciary duty claims (Counts I and II). "The principal object of [ERISA] is to protect plan participants and beneficiaries." *Boggs*

---

[6] Plaintiffs also allege "an exchange of property between the Plan and [ESI] prohibited by 29 U.S.C. § 1106(a)(1)(A)" and "a transfer of the Plan's assets to … [ESI] prohibited by 29 U.S.C. § 1106(a)(1)(D)." AC ¶¶ 22, 297, 305.

*v. Boggs*, 520 U.S. 833, 845 (1997).[7] Among other things, fiduciaries must act "solely in the interest of the participants … for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying ***reasonable expenses*** of administering the plan." 29 U.S.C. § 1104(a)(1)(A) (emphasis added). In addition, fiduciaries must act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent [person] acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B). These fiduciary duties are considered "the highest known to the law." *Braden*, 588 F.3d at 598.

One component of carrying out these duties is diligently monitoring plan expenses. *See Tussey v. ABB, Inc.*, 746 F.3d 327, 336 (8th Cir. 2014) (fiduciaries "breached their fiduciary duties by failing to monitor and control recordkeeping fees"); *accord Tibble v. Edison Int'l*, 843 F.3d 1187, 1198 (9th Cir. 2016) (en banc) ("Wasting beneficiaries' money is imprudent .… trustees are obliged to minimize costs."); Restatement (Third) of Trusts § 88 cmt. a (2007) ("Implicit in a trustee's fiduciary duties is a duty to be cost conscious.").[8]

Wells Fargo tries to escape these fiduciary duties by arguing that "setting premiums, co-pays, and deductibles are plan design decisions and … not fiduciary functions." MTD at 19. This is a straw man. Plaintiffs do not allege that Wells Fargo breached its fiduciary

---

[7] Courts "must be attendant to ERISA's remedial purpose." *Braden*, 588 F.3d at 597. Accordingly, ERISA "should be liberally construed" to protect participants. *Brown v. J.B. Hunt Transp. Servs., Inc.*, 586 F.3d 1079, 1086 (8th Cir. 2009).

[8] "In determining the contours of an ERISA fiduciary's duty, courts often must look to the law of trusts." *Tibble v. Edison Int'l*, 575 U.S. 523, 528-29 (2015).

duties by setting employee premium contributions at 25% of total contributions (AC ¶ 240), or by establishing co-pays, co-insurance amounts, and deductibles (*id.* ¶¶ 33, 106). Rather, Plaintiffs allege that, *taking as given the settlor decisions that Wells Fargo made about premiums and co-pays*, Wells Fargo had a duty to ensure that drug costs and administrative expenses were reasonable and to monitor ESI's conduct. *Id.* ¶¶ 9, 284-85, 291-92. If Wells Fargo had set the employee premium contribution amount differently (at 20% or 30%, instead of 25%), or had adopted different co-insurance percentages or deductible amounts, the extent of the harm might have differed to a degree, but the nature of the claims would be the same. Thus, Plaintiffs do not challenge how Wells Fargo "set[] premiums, co-pays, and deductibles." MTD at 19.

Wells Fargo next argues that its "decision to enter into a PBM agreement [with ESI] and assent to its terms" (MTD at 20) is also a "plan design" decision immune from ERISA scrutiny. That is incorrect: selecting and monitoring service providers is a "quintessential" fiduciary function. *Waller v. Blue Cross of Cal.*, 32 F.3d 1337, 1342 (9th Cir. 1994). Indeed, the Department of Labor's Fiduciary Guidebook expressly states that "[h]iring a service provider … is a fiduciary function," and further states that "[f]ees are … one of several factors fiduciaries need to consider in deciding on service providers." MEETING YOUR FIDUCIARY RESPONSIBILITIES at 5-6 (Sept. 2021).[9] In addition, "monitoring a service provider" is also a fiduciary function, *id.* at 6, "separate and apart" from the duty to prudently select the provider at the outset, *Tibble*, 575 U.S. at 529.

---

[9] https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/publications/meeting-your-fiduciary-responsibilities-booklet-2021.pdf.

