# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

SERGIO NAVARRO, THERESA
GAMAGE, DAYLE BULLA, JANE
KINSELLA, and ERICA McKINLEY,
*on their own behalf, on behalf of all*
*others similarly situated, and on behalf*
*of the Wells Fargo & Company Health*
*Plan and its component plans,*

Case No. 24-cv-3043 (LMP/DLM)

Plaintiffs,

**ORDER GRANTING
DEFENDANT'S
MOTION TO DISMISS**

v.

WELLS FARGO & COMPANY,

Defendant.

Kai H. Richter, **Cohen Milstein Sellers & Toll, PLLC, Minneapolis, MN**; Michelle C. Yau and Allison Pienta, **Cohen Milstein Sellers & Toll, PLLC, Washington, D.C.**; Michael B. Eisenkraft, **Cohen Milstein Sellers & Toll, PLLC, New York, NY**; Jamie Crooks and Michael D. Lieberman, **Fairmark Partners LLP, Washington, D.C.**; and Daniel E. Gustafson and Daniel J. Nordin, **Gustafson Gluek PLLC, Minneapolis, MN**, for Plaintiffs.

Russell L. Hirschhorn, Joseph E. Clark, and Sydney L. Juliano, **Proskauer Rose LLP, New York, NY**; and Jeffrey P. Justman and Kiera Murphy, **Faegre Drinker Biddle & Reath LLP, Minneapolis, MN**, for Defendant.

Carl F. Engstrom, **Engstrom Lee, Minneapolis, MN**, for Amicus Curiae Amy B. Monahan.

Plaintiffs Sergio Navarro, Theresa Gamage, Dayle Bulla, and Jane Kinsella (the "Original Plaintiffs"), former employees of Defendant Wells Fargo & Company ("Wells Fargo") and former participants in the Wells Fargo & Company Health Plan (the "Plan"), filed the initial complaint in this matter, alleging that Wells Fargo breached its fiduciary

duties under the Employee Retirement Income Security Act ("ERISA") by mismanaging the Plan's prescription drug benefits program. ECF No. 1. Wells Fargo moved to dismiss the Original Plaintiffs' complaint for lack of standing and for failure to state a plausible claim for relief. ECF No. 28. Upon review of the initial complaint, this Court found that "[w]hile compelling and detailed, Plaintiffs' allegations are simply too speculative to show concrete individual harm, too tenuous to show causation, and too conjectural to show redressability." ECF No. 57 at 25. The Court therefore concluded that the Original Plaintiffs lacked standing and granted Wells Fargo's motion. *Id.* at 29.

With leave of Court, the Original Plaintiffs filed an amended complaint supplementing their factual allegations, asserting the same claims, and adding Plaintiff Erica McKinley (collectively with the Original Plaintiffs, "Plaintiffs"), who is a former Wells Fargo employee and current Plan participant. ECF No. 64. Wells Fargo moves to dismiss the amended complaint on the same grounds. ECF No. 77. For the reasons discussed here, the Court again concludes upon review of the amended complaint that Plaintiffs have not demonstrated standing to bring their claims, grants Wells Fargo's motion, and dismisses Plaintiffs' amended complaint.

## FACTUAL BACKGROUND

The factual allegations in Plaintiffs' amended complaint largely mirror the allegations in the initial complaint. *Compare* ECF No. 64, *with* ECF No. 1; *see* ECF No. 64-2; *see also* ECF No. 57 at 2–9. The Court will cover the facts alleged in the amended complaint for the benefit of context. In addition, the Court notes that for purposes of assessing Wells Fargo's motion to dismiss, the Court accepts the factual allegations in

Plaintiffs' amended complaint as true.  *Gorog v. Best Buy Co.*, 760 F.3d 787, 792 (8th Cir. 2014).

## I.    The Plan

The Plan is a self-funded employee welfare benefit plan established to provide medical and prescription drug benefits to Wells Fargo employees who choose to enroll. *See* ECF No. 64 ¶¶ 21–22.  Wells Fargo is the sponsor and a fiduciary of the Plan and retains decision-making authority with respect to the Plan's management.  *Id.* ¶ 24.  The Original Plaintiffs are each former Wells Fargo employees and former Plan participants. *Id.* ¶¶ 14–17.  McKinley is also a former Wells Fargo employee, but as of the filing of the amended complaint, she remains a participant in the Plan because she elected to continue her coverage under the Consolidated Omnibus Budget Reconciliation Act ("COBRA") after her employment with Wells Fargo ended.  *Id.* ¶ 18.

Because the Plan is self-funded, its expenses—including payment for participants' covered medical expenses and administrative fees—are shared by Wells Fargo and Plan participants.  *Id.* ¶¶ 22, 30.  To cover those expenses, Wells Fargo established the Wells Fargo & Company Employee Benefit Trust (the "Trust").  *Id.* ¶ 22.  The Trust is funded almost entirely by a combination of Wells Fargo and Plan-participant contributions, and it is responsible for all the Plan's expenses.  *Id.*  As such, any increases in Plan spending must be covered by increases in contributions to the Trust.  *See id.* ¶ 32.

Wells Fargo retains "sole discretion" to set and modify participant contribution amounts.  ECF No. 31-3 at 9; *see also* ECF No. 31-2 at 22 ("The Plan Sponsor may establish different contribution rates for different classes of Participants . . . for any Benefit

3

Option.").  Between 2018 and 2023, Wells Fargo required Plan participants to contribute approximately 25% of the Plan's overall costs, with Wells Fargo contributing the remaining 75%.  ECF No. 64 ¶ 240.

## II.    The Plan's Prescription Drug Program

### A.    Pharmacy Benefit Managers Generally

Fiduciaries of employer-sponsored health plans like the Plan often contract with third-party pharmacy benefit managers ("PBMs") to administer their plans' prescription drug benefits.  *See* ECF No. 64 ¶ 53.  PBMs offer various services, including processing participant claims; negotiating with pharmacies to establish a plan's pharmacy networks; managing a plan's formulary, which is a list of the prescription drugs the plan covers; and negotiating with prescription drug manufacturers to secure rebates or discounts for those manufacturers' products.  *Id.* ¶¶ 49, 53.  Generally, when a plan participant obtains a prescription drug from a pharmacy in the plan's network, the participant pays the portion, if any, for which they are responsible under the terms of their plan (like a co-pay or deductible), the PBM pays the pharmacy for the remainder of the cost as negotiated by the PBM, and the PBM is later reimbursed by the plan.  *See id.* ¶¶ 54, 57, 106.  In short, PBMs serve as intermediaries between plans (and by extension, plan participants) and pharmacies.  *See id.* ¶¶ 53–55.