Courts have long distinguished between "decisions to alter a plan," which is a settlor function, and "the implementation of those decisions," which is a fiduciary function. *Lee v. Verizon Commc'ns., Inc.*, 837 F.3d 523, 536 (5th Cir. 2016). For example, in *Beck v. PACE Int'l Union*, 551 U.S. 96 (2007), the Supreme Court distinguished between the settlor decision to terminate a pension plan and the fiduciary decision of selecting an annuity provider to implement the termination. *Id.* at 102. It made clear that "ERISA imposed on [defendant] a fiduciary obligation in its selection of an appropriate [service] provider." *Id.* The same principle applies here: Wells Fargo acted as a settlor when it decided to offer prescription drug benefits, but it acted as a fiduciary in selecting and retaining ESI to implement those benefits. Likewise in *Mahoney v. J.J. Weiser & Co.*, 564 F.Supp.2d 248 (S.D.N.Y. 2008), the defendant's "decision … to offer supplemental health insurance was a settlor function," while its "determinations to retain [specific service providers] and the subsequent decisions to maintain and renew those relationships were subject to ERISA fiduciary oversight." *Id.* at 256; *see also Waller*, 32 F.3d at 1342; *Abraha v. Colonial Parking, Inc.*, 243 F.Supp.3d 179, 187 (D.D.C. 2017).

In stark contrast to this established precedent, Wells Fargo relies on underdeveloped dicta in distinguishable cases. In *Moeckel v. Caremark*, 622 F.Supp.2d 663 (M.D. Tenn. 2017), the only defendant was the PBM, not the plan sponsor, so the court's characterization of the plan sponsor's "decision to enter into the PBM Agreement" as a "plan design decision" was dicta without any reasoning or citation. *Id.* at 678; *see also Mulder v. PCS Health Sys., Inc.*, 432 F.Supp.2d 450, 458 (D.N.J. 2006) (same). In *Doe One v. CVS Pharmacy, Inc.*, 348 F.Supp.3d 967, 1001-1002 (N.D. Cal. 2018), the court

31

relied solely on *Moeckel*'s unreasoned dicta, making it no better authority. Even further afield is *Pharm. Care Mgmt. Ass'n v. Mulready*, 78 F.4th 1183 (10th Cir. 2023), a preemption case against Oklahoma's insurance commissioner that has nothing to do with fiduciary duties or settlor functions. These thinly reasoned snippets cannot overcome the "dispositive" distinction—recognized by the Supreme Court, courts of appeals, and the Department of Labor—between the settlor decision to offer benefits and the fiduciary obligations that ERISA imposes in "implement[ing]" those benefits decisions, including in "choosing [service] providers." *Waller*, 32 F.3d at 1342.

### 2.    Wells Fargo Breached Its Duties in Multiple Ways

Plaintiffs plausibly allege that Wells Fargo breached its fiduciary duties in two respects: (1) it allowed ESI to charge grossly marked-up prices for prescription drugs; and (2) it allowed ESI to charge inflated administrative fees. In support, Plaintiffs offer apples-to-apples cost comparisons for the exact same drugs, and administrative fee comparisons for other large plans receiving like PBM services. These are "meaningful benchmarks" that plausibly show "a prudent fiduciary in like circumstances would have acted differently." *Meiners v. Wells Fargo & Co.*, 898 F.3d 820, 822 (8th Cir. 2018); *see Braden*, 588 F.3d at 595-96 (approving product comparisons showing "ready availability of better options"); *Davis v. Washington Univ. in St. Louis*, 960 F.3d 478, 483 (8th Cir. 2020) (approving product comparisons showing "lower-cost alternatives"); *Morin v. Essentia Health*, 2017 WL 4083133, at *11-12 (D. Minn. Sept. 14, 2017), *adopted*, 2017 WL 4876281 (Oct. 27, 2017) (approving cost comparisons for "comparable or superior services").

Plaintiffs' comparisons are nothing like those in the cases Wells Fargo cites, where the plaintiffs made cost comparisons between *different* products, *see Meiners*, 898 F.3d at 823 (8th Cir. 2018), or plans receiving materially *different* services, *see Barrett v. O'Reilly Auto., Inc.*, 112 F.4th 1135, 1139 (8th Cir. 2024); *Matousek v. MidAmerican Energy Co.*, 51 F.4th 274, 279 (8th Cir. 2022). Although Wells Fargo disputes the overcharges and nitpicks the comparisons, its arguments "raise factual issues that cannot be resolved in a motion to dismiss." *Wildman v. Am. Century Servs., LLC*, 237 F.Supp.3d 902, 914 (W.D. Mo. 2017); *see also Braden*, 588 F.3d at 595.