Two dominant PBM models have emerged: "pass-through" and "traditional" PBMs.  *Id.* ¶ 56.  Pass-through PBMs generate profit exclusively by charging administrative fees for the services they provide to plans.  *Id.*; *see id.* ¶ 73.  Traditional PBMs, on the other

hand, generate profit through a combination of "spread pricing,"[1] pharmacy rebates, administrative fees, and ownership of their own pharmacies.  *Id.* ¶ 56.  Traditional PBMs also negotiate with plan fiduciaries the prices the PBMs will be reimbursed for various prescription drugs.  *Id.* ¶ 57.  As such, traditional PBMs are incentivized to negotiate with a plan the highest price for a prescription drug to which the plan will agree to maximize the "spread."  *Id.* ¶ 67.

Some PBMs and plan fiduciaries structure their agreements by setting prices for groups of drugs by reference to a benchmark price rather than negotiating the price for each drug individually.  *Id.* ¶ 58.  One such benchmark, the National Average Drug Acquisition Cost ("NADAC"), tracks the average cost pharmacies pay to obtain many prescription drugs.  *Id.* ¶ 59.  Another, the "Average Wholesale Price" ("AWP"), purports to do the same thing as NADAC, but according to Plaintiffs, it is not truly representative of actual market prices and is susceptible to industry manipulation.  *Id.* ¶ 61.

## B.    The Plan's Agreement with Express Scripts, Inc.

Wells Fargo entered an agreement with Express Scripts, Inc. ("ESI"), a PBM that operates under the traditional model and one of the three largest PBMs in the U.S., to serve as the Plan's PBM.  *Id.* ¶¶ 88, 110.  Wells Fargo did not conduct an open bid process before retaining ESI but rather engaged a broker which evidently identified and recommended ESI.  *See id.* ¶¶ 111, 113.  The agreement between Wells Fargo and ESI is not publicly

---

[1]    "Spread pricing" refers to a practice in which a PBM negotiates with a pharmacy a lower price for a particular prescription drug than the price a plan agreed to pay the PBM as part of the plan's contract with the PBM, then retains the difference as profit.  *See* ECF No. 64 ¶¶ 57, 64, 66.

available, but ESI's standard contract with other plans suggests that Wells Fargo would have agreed to various terms regarding drug pricing, formulary management, pharmacy networks, and administrative services. *Id.* ¶¶ 110, 114. ESI's standard contract also expressly states that the plan sponsor—here, Wells Fargo—retains discretionary authority and control over decisions relating to plan management. *Id.* ¶ 112.

The Plan's formulary designates approximately 300 of the most commonly prescribed generic drugs as "preferred alternatives," meaning Plan participants are encouraged to use those generic versions rather than their brand-name equivalents. *Id.* ¶¶ 118–19. NADAC information is publicly available for 260 of those drugs. *Id.* ¶ 120. The Plan's formulary uses the AWP as a benchmark, however, and NADAC information for those 260 drugs reveals that the prices Wells Fargo negotiated with ESI for these "preferred alternative" drugs were approximately 115% above the pharmacy acquisition cost on average. *Id.* ¶¶ 115, 121.

The Plan's agreement with ESI also requires Plan participants to acquire so-called "generic-specialty" drugs from ESI's wholly owned mail-order pharmacy, Accredo. *Id.* ¶ 124. NADAC information is publicly available for 38 of the 95 generic-specialty drugs on the Plan's formulary, which shows that the Plan agreed to pay, on average, 383% above the pharmacy acquisition cost for those 38 drugs. *Id.* ¶ 125. In some cases, the prices the Plan agreed to pay ESI for certain generic-specialty drugs exceeds the cost an uninsured person would be required to pay at a retail pharmacy. *See id.* ¶¶ 126–37, 140–43.

After the Original Plaintiffs filed the initial complaint, Wells Fargo "appears to have . . . renegotiated its prices with [ESI] to lower them substantially." *Id.* ¶ 166. As of

6

the filing of the amended complaint, Wells Fargo "has more favorable pricing on 158 of the 260 drugs" on the Plan's formulary, and the Plan's drug prices "are now 11% lower than they were" when the initial complaint was filed. *Id.* In any event, regardless of the type or cost of any particular prescription drug, a Plan participant is required to pay some portion, if not all, of the cost themselves until they meet their annual deductible. *See id.* ¶ 106. After meeting their annual deductible, a participant may still be responsible for some out-of-pocket costs, like coinsurance payments. *See id.*

Separately, the administrative fees the Plan agreed to pay ESI exceed the fees paid by other large plan sponsors for comparable services. *See id.* ¶ 155. In 2022, for example, the Plan had 188,798 participants and paid ESI $25,639,955 in administrative fees, or $135.81 per participant. *Id.* ¶ 157. By comparison, the Railroad Employees National Health and Welfare Plan ("RENHWP"), who also contracted with ESI as its PBM that year, had 213,981 participants and paid $4,250,101 in administrative fees, or $19.86 per participant. *Id.* The Plan's and the RENHWP's respective Form 5500s from that year show two of the same three service codes.[2] *Id.*

## III.    Plaintiffs' Amended Complaint

The essence of Plaintiffs' amended complaint remains essentially unchanged from the initial complaint, and their allegations can be sorted into three main categories.

---

[2]    A Form 5500 explains what third-party services were provided to a plan and "discloses the aggregate payments made" by the plan to the service provider—here, ESI. *Matousek v. MidAmerican Energy Co.*, 51 F.4th 274, 279 (8th Cir. 2022).

*First*, Plaintiffs allege that because ESI uses AWP as a benchmark, the Plan agreed to pay to ESI prices for certain drugs that exceed NADAC prices, prices charged by pass-through PBMs, and prices an uninsured person would pay at a retail pharmacy for the same drugs. *See id.* ¶¶ 110, 114–43, 150–54. Plaintiffs contend these prices would have been lower and that they would have paid lower contributions and out-of-pocket expenses had Wells Fargo negotiated prices with ESI based on NADAC, retained a pass-through PBM, or retained a different PBM entirely that did not steer Plan participants to its own pharmacy. *See id.* ¶¶ 71, 108, 115, 121, 150–54, 219–28. Plaintiffs supplement these allegations in the amended complaint by alleging that: (1) other PBMs—and, indeed, ESI—offer drug pricing to other plans that are "based on the lowest of three benchmarks, one of which is NADAC," *id.* ¶ 60; (2) the "thousands" of other drugs covered by the Plan for which NADAC information is not publicly available mostly are "different dosages or delivery forms" of the drugs identified in the amended complaint, which are the "most commonly prescribed drugs" under the Plan, *id.* ¶¶ 146–47; and (3) Wells Fargo negotiated lower prescription drug prices with ESI after the Original Plaintiffs filed the initial complaint, *id.* ¶ 166.