### a.    Excessive Prescription Drug Costs

Plaintiffs plausibly allege that Wells Fargo breached its duty to monitor the Plan's prescription drug costs. Plaintiffs support their allegation with multiple analyses of Wells Fargo's drug prices that reveal a staggering markup from drug acquisition costs, a staggering markup from the prices that "pass-through" PBMs charge, and a staggering markup from prices charged to comparable plans by other traditional PBMs. AC ¶ 114. These prices greatly exceed the prices that any prudent fiduciary would agree to pay and are not reasonable.

***Excessive Compared to NADAC***. Plaintiffs' principal analysis shows that Wells Fargo's prices across *all* covered prescription drugs are unreasonably high. That analysis had several components, covering all three types of drugs—generic, specialty, and brand. First, Plaintiffs analyzed *every* generic drug on the Preferred Formulary for which NADAC data exists and showed that, on average, Wells Fargo agreed to pay *more than double* what those same drugs actually cost—a markup of 115%. AC ¶¶ 118-21. Second, Plaintiffs

analyzed Wells Fargo's prices for "specialty" drugs listed on a separate ESI formulary and found an even higher average markup—383%. *Id.* ¶ 125. For some of these drugs, the markups were over 1,000% (*id.* ¶¶ 126, 132, 134), 2,000% (*id.* ¶ 128), or even 10,000% (*id.* ¶ 136). Third, Plaintiffs analyzed Wells Fargo's prices for brand-name drugs available under the Plan and found that they "do not reflect special discounts that would offset or justify the atypical and extraordinary overcharges" for other drugs. AC ¶ 148. The massive markups to which Wells Fargo agreed raise a plausible inference that Wells Fargo acted imprudently. *See, e.g.*, *Braden*, 588 F.3d at 595 n.5 (plaintiff stated claim by alleging fiduciaries agreed to pay 0.68% fee on mutual funds when the same funds were available with only 0.43% fee).

Wells Fargo contends that NADAC data is not an appropriate benchmark, MTD at 25, but this directly contradicts the Amended Complaint. *See* AC ¶ 59 ("A prescription drug's NADAC is a widely-accepted … benchmark"); ¶ 60 ("NADAC is commonly used by other plans as a benchmark for the prices they pay for prescription drugs."); ¶ 68 ("[M]any prudent fiduciaries negotiate generic pricing based on NADAC."). At this stage, these allegations must be taken as true. *See Snyder v. UnitedHealth Group, Inc.*, 2021 WL 5745852, at *3 (D. Minn. Dec. 2, 2021) ("To the extent that Defendants dispute the [validity of the comparators], these are factual issues that the Court cannot resolve on a motion to dismiss."). The Amended Complaint also specifically identifies multiple PBMs that use NADAC prices as a benchmark, including both Capital Rx and the "ClearNetwork" product offered by Wells Fargo's own PBM. AC ¶ 60.

Wells Fargo tries to downplay its high prices by suggesting that Plaintiffs analyzed only a subset of "the thousands of drugs covered by the Plan." MTD at 8. This argument is factually untrue and legally irrelevant. As a factual matter, most of the supposed "thousands" of other drugs are just different dosages (*e.g.* 10mg vs. 20mg) or delivery forms (*e.g.* tablet vs. capsule) of the same drugs, so they *are* included in Plaintiffs' analysis. AC ¶ 146. Moreover, the Preferred Formulary states that the drugs in Plaintiffs' analysis are "the most commonly prescribed drugs" under the Plan, meaning they have an outsized impact on overall spending even if some rarely-used drugs are also covered. *Id.* ¶ 147. To the extent that other drugs are not part of Plaintiffs' analysis, Wells Fargo is not entitled to an inference in its favor that cost comparisons for such drugs would be any more favorable to it than the comparisons in the Amended Complaint. To the contrary, the Court must "grant[] all reasonable inferences to the [plaintiffs]," *Braden*, 588 F.3d at 591, including the inference that any drugs not listed on the Preferred Formulary are similarly priced to those that are.