*Second*, Plaintiffs allege that Wells Fargo paid excessive administrative fees to ESI. *See id.* ¶¶ 155–62. Plaintiffs assert that if Wells Fargo had "adequately negotiated" with ESI regarding these administrative fees, "the Plan and its participants/beneficiaries would have saved millions of dollars." *Id.* ¶ 169. Here, Plaintiffs supplement the allegations made in the initial complaint by adding the fees the Plan paid to ESI in 2023 and including

the relevant service codes from the Plan's and comparator plans' 2022 and 2023 Form 5500s. *See id.* ¶¶ 157–61.

*Third*, Plaintiffs allege that because of the Plan's excessive payments to ESI for administrative services and prescription drugs, they and other Plan participants effectively received "lower wages" or experienced "limited wage growth." *Id.* ¶ 285. Plaintiffs contend that these harms would have been avoided had Wells Fargo more diligently monitored the Plan's prescription drug program. *See id.* These allegations are unchanged from the initial complaint. *Compare id.*, *with* ECF No. 1 ¶ 181.

Altogether, Plaintiffs allege that Wells Fargo's "inattentiveness to prescription drug costs and other fiduciary failures" caused Plaintiffs to pay more in contributions and out-of-pocket costs than they otherwise would have paid, which Plaintiffs assert constitutes a breach of Wells Fargo's fiduciary duties under 29 U.S.C. § 1104(a). *See* ECF No. 64 ¶¶ 229, 282–94. Plaintiffs contend that had Wells Fargo acted as a prudent fiduciary, it could or should have: (1) wielded its "substantial bargaining power" to "demand and obtain substantially better contractual terms" with ESI "relating to prices and the way in which prices are determined" under the Plan, *id.* ¶ 164; (2) "solicit[ed] bids from pass-through PBMs," which "would have made clear that the Plan would save a substantial amount of money for itself and its participants" by contracting with a pass-through PBM instead of entering or renewing its contract with ESI, *id.* ¶ 170; and (3) considered "carving out the specialty-drug program" from its contract with ESI, *id.* ¶ 176. Plaintiffs also allege that Wells Fargo engaged in prohibited transactions under 29 U.S.C. § 1106(a)(1) because "the compensation Wells Fargo agreed to pay [ESI] was not reasonable." *Id.* ¶¶ 12, 295–309.

Plaintiffs bring claims on behalf of the Plan under 29 U.S.C. § 1132(a)(2), *id.* ¶¶ 282–88, 295–302, and on behalf of a putative class of Plan participants under 29 U.S.C. § 1132(a)(3), *id.* ¶¶ 289–94, 303–09. They seek injunctive and other equitable relief in the form of: (1) removing the Plan's fiduciaries and appointing an independent fiduciary to run the Plan; (2) removing and replacing ESI as the Plan's PBM or, alternatively, requiring a search for another PBM to replace ESI; (3) requiring Wells Fargo to "make good to the Plan all losses to the Plan" and to "restore the Plan to the position it would have occupied but for" the alleged fiduciary breaches and prohibited transactions; and (4) awarding "fiduciary surcharge, equitable restitution, and/or other make-whole equitable relief to Plaintiffs" and the putative class they represent. *Id.* ¶¶ 312–16.

## PROCEDURAL BACKGROUND

The Original Plaintiffs filed the initial complaint on July 30, 2024, ECF No. 1, and Wells Fargo moved to dismiss the initial complaint for lack of standing and for failure to state a claim, ECF No. 28. On March 24, 2025, the Court entered an order concluding that the Original Plaintiffs had not demonstrated standing, ECF No. 57, and entered judgment dismissing the initial complaint, ECF No. 58.

The Court, however, did not address the Original Plaintiffs' request—made in a footnote at the end of their brief in opposition to Wells Fargo's first motion to dismiss, *see* ECF No. 38 at 50 n.26—for an opportunity to amend their complaint in the event the Court granted Wells Fargo's motion. The Original Plaintiffs subsequently sought the Court's permission to file a motion for reconsideration of the dismissal order, citing their unaddressed request for leave to amend the initial complaint and contending that the Court

10

erroneously relied upon abrogated case law in reaching its decision.[3]  *See* ECF No. 59 at 1–2.  Over Wells Fargo's objection, *see* ECF No. 60, the Court vacated the judgment dismissing the initial complaint and granted the Original Plaintiffs leave to file an amended complaint, *see* ECF No. 62.

Plaintiffs—now including McKinley—filed their amended complaint on May 8, 2025, ECF No. 64, with an expert report attached as an exhibit to support their factual allegations, ECF No. 64-1.  Wells Fargo filed a motion to dismiss the amended complaint.  ECF No. 77.  After Plaintiffs filed their response to Wells Fargo's motion, but before Wells Fargo filed its reply to Plaintiffs' response, Professor Amy B. Monahan, an unrelated third party, filed a motion seeking leave to file a brief of amicus curiae, ECF No. 86, and a proposed amicus brief, ECF No. 88-1, in support of Plaintiffs' opposition to Wells Fargo's motion.

---

[3]    In analyzing the Original Plaintiffs' claims under 29 U.S.C. § 1132(a)(3) in the first dismissal order, the Court stated that "much of the retrospective equitable relief Plaintiffs request bears the characteristics of monetary or compensatory relief" and that such relief is "not available" under that provision, relying upon case law from multiple circuits, including the Eighth Circuit, and the Supreme Court.  *See* ECF No. 57 at 27–28.  The cases on which the Court relied, however, were decided before the Supreme Court's decision in *CIGNA Corp. v. Amara*, 563 U.S. 421 (2011), which held that equitable remedies that are monetary or compensatory in nature "fall within the scope of the term 'appropriate equitable relief'" under Section 1132(a)(3).  *Id.* at 442; *see also Silva v. Metro. Life Ins. Co.*, 762 F.3d 711, 724 (8th Cir. 2014) (acknowledging that "*Amara* changed the law" as the Eighth Circuit "had previously interpreted it" pertaining to equitable remedies available in ERISA cases).  Although that portion of the first dismissal order was not exclusively (or even primarily) the basis for the Court's conclusion that the Original Plaintiffs lacked standing to pursue their Section 1132(a)(3) claims, *see* ECF No. 57 at 25–28, the Court acknowledges its error.

## ANALYSIS

Wells Fargo challenges Plaintiffs' standing under Federal Rule of Civil Procedure 12(b)(1) and the sufficiency of their pleadings under Rule 12(b)(6). *See generally* ECF No. 79. Article III standing is a jurisdictional issue and, accordingly, "is the threshold question in every federal case." *Becker v. N.D. Univ. Sys.*, 112 F.4th 592, 595 (8th Cir. 2024) (quoting *Warth v. Seldin*, 422 U.S. 490, 498 (1975)); *see Carlsen v. GameStop, Inc.*, 833 F.3d 903, 908 (8th Cir. 2016) (citation omitted) ("[I]f a plaintiff lacks standing to sue, the district court has no subject-matter jurisdiction."). The Court therefore must address whether Plaintiffs have demonstrated standing before it may consider whether they have stated plausible claims for relief. *See Brownback v. King*, 592 U.S. 209, 218 (2021).