As a legal matter, Wells Fargo's suggestion that the Amended Complaint is insufficient for not analyzing every drug available under the Plan is fatally flawed twice over. First, Wells Fargo's argument directly contradicts *Braden*, in which the Eighth Circuit directed district courts to "take account of [plaintiffs'] limited access to crucial information" and warned that ERISA's "remedial scheme … will fail" if courts require plaintiffs to "plead[] facts which tend systemically to be in the sole possession of defendants." 588 F.3d at 598. Wells Fargo does not dispute that the formulary Plaintiffs analyzed is the "most comprehensive" Wells Fargo formulary that is publicly available.

35

AC ¶ 118. Dismissing the Amended Complaint for not analyzing prices of drugs that are listed only on *non*-public formularies would contravene *Braden*.

Second, ERISA does not require plaintiffs to allege that every drug covered by the Plan is overpriced. In *Hughes*, for example, the Supreme Court rejected a similar argument that fiduciaries who offered unreasonably priced funds could escape liability as long as they *also* offered some reasonably priced ones. 595 U.S. at 176. Instead, fiduciaries "breach their duty" if they include *any* "imprudent investment [in] the plan." *Id.*; *accord*; *Sacerdote v. New York Univ.*, 9 F.4th 95, 109 (2d Cir. 2021) ("Fiduciaries cannot shield themselves from liability—much less discovery—simply because the alleged imprudence inheres in fewer than all of the fund options."); *DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 423 (4th Cir. 2007) ("The prudence of investments or classes of investments offered by a plan must be judged individually."). This same rule applies here *a fortiori*: unlike defined-contribution plan participants with "ultimate choice over their investments" and thus the ability to avoid overpriced ones, *Hughes*, 595 U.S. at 176, patients' only choice is the specific drug their doctor prescribed.

Wells Fargo's grab bag of other NADAC-related arguments are equally unavailing. Wells Fargo notes that NADAC is based on "voluntary reporting," MTD at 25, but it does not contend that NADAC is inaccurate or non-representative. Wells Fargo claims that Plaintiffs do not identify any plan with prices based on NADAC, but *every* plan that uses Capital Rx or ESI's "ClearNetwork" product fits that description. *See* AC ¶¶ 60, 216. Wells Fargo states that "NADAC also reflects prices prior to the application of rebates or discounts," MTD at 25, but that is misleading, as "[m]anufacturers of generic

drugs generally do not offer rebates." Congressional Budget Office, *Prescription Drugs: Spending, Use, and Prices* at 6 (Jan. 2022), https://www.cbo.gov/system/files/2022-01/57050-Rx-Spending.pdf.

***Excessive Compared to Wells Fargo's Own Plan (After the Lawsuit Was Filed)***. Nothing confirms the plausibility of Plaintiffs' allegations quite like Wells Fargo's own conduct after Plaintiffs filed this lawsuit. Suddenly motivated to monitor its PBM, Wells Fargo quickly secured more favorable pricing for most of the generic drugs on its formulary, with those prices now 11% lower than when the original Complaint was filed. AC ¶ 166. This belated renegotiation—worth millions of dollars annually—confirms that Wells Fargo "could have achieved a similar result by [monitoring its PBM] earlier." *Cates v. Trs. of Columbia Univ.*, 2020 WL 1528124, at *5 (S.D.N.Y. Mar. 30, 2020). When plan fiduciaries suddenly find millions in annual savings after getting sued, the inference of imprudence during the class period becomes inescapable.

***Excessive Compared to Retail Prices***. Plaintiffs also show that prices for prescription drugs purchased through the Plan were higher than they would have been if plan participants bought them *without even using their insurance*. *See* AC ¶¶ 116, 127, 129, 131, 133, 135, 137, 140-43.[10] Wells Fargo contends that this is not a "relevant" comparison because retail prices are for individual consumers, not plans. MTD at 27. But this only makes the price discrepancies *worse*, as the Plan should have been able to obtain

---

[10] In many cases, the retail pharmacy price was even lower than NADAC, *see* AC ¶¶ 126-27, 132-33, 136-37, further demonstrating that NADAC is a conservative pricing benchmark.