As discussed above, the Court dismissed the initial complaint in this matter for lack of standing. *See* ECF No. 57 at 12–28. Upon careful consideration of the allegations in the amended complaint and the parties' arguments, the Court concludes that Plaintiffs have not remedied the deficiencies identified in the Court's previous order and dismisses the amended complaint for lack of standing.

## I.    Legal Standard

Article III of the U.S. Constitution "restricts federal courts to the resolution of cases and controversies." *Davis v. FEC*, 554 U.S. 724, 732 (2008). "For there to be a case or controversy under Article III, the plaintiff must have a 'personal stake' in the case—in other words, standing." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021) (citation omitted). To demonstrate standing, a plaintiff must plausibly allege: (1) they suffered an injury in fact; (2) the injury is fairly traceable to the defendant's conduct; and (3) the injury

is likely to be redressed by a favorable judicial decision. *Arc of Iowa v. Reynolds*, 94 F.4th 707, 710 (8th Cir. 2024) (citing *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016)). To establish a cognizable injury, the plaintiff "must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Scott v. UnitedHealth Grp., Inc.*, 540 F. Supp. 3d 857, 861 (D. Minn. 2021) (quoting *Spokeo*, 578 U.S. at 339). Plaintiffs, as the parties invoking federal court jurisdiction, bear the burden of establishing these elements, *Spokeo*, 578 U.S. 338, and they must do so "for each claim that they press and for each form of relief that they seek," *TransUnion*, 594 U.S. at 431.

Because standing implicates a court's subject-matter jurisdiction, challenges to a plaintiff's standing are analyzed under Federal Rule of Civil Procedure 12(b)(1). *Mekhail v. N. Mem'l Health Care*, 726 F. Supp. 3d 916, 931 (D. Minn. 2024). The Court's analysis under Rule 12(b)(1) depends on whether the challenger raises a "facial" or "factual" attack. *Scott*, 540 F. Supp. 3d at 861. In a facial challenge, the Court "restricts itself to the face of the pleadings" and "the non-moving party receives the same protections as it would defending against a motion brought under Rule 12(b)(6)." *Osborn v. United States*, 918 F.2d 724, 729 n.6 (8th Cir. 1990). By contrast, in a factual challenge, the Court "considers matters outside the pleadings." *Id.* Here, the Court need not look further than the amended complaint and the Plan documents submitted by Wells Fargo, which are "necessarily embraced by the complaint." *Rossi v. Arch Ins. Co.*, 60 F.4th 1189, 1193 (8th Cir. 2023) (citation omitted). And because "documents 'necessarily embraced by the complaint' are not matters outside the pleading," *Enervations, Inc. v. Minn. Mining & Mfg.*

13

*Co.*, 380 F.3d 1066, 1069 (8th Cir. 2004) (citations omitted), the Court construes Wells Fargo's motion as a facial challenge to Plaintiffs' standing and applies the standard for reviewing motions to dismiss under Rule 12(b)(6), *see Osborn*, 918 F.2d at 729 n.6.

The Court accepts the factual allegations in the amended complaint as true and draws all reasonable inferences in Plaintiffs' favor. *Gorog*, 760 F.3d at 792. The Court will not, however, give the benefit of "unreasonable inferences," *Brown v. Medtronic, Inc.*, 628 F.3d 451, 461 (8th Cir. 2010), and is "not bound to accept as true a legal conclusion couched as a factual allegation," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). Although the amended complaint need not contain "detailed factual allegations," it must contain facts with enough specificity to state a claim that is "plausible on its face" and to "raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007).

## II.    Plaintiffs' Expert Report and Amicus Brief in Support of Plaintiffs

Before turning to the specific issues raised in Wells Fargo's motion to dismiss, the Court first will address whether, and to what extent, it considers Plaintiffs' expert report and Professor Monahan's proposed amicus brief. Wells Fargo asks the Court to disregard or to accord little weight to both filings. *See* ECF No. 79 at 21–22; ECF No. 91 at 13–14.

Beginning with Plaintiffs' expert report, the Court applies the standard for assessing motions under Federal Rule of Civil Procedure 12(b)(6) to Wells Fargo's motion for the reasons discussed above, so the Court considers the factual information in Plaintiffs' expert report to the extent it is alleged in the amended complaint. *See* ECF No. 64 ¶¶ 263–70; *see also Rossi*, 60 F.4th at 1193 (citation omitted) (explaining that courts deciding a Rule 12(b)

14

motion may consider "documents whose contents are alleged in a complaint"). The Court accords no weight, however, to the expert report's conclusory opinions. *See Lerner v. Nw. Biotherapeutics*, 273 F. Supp. 3d 573, 590 (D. Md. 2017) ("Plaintiffs may not substitute factual allegations with the speculation of their expert witness."); *In re MannKind Sec. Actions*, 835 F. Supp. 2d 797, 820 (C.D. Cal. 2011) (citation omitted) ("Conclusory allegations and speculation carry no additional weight merely because a plaintiff placed them within the affidavit of a retained expert."); *see also Fin. Acquisition Partners LP v. Blackwell*, 440 F.3d 278, 285–86 (5th Cir. 2006) (noting that considering an expert opinion for purposes of a Rule 12(b)(6) motion "might require ruling on the expert's qualifications," which is "inappropriate at the pleading stage").

As for Professor Monahan's proposed amicus brief, "[t]here is no formal rule governing the standard by which to evaluate whether to grant a motion requesting leave to file an amicus curiae brief," and the decision whether to grant or refuse leave is a matter committed to the Court's discretion. *Larson v. Allina Health Sys.*, No. 17-cv-3835 (SRN/TNL), 2020 WL 583082, at *2 (D. Minn. Feb. 6, 2020). The Court has reviewed and considered the proposed amicus brief and Wells Fargo's arguments in response to it in deciding Wells Fargo's motion and, in its discretion, grants Professor Monahan's motion.[4]

## III. ERISA Claims

ERISA imposes "twin duties of loyalty and prudence" upon fiduciaries of ERISA-governed plans which require them "to act 'solely in the interest of [plan] participants and

---

[4]    The Court considers the proposed brief (ECF No. 88-1) to be properly filed. Professor Monahan need not re-file her proposed brief as a "final" version.

beneficiaries' and to carry out their duties 'with the care, skill, prudence, and diligence under the circumstances then prevailing' that a prudent [person] 'acting in a like capacity and familiar with such matters would use.'" *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 595 (8th Cir. 2009) (first alteration in original) (quoting 29 U.S.C. § 1104(a)(1)).  In the first dismissal order, the Court noted the "decisive importance" to the standing analysis of determining whether the Plan is a defined-benefit or defined-contribution plan:

> A defined-benefit plan is "in the nature of a contract."  [*Thole v. U.S. Bank N.A.* ("*Thole II*"), 590 U.S. 538, 542–43 (2020)].  Such plans are typically "funded by employer or employee contributions, or a combination of both," and consist of "a general pool of assets rather than individual dedicated accounts." *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 439 (1999); *see Scott*, 540 F. Supp. 3d at 862. . . .  Defined-contribution plans, by contrast, "provide[] for an individual account for each participant and for benefits based solely upon the amount contributed to the participant's account, and any income, expenses, gains and losses." *Scott*, 540 F. Supp. 3d at 862 (quoting 29 U.S.C. § 1002(34)).