*better* than retail pricing given its size and bargaining power. *See* AC ¶¶ 8, 102, 116, 164. Wells Fargo also argues that lower retail prices reflect "competition" in the marketplace. MTD at 27. Indeed. The problem is that Wells Fargo never bothered to survey the marketplace. *See* AC ¶¶ 72, 77-78, 116.

**Excessive Compared to Other PBMs.** Plaintiffs further allege that Wells Fargo's prices for drugs through ESI were more expensive than prices for the same drugs through other PBMs. *See* AC ¶¶ 114, 116, 170-75. In support, Plaintiffs include a detailed chart showing a 2,051% price difference between ESI and another PBM (SmithRx) for specialty drugs, *id.* ¶¶ 172-73, allege that the clients of another PBM (Navitus) pay less per-member, per-month than Wells Fargo does, *id.* ¶ 175, detail why the pricing methodology to which Wells Fargo agreed is less favorable than other PBMs' pricing methodologies, *id.* ¶¶ 73-78, and identify numerous plans that saved substantially by switching from a traditional PBM like ESI to other PBMs, *id.* ¶¶ 95, 206-16.

Contrary to Wells Fargo's argument, Plaintiffs specifically allege that these other PBMs offer a range of services comparable to ESI's. *See id.* ¶¶ 75-76, 170, 175. Regardless, Plaintiffs are not required to rebut Wells Fargo's unsupported assertion that unspecified differences in services justified the massive price differences for the products at issue here. *See Braden*, 588 F.3d at 596 ("The district court … stated that [defendants] 'could have chosen funds with higher fees for any number of reasons, including … more services offered….' That may be so, but Rule 8 does not require a plaintiff to plead facts tending to rebut all possible lawful explanations for a defendant's conduct.").

Wells Fargo's contention that traditional PBMs' spread pricing "benefit[s] participants" while in the deductible phase, MTD at 24, misstates the facts. Participants in the deductible phase still pay the exorbitant prices to which Wells Fargo agreed, not the lower price that ESI negotiates with pharmacies. AC ¶ 46 ("If the person has yet to meet an applicable deductible, they are responsible for the full cost of the drug *at plan rates*." (emphasis added)). Wells Fargo equally misses the mark by arguing that comparisons to pass-through PBMs are invalid because they "employ materially different business models." MTD at 23. That is exactly the problem: the "business model" that Wells Fargo agreed to let ESI use is one that results in massive overcharges to the Plan and its participants.

***Excessive Compared to Other Plans.*** Plaintiffs additionally compare the Plan's drug prices with the prices charged to another large plan (the Pepsico plan) that also uses ESI. AC ¶ 204. Here, too, the Wells Fargo Plan falls short. The Plan pays over two to four times the cost paid by the Pepsico plan for the exact same drugs purchased from the exact same vendor. *Id.* And Plaintiffs identify approximately a dozen other health plans that have achieved prescription drug savings the Wells Fargo Plan did not, *id.* ¶¶ 204-16, further highlighting Wells Fargo's failure to properly monitor and control expenses, *see Sweda v. Univ. of Pa.*, 923 F.3d 320, 330-31 (3d Cir. 2019) ("Sweda offered examples of similarly situated fiduciaries who acted prudently").

***Direct Allegations of Imprudent Process***. ERISA does not require plaintiffs to directly allege "the process by which the Plan was managed." *Braden*, 588 F.3d at 596. Instead, courts may infer an imprudent process from unreasonable prices. *Id.* But

regardless, Plaintiffs directly allege two glaring flaws in Wells Fargo's process. First, Wells Fargo did not engage in an open RFP process for PBM services or survey the marketplace, *see* AC ¶¶ 111, 116, as other plan sponsors do, *see id.* ¶¶ 72, 77-78, and as Wells Fargo itself does when operating as a broker for other plans, *see id.* ¶ 200. This further bolsters Plaintiffs' claims here. *See George v. Kraft Foods Glob., Inc.*, 641 F.3d 786, 799 (7th Cir. 2011) (failure to solicit bids supported triable fiduciary breach claim); *Larson v. Allina Health Sys.*, 350 F.Supp.3d 780, 800 (D. Minn. 2018) (same). Second, Wells Fargo allowed a benefits consultant that receives compensation from ESI for client referrals—and who is thus deeply conflicted—to guide its PBM selection process. AC ¶ 113. This, too, bolsters the plausibility of Plaintiffs' claims.