> The key difference, as courts have explained, is that "in a defined-contribution plan, such as a 401(k) plan, the [participants'] benefits are typically tied to the value of their accounts," *Thole II*, 590 U.S. at 540, while "benefits under a defined-benefit plan 'do not fluctuate with the value of the plan or because of the plan fiduciaries' good or bad investment decisions," *Scott*, 540 F. Supp. 3d at 862 (quoting *Thole II*, 590 U.S. at 540); *see also Thole II*, 590 U.S. at 543 ("The plan participants' benefits are fixed and will not change, regardless of how well or poorly the plan is managed.").  Thus, "a necessary predicate to a participant bringing broader claims on behalf of [a defined-benefit] plan is a showing of a concrete and particularized injury to the participant herself," not just the plan, and that individual harm must "affect [the participant's] benefits" to confer standing to sue.  *Scott*, 540 F. Supp. 3d at 865; *see also Thole II*, 590 U.S. at 542–43.

ECF No. 57 at 14–15.  The Court concluded that the Plan is "closely analogous to the defined-benefit plan at issue in *Thole* [*II*]" because Plaintiffs were (or are) "entitled to their contractually defined benefits regardless of the value of the [Plan's] assets." *Id.* at 15

(alterations in original) (quoting *Scott*, 540 F. Supp. 3d at 864).  Plaintiffs do not dispute—

and, if anything, tacitly accept—this conclusion, *see* ECF No. 85 at 45, and the Court sees

no reason to depart from it now.[5]

Under Section 1132(a)(2), a plan participant may seek only the relief provided by

29 U.S.C. § 1109.  29 U.S.C. § 1132(a)(2).  Section 1109, in turn, provides that plan

fiduciaries found to have breached their duties "shall be personally liable to make good to

---

[5]    Professor Monahan contends that because "welfare plans," like the Plan, are not "pension plans," they "are not subject to the legal distinctions between 'defined benefit' and 'defined contribution' plans that were central to the Supreme Court's analysis" in *Thole II*.  ECF No. 88-1 at 4.  It certainly is true that welfare plans are distinct from pension plans in several respects.  *See Knudsen v. MetLife Grp., Inc.*, 117 F.4th 570, 579–80 (3d Cir. 2024).  Even so, Professor Monahan's attempt to avoid the import of *Thole II* is unpersuasive.

Although welfare plans do not fall neatly into the defined-benefit or defined-contribution categories, this Court and other courts have concluded that welfare plans like the Plan are "closely analogous to the defined-benefit plan at issue" in *Thole II*.  ECF No. 57 at 15 (quoting *Scott*, 540 F. Supp. 3d at 864); *see Smith v. Med. Benefit Adm'rs Grp., Inc.*, 639 F.3d 277, 283 (7th Cir. 2011) ("The plan at issue here . . . is a group health insurance plan, which is the kind of defined benefit plan that . . . typically holds no assets in trust for any individual participant."); *see also Winsor v. Sequoia Benefits & Ins. Servs., LLC*, 62 F.4th 517, 528 (9th Cir. 2023) ("Although the Tech Benefits Program is not a defined-benefit pension plan, it similarly provides a fixed set of benefits as promised in plan documents.").

Professor Monahan argues that "the better analogy is to section 401(k) plan fee litigation."  ECF No. 88-1 at 8.  But those kinds of cases typically involve defined-contribution plans; indeed, despite contending that the Plan is not subject to the legal distinctions between defined-benefit and defined-contribution plans, the individual cases on which Professor Monahan relies involved defined-contribution retirement plans.  *See Hughes v. Nw. Univ.*, 595 U.S. 170, 173 (2022) (involving "two retirement plans" that were "defined-contribution plans"); *Davis v. Wash. Univ. in St. Louis*, 960 F.3d 478, 481 (8th Cir. 2020) (involving a "retirement-savings plan[]" that was "a defined-contribution plan"); *Larson v. Allina Health Sys.*, 350 F. Supp. 3d 780, 788 (D. Minn. 2018) (involving "403(b) and 401(k) Plans" that were "defined contribution plans").  For the reasons discussed in Part III.B of the Analysis, these kinds of cases are distinguishable and inapplicable—and not merely because they involve defined-contribution plans.

[the] plan any losses . . . resulting from each such breach, and to restore to [the] plan any profits . . . which have been made through use of assets of the plan." 29 U.S.C. § 1109(a). A Section 1132(a)(2) plaintiff "acts 'in a representative capacity on behalf of the plan as a whole,' because § 1109 is designed to 'protect the entire plan,'" and relief under Section 1132(a)(2) therefore must "inure[] to the be benefit of the plan as a whole." *Pilger v. Sweeney*, 725 F.3d 922, 926 (8th Cir. 2013) (quoting *Mass. Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 140, 142, 142 n.9 (1985)); *see* 29 U.S.C. § 1109(a). And when a defined-benefit plan is at issue, Section 1132(a)(2) "does not provide a remedy for individual injuries distinct from plan injuries." *Pilger*, 725 F.3d at 926 (quoting *LaRue v. DeWolff Boberg & Assocs., Inc.*, 552 U.S. 248, 256 (2008)).

By contrast, a participant who brings a claim under Section 1132(a)(3) may seek "to enjoin any act or practice which violates" ERISA or "to obtain other appropriate equitable relief" to redress a violation for which Section 1132 otherwise does not provide an adequate remedy. 29 U.S.C. § 1132(a)(3); *see Varity Corp. v. Howe*, 516 U.S. 489, 510–12 (1996) (describing Section 1132(a)(3) as a "'catchall' provision[]" which offers "relief for injuries caused by violations that [Section 1132] does not elsewhere adequately remedy"). Such equitable relief may include surcharge—that is, individual "monetary compensation for a loss resulting from a [fiduciary's] breach of duty." *CIGNA Corp. v. Amara*, 563 U.S. 421, 441 (2011) (internal quotation marks omitted) (citation omitted).

Whether a plan participant proceeds under Section 1132(a)(2) or (a)(3), "[t]here is no ERISA exception to Article III." *Thole II*, 590 U.S. at 547. Accordingly, to recover for breach of fiduciary duty under ERISA, the participant "must show actual injury," both

individually and to the plan. *Thole v. U.S. Bank, Nat'l Ass'n*, 873 F.3d 617, 630 (8th Cir. 2017); *see Amara*, 563 U.S. at 444 (holding that relief under Section 1132(a)(3) is available "only upon a showing of actual harm" caused by a fiduciary's breach of duty).