* * *

The Amended Complaint's extensive and detailed allegations about the Plan's exorbitant prices—using comprehensive comparisons across multiple types of benchmarks—create a strong inference that Wells Fargo failed to prudently manage the Plan's PBM arrangement and monitor prescription drug costs.

### b.    Excessive Administrative Fees

Plaintiffs' allegations regarding excessive administrative fees separately state a claim for breach of fiduciary duty. The Amended Complaint compares the administrative fees paid in 2022 and 2023 by the Plan to those paid by other large plans that also used ESI, and shows that the comparator plans all paid substantially less—by as much as $158 per participant annually. *See* AC ¶ 157 (charts).

Wells Fargo speculates that the comparator plans may have received different services, MTD at 27-28, but that directly contradicts the Amended Complaint and the Form 5500s submitted by each company. As noted above, the comparator plans all used ESI as their PBM,[11] and Plaintiffs expressly allege that each one "received equivalent or substantially equivalent PBM services" as the Plan. AC ¶ 157.

Each of the comparator plans, like the Wells Fargo Plan, identified those services under code 12 (claims processing) or code 13 (contract administrator), or both. *Id*. ¶ 158. For purposes of PBM services, codes 12 and 13 are synonymous – as "contract administrator," ESI provided "claims administration" services. *See* AC ¶¶ 53, 158. Indeed, Wells Fargo ***admits*** that the service codes on the comparators' Form 5500s "overlap" with its own. MTD at 27. This is fatal to its motion to dismiss. *See Mator v. Wesco Distrib., Inc.*, 102 F.4th 172, 186 (3d Cir. 2024) ("The different service codes do not undermine the [plaintiffs'] comparisons because they apparently overlap."); *Lucero v. Credit Union Ret. Plan Ass'n*, 2023 WL 2424787, at *4 (W.D. Wis. Mar. 9, 2023) ("The codes listed by the other plans are not identical to defendants' codes, but there is substantial overlap"); *accord Barrett*, 112 F.4th at 1140 (claims could have proceeded if there "[h]ad there been allegations that 'the services purchased were sufficiently similar to render the comparisons valid'").

---

[11] The Charter Communications Plan switched from ESI to CVS Caremark in 2023. AC ¶ 157. When it did so, its costs dropped by almost half, from $68.34/participant to $35.58/participant. *Id.*

Wells Fargo notes that none of the comparators listed service code 50, but that is meaningless. Service code 50 "does not signify an additional service provided but only that the fees were made by 'direct payment from the plan.'" AC ¶ 159; *see Mator*, 102 F.4th at 186 ("[I]t is unclear why the code 'Direct payment from the plan' exists at all."). And while Wells Fargo notes that "no comparator lists the *same* set of codes" as it does, MTD at 27, that is only because two comparator plans reported receiving *more* services than the Wells Fargo Plan did, which only serves to make the fee discrepancies *worse*. *See* AC ¶¶ 160-61 (Railroad Plan and Charter Plan).

Wells Fargo also ignores the most important comparator of all – the Plan itself. In 2019, the Plan paid "only" $9,235,645 in administrative fees to ESI. AC ¶ 156. By 2023, that amount had jumped to $31,239,311 – over three times as much. *Id.* In the meantime, the number of participants in the Plan *decreased* from 218,107 to 176,012. *Id.* ¶¶ 157, 235. Thus, the per capita price difference was even worse – *419%* ($42.34 versus $177.48). Meanwhile, the services provided by Wells Fargo remained the same. *See* ECF 30 at 26 n.11 (admitting that service codes were unchanged throughout the relevant period). The fact that Wells Fargo allowed per capita administrative fees to jump 419% in four years strongly supports the inference that Wells Fargo was not adequately monitoring those fees. *See Coppel v. Seaworld Parks & Ent., Inc.*, 2023 WL 2942462, at *13 (S.D. Cal. Mar. 22, 2023); *Carrigan v. Xerox Corp.*, 2022 WL 1137230, at *5 (D. Conn. Apr. 18, 2022); *Kruger v. Novant Health, Inc.*, 131 F.Supp.3d 470, 479 (M.D.N.C. 2015).