Plaintiffs present the same theory of standing now as they did initially: (1) Plaintiffs individually were injured by paying higher contributions for their insurance coverage and out-of-pocket costs for their prescription drugs than they should have, and the Plan was injured by Wells Fargo causing it to pay inflated prices for prescription drugs and excessive administrative fees; (2) those injuries are traceable to Wells Fargo's purported fiduciary breaches, namely Wells Fargo's failure to closely monitor the Plan's prescription drug costs and to negotiate a better deal with ESI; and (3) the injuries will be redressed and prevented from recurring by the relief Plaintiffs seek. *See* ECF No. 85 at 17–32. As discussed below, despite the supplemented factual allegations in Plaintiffs' amended complaint, their theory of standing—whether premised on higher contributions or increased out-of-pocket costs—still falls short for essentially the same reasons the Court previously identified: "their alleged harm is speculative and, ultimately, not redressable." ECF No. 57 at 12.

### A.    Participant Contributions

"Of critical importance" to the Court's analysis in the first dismissal order was that the Plan vests Wells Fargo with "sole discretion" to set participant contribution rates. ECF No. 57 at 20 (quoting ECF No. 31-3 at 9); *see also* ECF No. 31-2 at 22. Not only that, but participant contribution amounts "may be affected by several factors having nothing to do with prescription drug benefits, like whether a participant uses tobacco, whether a participant obtains coverage for her spouse or children in addition to herself, and a

participants' 'compensation category.'"  ECF No. 57 at 20–21 (quoting ECF No. 31-3 at 9).

The Court noted that "the Plan authorizes Wells Fargo to require participants to fund *all*

Plan expenses, not just expenses related to their own individual benefits," but the Plan does

not require *any* contribution from Wells Fargo, "notwithstanding that Wells Fargo supplied

the bulk of Plan funding during the relevant period."  ECF No. 57 at 21; *see* ECF No. 31-2

at 22 (providing that "[p]articipants *shall be* responsible for payment of applicable

premiums and contributions to the Plan," but that Wells Fargo "*may* pay such contributions

to the Plan" (emphasis added)).   Finally, the Court observed that "Plaintiffs' selective

allegations regarding the markups on a subset of prescription drugs in the Plan's formulary"

represented "only a subset of the total benefits whose costs Plan participants' contributions

may be used to cover" were "not sufficient to establish a causal connection between

Plaintiffs' increased costs and ESI's administrative fees."  ECF No. 57 at 22.  As a result,

the Court concluded that "it is speculative that the allegedly excessive fees" or allegedly

higher prices for prescription drugs paid by the Plan to ESI "had any effect at all on

Plaintiffs' contribution rates."   *Id.* at 21 (internal quotation marks omitted) (citation

omitted).

Nothing in Plaintiffs' amended complaint meaningfully addresses, much less cures,

these issues.  As an initial matter, Plaintiffs "d[o] not allege that they were denied any health

benefits promised under the Plan, nor d[o] they allege that the Plan was insolvent or

otherwise incapable of continuing to provide covered health benefits."  *Gonzales de Fuente*

*v. Preferred Home Care of N.Y. LLC*, 858 F. App'x 432, 434 (2d Cir. 2021).  Instead, they

assert that had Wells Fargo negotiated a better deal with ESI or retained a different PBM

altogether, the Plan's spending would have decreased, which necessarily would have reduced the amount they were required to pay in contributions. *See* ECF No. 85 at 12–15. But "these allegations are general in nature and do not solve the variable of [Wells Fargo's] discretion in setting employee contribution rates." *Winsor v. Sequoia Benefits & Ins. Servs., LLC*, 62 F.4th 517, 524 (9th Cir. 2023).

Plaintiffs rely heavily on their allegation that "Wells Fargo intentionally set participant contributions at 25–26% of overall Plan health care costs," ECF No. 85 at 23 (quoting ECF No. 64 ¶ 240), which "inherently cause[s]" participant contributions to "rise and fall in lockstep with Plan spending," *id.* This is superficially seductive. It seems possible that if the price of drugs from the PBM goes down, the participants' contributions would go down by the same amount. But this gets precisely at the core of the problem with Plaintiffs' theory: Plaintiffs' contributions are used to cover *overall* Plan expenses, not specifically or exclusively their prescription drug benefits or ESI's administrative fees. It is not a one-to-one relationship. And the Plan documents clearly show that "participant contribution amounts may be affected by several factors having nothing to do with prescription drug benefits." ECF No. 57 at 20–21. As the Court explained before, "[t]here are simply too many variables in how Plan participants' contribution rates are calculated" to infer that Wells Fargo's payments to ESI for prescription drug payments or administrative fees were the but-for cause of any increases in Plaintiffs' required contributions. *Id.* at 22; *see Winsor*, 62 F.4th at 524–25 (holding plaintiffs failed to plead injury-in-fact because their allegation that the employer set contributions "based on overall premium costs" was not plausible given the employer's "broad discretion" to set employee

contribution rates, which were calculated based on "various factors and discussion" rather than "a specific formula or set of factors"); *see also Knudsen v. MetLife Grp., Inc.*, 117 F.4th 570, 574, 581–82 (3d Cir. 2024) (holding it was "speculative" that the employer's "alleged misappropriation of drug rebate money," which plan documents provided were to be applied to plan expenses, "resulted in Plaintiffs paying more for their health insurance or had any effect at all"); *Horvath v. Keystone Health Plan E., Inc.*, 333 F.3d 450, 457 (3d Cir. 2003) (concluding that whether plan savings would pass to plan participants was "too speculative to serve as the basis for a claim of individual loss").

Further, there is no plausible allegation in the amended complaint to suggest that this exercise of Wells Fargo's total discretion to set participant contribution rates violates the terms of the Plan. *See Gonzalez de Fuente*, 858 F. App'x at 433–34 (quoting *US Airways, Inc. v. McCutchen*, 569 U.S. 88, 101 (2013)) ("ERISA . . . requires fiduciaries to discharge their duties 'in accordance with the documents and instruments governing the plan' rather than any particular accounting formula."). The Court previously noted that it does not read *Thole II* "to hold, as a matter of law, that a plaintiff suing a fiduciary of an ERISA-governed defined-benefit health plan cannot ever establish standing on a theory of harm premised on excessive . . . costs." ECF No. 57 at 19. But that reading of *Thole II* is contingent upon there being some specific underlying misconduct—for example, "breaching the terms of the plan[]," *id.*—that can be plausibly connected to the purported harm. There are no allegations from which the Court can infer such misconduct occurred here, much less that it was the but-for cause of Plaintiffs' alleged injury. *See Knudsen*,