### c.    Steering to a High-Cost Pharmacy Affiliated with ESI

Wells Fargo further mismanaged the Plan by requiring participants to use ESI's mail-order pharmacy, Accredo, for specialty drugs despite Accredo's prices being substantially higher than those of other pharmacies. AC ¶¶ 150-54. No prudent fiduciary would force participants to their fill prescriptions at a pharmacy that routinely charges substantially *more* than other widely-used retail pharmacies. *Id.* ¶ 154. This further supports Plaintiffs' breach of fiduciary duty claims. *See Tussey v. ABB, Inc.*, 2007 WL 4289694 at *1-2 (W.D. Mo. Dec. 3, 2007) (plaintiffs stated breach of fiduciary duty claim against plan sponsor for "allowing Fidelity Trust to steer the Plan toward expensive Fidelity funds"). And aside from the higher costs associated with Accredo, Plaintiffs and other Plan participants suffered a loss of choice and more limited mail-order service. *See* AC ¶¶ 153, 285, 292.

### 3.    Wells Fargo's Argument that Plaintiffs Cannot Assert an Individual Claim for Fiduciary Breach Is Repetitive and Meritless

Wells Fargo's arguments that the Amended Complaint does not plausibly allege an individual claim for fiduciary breach are mostly repetitive of its other arguments, and meritless.

Wells Fargo contends that the harm to Plaintiffs from increased premium contributions is "speculative." MTD at 29. As explained above, however, the Amended Complaint plausibly alleges harm to Plaintiffs. *See supra* at § I.B.1.

As to out-of-pocket costs, Wells Fargo asserts that "an inference of [fiduciary] breach cannot be drawn from the experiences of a small subset of participants who

purchased a handful of drugs." MTD at 29. But Plaintiffs' breach of fiduciary duty claims are based on far more than just the prices they personally paid for prescriptions—they are based on "pervasive" drug overcharges (AC ¶ 10), excessive administrative fees, and imprudent steering toward ESI's higher-cost pharmacy. Regardless, ERISA "permits individuals to enforce fiduciary obligations owed directly to them as individuals," *Varity Corp. v. Howe*, 516 U.S. 489, 513 (1996), and they may seek "individual relief for breach of a fiduciary obligation," *id.* at 510.

Wells Fargo's unsupported one-sentence argument regarding steering should be rejected for the reasons explained above. *See supra* at II.B.2.c.

Finally, lower wages also plausibly result from a failure to monitor and control health plan expenses. *See Acosta v. Bd. of Trs. of Unite Here Health*, 2023 WL 2744556, at *2-3 (N.D. Ill. Mar. 31, 2023).

## CONCLUSION

For the foregoing reasons, Wells Fargo's motion to dismiss should be denied.

Respectfully Submitted,

Dated: July 17, 2025

*/s/ Kai H. Richter*
Kai H. Richter MN Bar No. 0296545
COHEN MILSTEIN SELLERS & TOLL, PLLC
400 South 4th Street #401-27
Minneapolis, MN 55415
Telephone: (612) 807-1575
krichter@cohenmilstein.com

Michelle Yau (*pro hac vice*)
Allison Pienta (*pro hac vice*)
COHEN MILSTEIN SELLERS & TOLL, PLLC
1100 New York Ave. NW, Eighth Floor
Washington, D.C. 20005

Telephone: (202) 408-4600
myau@cohenmilstein.com
apienta@cohenmilstein.com

Michael Eisenkraft (*pro hac vice*)
COHEN MILSTEIN SELLERS & TOLL, PLLC
88 Pine Street, 14th Floor
New York, New York 10005
Telephone: (212) 838-7797
meisenkraft@cohenmilstein.com

Jamie Crooks (*pro hac vice*)
Michael Lieberman (*pro hac vice*)
FAIRMARK PARTNERS, LLP
1001 G Street NW, Suite 400 East
Washington, DC 20001
Telephone: (619) 507-4182
jamie@fairmarklaw.com
michael@fairmarklaw.com

Daniel E. Gustafson
Daniel J. Nordin
GUSTAFSON GLUEK PLLC
Canadian Pacific Plaza
120 South 6th Street, Suite 2600
Minneapolis, MN 55402
Telephone: (612) 333-8844
dgustafson@gustafsongluek.com
dnordin@gustafsongluek.com

*Attorneys for Plaintiffs and
the Proposed Class*