117 F.4th at 581–82; *cf. McCutchen*, 569 U.S. at 100 (explaining that ERISA protects "contractually defined benefits").

The addition of McKinley as a Plaintiff does not change the analysis. It is true that McKinley's status as a current Plan participant would make certain prospective relief available to her that would not be available to the Original Plaintiffs—assuming, of course, that she could demonstrate a cognizable injury. *See* ECF No. 85 at 21; ECF No. 57 at 26–27. To that point, Plaintiffs emphasize that because McKinley is a participant in the Plan through COBRA, she is required to pay "both the employer share and the employee share" of premium contributions, ECF No. 64 ¶ 18, which must "be based on total plan expenses," ECF No. 85 at 22 (first citing ECF No. 64 ¶ 258; and then citing 29 U.S.C. § 1164(2)). But that fact does not move the needle here given the discretion the Plan confers on Wells Fargo to set contribution amounts. What is of critical importance here, again, is that the Plan "vests Wells Fargo with 'sole discretion' to set participant contribution rates." ECF No. 57 at 20. And the Plan documents permit Wells Fargo to require *all* Plan participants—not just those who, like McKinley, are participants through COBRA—to pay contributions sufficient to cover *all* Plan expenses, with no requirement that Wells Fargo make any contributions. *See* ECF No. 31-2 at 22. If Wells Fargo exercised its discretion in this manner and chose to cease its own contributions, that would almost assuredly increase participant contributions, but it would not, by itself, constitute a violation of ERISA. *See Gonzalez de Fuente*, 858 F. App'x at 433–34; *Knudsen*, 117 F.4th at 582. Further, Plaintiffs do not dispute that McKinley's contributions were calculated based on estimated Plan expenses as required by COBRA. *See* 42 U.S.C. § 1164(2). Plaintiffs instead merely

23

speculate that a decrease in the Plan's prescription drug expenses or ESI's administrative fees necessarily would have resulted in lower contributions. This again overlooks that the Plan's overall expenses account for more than those specific line items and that participant contributions are "affected by several factors having nothing to do with prescription drug benefits." ECF No. 57 at 20–21. As with the others, McKinley cannot show "actual or imminent injury to the Plan itself" that causes injury to her interests in the Plan to establish standing. *Id.* at 26 (citation omitted). And there is no allegation that McKinley did not get all the benefits to which she was entitled. *See* ECF No. 64 ¶ 228; *see also Scott*, 540 F. Supp. 3d at 862 (finding ERISA plaintiffs had not demonstrated injury because they did "not allege that they have been denied any benefits to which they are entitled").

Finally, Plaintiffs' theory of redressability does not demonstrate that "it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000). As noted, Plaintiffs contend that Plan expenses necessarily would have been reduced and that they consequently would have been required to pay less in contributions if Wells Fargo had negotiated a better deal with ESI or retained a different PBM. *See* ECF No. 85 at 12–15. But as the Court already explained, Plaintiffs' argument "assumes that Wells Fargo would maintain the 75-25 employer-employee contribution ratio" even though "nothing in the Plan *requires* Wells Fargo to do so." ECF No. 57 at 23; *cf. Pendleton v. QuikTrip Corp.*, 567 F.3d 988, 993 (8th Cir. 2009) ("Whether an employee is entitled to benefits under ERISA is controlled by the plan documents and not the customs of a company."). Plaintiffs dismiss this reasoning as "legally irrelevant," ECF No. 85 at 29, but they do not "explain

24

how a court could place [Wells Fargo's or ESI's] ill-gotten profits directly into plaintiffs' pockets when plaintiffs have not alleged how a court could identify the discrete profits supposedly owed to them, given [Wells Fargo's] discretion in setting employee contribution amounts and the manner in which [Wells Fargo] exercised this discretion," *Winsor*, 62 F.4th at 526 (internal quotation marks omitted). Nor do Plaintiffs advance any persuasive argument that ERISA authorizes the Court to order Wells Fargo to lower participant contribution amounts prospectively when the Plan's terms give Wells Fargo the exclusive authority to set those amounts.[6] And even if the Court ordered Wells Fargo to remit a one-time payment to the Plan to remedy any purported past overcharges, nothing would prevent Wells Fargo from "offset[ting] its own contributions" going forward "while making no reduction to the contributions it require[s]" from Plaintiffs. *Id.* at 527; *see also Horvath*, 333 F.3d at 457.

For these reasons, the Court concludes that Plaintiffs' allegations relating to excessive participant contributions are too speculative and conjectural to confer standing.

### B.    Out-of-Pocket Costs

Plaintiffs' theory of standing as it pertains to out-of-pocket costs fails for essentially the same reasons, but it presents additional issues worth addressing. Plaintiffs' theory is rooted in their assertion that they were required to pay higher prices for certain prescriptions than pharmacies paid, on average, to acquire those drugs. *See* ECF No. 64

---

[6]    Although reformation is an available remedy in equity, it has traditionally been "used to prevent fraud." *Amara*, 563 U.S. at 440. Plaintiffs raise no allegations of fraud or that Wells Fargo (or ESI, for that matter) provided "false or misleading information" relating to the Plan. *Id.*

¶¶ 220, 222, 224, 226, 228.  While these allegedly excessive costs are more readily quantifiable, Plaintiffs' argument is, in effect, another way of asserting injury on the basis that Plaintiffs "might have received" better or different benefits than what they were promised under the Plan's terms, which is insufficient to confer standing.  *See Gonzalez de Fuente*, 858 F. App'x at 433–34; *cf. Burgio & Campofelice, Inc. v. N.Y. State Dep't of Lab.*, 107 F.3d 1000, 1007 (2d Cir. 1997) (quoting *Alessi v. Raybestos-Manhattan, Inc.*, 451 U.S. 504, 511 (1981)) ("Under ERISA, 'private parties, not the Government, control the level of benefits.'").  Again, Plaintiffs do not allege that they did not receive the benefits to which they were entitled under the Plan or that the Plan was ever at risk of insolvency or inability to provide participant benefits.  *See Gonzalez de Fuente*, 858 F. App'x at 434; *Scott*, 540 F. Supp. 3d at 862.  This is important because, as already discussed, the Plan is "closely analogous" to a defined-benefit plan in which "participants are entitled to their *contractually defined* benefits regardless of the value of the [Plan's] assets."  *Scott*, 540 F. Supp. 3d at 864 (emphasis added); *see Thole II*, 590 U.S. at 542–43.  There is no allegation that Plaintiffs' benefits were ever diminished or that they were required to pay more than they were promised or what is authorized by the Plan's terms.  *See Scott*, 540 F. Supp. 3d at 863; *see also Gonzalez de Fuente*, 858 F. App'x at 433–34; *cf. McCutchen*, 569 U.S. at 100 (explaining that ERISA protects "contractually defined benefits").

The cases on which Plaintiffs rely are distinguishable either because they involved defined-contribution plans, were later abandoned, or did not involve ERISA claims.  For instance, Plaintiffs rely on *Braden v. Wal-Mart Stores* to support their argument that the allegedly excessive prices they were required to pay for certain prescription drugs

constitute a cognizable injury. ECF No. 85 at 19. In that case, the Eighth Circuit held that the plaintiff, a participant with an individual investment account in his employer's defined-contribution 401(k) plan, had standing under ERISA to sue for breach of fiduciary duty because of his employer's alleged mismanagement of the plan, including allegations that the plan fiduciaries agreed to pay excessive fees to a third-party service provider and failed to wield the plan's "substantial bargaining power" to secure more favorable and cost-effective benefits. *See Braden*, 588 F.3d at 589–90, 592. The crucial distinction, however, is that the plaintiff in *Braden* alleged that his employer's mismanagement resulted in losses both to the plan itself and to the value of his specific, individual investment account—that is, one of his benefits under the plan. *See id.* Plaintiffs here do not allege that their *benefits* under the Plan were diminished; they allege only that they and the Plan should have paid less for those benefits. *See* ECF No. 64 ¶¶ 220, 222, 224, 226, 228. Even assuming as true that the Plan's assets diminished because of Wells Fargo's alleged mismanagement and overpayments to ESI, that would constitute an injury only to the Plan, not to Plaintiffs, because Plaintiffs "do not have any claim" to the Plan's assets. *Scott*, 540 F. Supp. 3d at 863; *see Jacobson*, 525 U.S. at 439–40 (explaining that a defined-benefit plan "consists of a general pool of assets" and that "no plan member has a claim to any particular asset that composes a part of the plan's general asset pool"). Instead, Plaintiffs' "only claim is to receive the benefits to which they are entitled" under the Plan, *Scott*, 540 F. Supp. 3d at 863, and Plaintiffs do not dispute that they received their benefits, *see* ECF No. 64 ¶¶ 219–28.

Plaintiffs also rely on *Lewandowski v. Johnson & Johnson* ("*Lewandowski I*"), No. 24-cv-671 (ZNQ) (RLS), 2025 WL 288230 (D.N.J. Jan. 24, 2025), where the court was confronted with nearly identical allegations. *See id.* at *1–2. The court in that case concluded that the plaintiff had "suffered an injury-in-fact" based on her assertion that she "pa[id] higher prices for drugs" under her employer's health plan, "causing her to pay more out-of-pocket." *Id.* at *5; *see* ECF No. 85 at 18. That court nevertheless dismissed the plaintiff's claim for lack of standing because it concluded her alleged injury was not redressable.[7] *Lewandowski I*, 2025 WL 288230, at *5. After granting the plaintiff leave to amend her complaint, however, that court later dismissed her claims again for lack of standing and adopted this Court's reasoning in the earlier dismissal order entered in this case, including as it relates to the remaining standing elements. *See Lewandowski v. Johnson & Johnson* ("*Lewandowski II*"), No. 24-cv-671 (ZNQ) (RLS), 2025 WL 3296009, at *4–7 (D.N.J. Nov. 26, 2025) ("This Court finds *Navarro* persuasive and applies that court's reasoning.").

Plaintiffs also cite *Blue Cross & Blue Shield of N.C. v. Rite Aid Corp.*, 519 F. Supp. 3d 522 (D. Minn. 2021), which held that the plaintiffs had alleged an injury in fact by pleading that they were "overcharged" for prescription drugs. *Id.* at 532; *see* ECF No. 85

---

[7] For context, the court in *Lewandowski I* found the plaintiff's injury was not redressable because she had "reached her prescription drug cap for each year she assert[ed]" in her complaint. 2025 WL 288230, at *5. As a result, the court concluded that even if the defendants "were to reimburse [her] for her out-of-pocket costs on a given drug—that is, the higher amount of money she spent as a result of Defendants' breaches— that money would be owed to her insurance carrier to reimburse it for its expenditures on *other* drugs that same year." *Id.*

at 18.  But that case is inapposite because it did not involve ERISA in any way; rather, it dealt with allegations by various insurance companies that a retail pharmacy company "fraudulently inflated" the prices for certain prescription drugs. *Blue Cross & Blue Shield*, 519 F. Supp. 3d at 532.  As a result, the insurance companies allegedly paid more for those drugs than the amount the insurance companies should have paid based on a formula the parties had contractually negotiated. *Id.*  Plaintiffs here raise no allegations of fraud or that Wells Fargo and ESI calculated the Plan's drug prices using a method that was not authorized or disclosed by the Plan.

To be sure, the price comparisons alleged in Plaintiffs' complaint are staggering. *See* ECF No. 64 ¶¶ 125–37, 140–43.  But it fundamentally cannot be the case that participants in a plan like the one at issue here are injured any time the contractually defined benefits to which they are entitled are available at lower cost to non-participants, absent any express promise by the plan fiduciary to provide those benefits at that lower cost or any specific allegations that the fiduciary's misconduct diminished those benefits or rendered the plan unable to provide them. *See Scott*, 540 F. Supp. 3d at 863–65; *Gonzalez de Fuente*, 858 F. App'x at 434.  That is, at bottom, the premise upon which Plaintiffs' allegations rest but "pleadings must be something more than an ingenious academic exercise in the conceivable" to meet the Article III standing threshold. *United States v. Students Challenging Regul. Agency Procs.*, 412 U.S. 669, 688 (1973); *see also Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557) ("Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" (internal quotation marks omitted)).

29

As a result, the Court concludes that Plaintiffs' allegations are insufficient to confer standing, and their amended complaint is dismissed.[8]  *See Lewandowski II*, 2025 WL 3296009, at *6–7; *Knudsen*, 117 F.4th at 582 (holding that pleadings rooted in speculation and conjecture "are not sufficient to support Article III standing").

## ORDER

Based on the foregoing, and on all the files, records, and proceedings in this matter,

**IT IS HEREBY ORDERED** that:

1.    Professor Amy B. Monahan's Motion for Leave to File a Brief of Amicus Curiae (ECF No. 86) is **GRANTED**;

2.    Wells Fargo's Motion to Dismiss the Amended Class Action Complaint (ECF No. 77) is **GRANTED**; and

3.    Plaintiffs' Amended Complaint (ECF No. 64) is **DISMISSED** for lack of jurisdiction.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: March 3, 2026                      *s/Laura M. Provinzino*
                                          Laura M. Provinzino
                                          United States District Judge

---

[8]    Because the Court dismisses Plaintiffs' amended complaint for lack of standing, the Court need not address Wells Fargo's alternative basis for dismissal under Rule 12(b)(6). *See Brownback*, 592 U.S. at 218 (quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 101–02 (1998)) ("[A] court cannot issue a ruling on the merits 'when it has no jurisdiction' because 'to do so is, by very definition, for a court to act ultra vires.").